*Adnan Syed v. State of Maryland*, No. 2519, September Term 2013, and *State of Maryland v. Adnan Syed*, No. 1396, September Term 2016

## CRIMINAL LAW – POST-CONVICTION – INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL – BACKGROUND

At trial, the State adduced evidence that Adnan Syed, appellant/cross-appellee, and Hae Min Lee ("Hae") were students at Woodlawn High School, who had a romantic relationship but ended it sometime before January 1999. Thereafter, on January 13, 1999, Syed asked Hae for a ride after school, and Hae agreed. During lunch that day, Syed gave his friend Jay Wilds his car and cell phone, and instructed Wilds that he would call him when he was ready to be picked up. Shortly after school ended at 2:15 p.m., Syed drove Hae's car to the Best Buy parking lot off of Security Boulevard, where Syed, according to the State, strangled Hae sometime between 2:15 and 2:35 p.m.

At 2:36 p.m., Syed called Wilds from a payphone in the Best Buy parking lot and instructed Wilds to pick him up at the Best Buy. When Wilds arrived, Syed showed Wilds Hae's lifeless body in the trunk of her car. Syed instructed Wilds to follow him in his car as Syed drove Hae's car and parked it at the Interstate 70 Park and Ride.

Later that evening, Syed and Wilds picked up Hae's car and drove to Leakin Park, where the two dug a shallow grave. According to the State, Syed's cell phone received two calls that placed Syed in Leakin Park at the time of the burial. After burying Hae's body, Syed and Wilds abandoned Hae's car behind an apartment complex. When Hae's car was later recovered, police found a map book with a map of Leakin Park torn out in the backseat, with Syed's partial palm print on the back cover of the map book.

A jury convicted Syed of first degree murder, robbery, kidnapping, and false imprisonment, and Syed was sentenced to a total term of life imprisonment plus thirty years. Syed's convictions were subsequently upheld on direct appeal.

In 2010, Syed filed a petition for post-conviction relief raising nine claims of ineffective assistance of trial counsel, sentencing counsel, and appellate counsel. After a hearing, the post-conviction court denied Syed post-conviction relief on January 6, 2014. Syed filed a timely application for leave to appeal to this Court, requesting review of his ineffective assistance of counsel claims for trial counsel's failure to contact a potential alibi witness, Asia McClain, and to pursue a plea deal. While his application was pending, Syed filed a request that this Court remand the case for additional fact-finding in light of a January 13, 2015 affidavit from McClain.

After granting leave to appeal on February 6, 2015, this Court issued an order on May 18, 2015, staying Syed's appeal and granting his request to remand the case for further proceedings. Pursuant to our order's instructions, on June 30, 2015, Syed filed a timely

motion to reopen the post-conviction proceeding based upon McClain's affidavit. Thereafter, Syed filed a Supplement on August 24, 2015, requesting the court to reopen the post-conviction proceeding to consider new claims of ineffective assistance of trial counsel and a *Brady* violation, both concerning the reliability of the cell tower location evidence. After granting Syed's request and conducting a hearing, the post-conviction court held, among other things, that Syed's trial counsel was deficient for failing to investigate McClain as a potential alibi witness, but that such deficiency did not prejudice Syed. The court, however, granted Syed a new trial on the basis that trial counsel was ineffective for failing to properly challenge the reliability of the cell tower location evidence.

After granting the State's application for leave to appeal and Syed's conditional application for leave to cross-appeal, the Court of Special Appeals affirmed the judgment of the circuit court, but on the ground that Syed's Sixth Amendment right to effective assistance of counsel was violated by trial counsel's failure to investigate a potential alibi witness.

**CRIMINAL LAW – POST-CONVICTION – SCOPE OF REMAND ORDER – ABUSE OF DISCRETION**

The State's first issue was whether the post-conviction court abused its discretion by exceeding the scope of the Court's May 18, 2015 remand order.

The Court's May 18, 2015 remand order provided that "[i]n the event that the circuit court grants a request to re-open the post-conviction proceedings, the circuit court may, in its discretion, conduct any further proceedings it deems appropriate." The Court held that, because the post-conviction court granted Syed's motion to reopen as to his claim of ineffective assistance of counsel for failure to investigate a potential alibi witness, it was within the court's discretion to conduct any further proceedings it deemed necessary. Further proceedings, according to the Court, included Syed's Supplement, because it was, in effect, a separate motion to reopen pursuant to Maryland Code (2001, 2008 Repl. Vol.), § 7-104 of the Criminal Procedure Article ("CP"), and because it would be in the interests of judicial economy for the post-conviction court to hear all of Syed's claims under CP § 7-104 in one proceeding.

**CRIMINAL LAW – POST-CONVICTION – REOPENING OF POST-CONVICTION PROCEEDING – ABUSE OF DISCRETION**

The State's second issue was whether the post-conviction court abused its discretion by reopening Syed's post-conviction proceeding to consider his new claim, set forth in the Supplement, of ineffective assistance of counsel for the failure of trial counsel to properly challenge the reliability of the cell tower location evidence.

CP § 7-104 provides that a court "may reopen a post[-]conviction proceeding that was previously concluded if the court determines that the action is in the interests of justice." In *Gray v. State*, 338 Md. 366, 382 n.7 (2005), the Court of Appeals gave several examples of when the "interests of justice" would support a reopening of a post-conviction proceeding. The Court of Special Appeals concluded that the *Gray* Court did not limit the broad discretion that the General Assembly provided pursuant to CP § 7-104 and thus, reviewed the post-conviction court's decision to determine whether it was "violative of fact and logic." *Id.* at 384.

In Syed's case, if the post-conviction court found that Syed's new claim was not waived and he adduced sufficient evidence to demonstrate ineffective assistance of counsel on that claim, Syed would be entitled to post-conviction relief. Therefore, the Court held that it was not "violative of fact and logic" for the post-conviction court to conclude that it was in the "interests of justice" to reopen Syed's post-conviction proceeding and consider his new claim. *See id.* at 382 n.7, 384.

**CRIMINAL LAW – POST-CONVICTION – INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL – WAIVER – NATURE OF RIGHT INVOLVED – NON-FUNDAMENTAL – GENERAL WAIVER PRINCIPLES APPLY**

The State's third issue was whether Syed's new claim of ineffective assistance of counsel for trial counsel's failure to properly challenge the reliability of the cell tower location evidence was waived, because such claim was not raised at Syed's first post-conviction proceeding.

The Court recognized that the Court of Appeals in *Curtis v. State*, 284 Md. 132 (1978), created a dual framework for analyzing whether a petitioner's claim has been waived: A court must examine whether the "nature of the right involved" is recognized by the Supreme Court as requiring an intelligent and knowing waiver and thereby a fundamental right governed by CP § 7-106(b), *see id.* at 137-38, or, whether the "nature of the right involved" is governed by "pertinent case law, statutes, or rules[,]" and thereby a non-fundamental right governed by the "general legal principles" of waiver. *See State v. Torres*, 86 Md. App. 560, 568 (1991). The Court framed the question in the instant appeal as follows: Where the *issue* of ineffective assistance of trial counsel has been raised and decided in a previous post-conviction proceeding, does a petitioner, absent a knowing and intelligent waiver, have the right to raise such *issue again but on different grounds* in a reopening of that proceeding?

In *Curtis*, the Court of Appeals determined that the issue of ineffective assistance of counsel was premised on a fundamental constitutional right, and thus "a criminal defendant cannot be precluded from having this issue considered because of his mere failure to raise the issue previously." 284 Md. at 150. There, the issue of ineffective assistance of trial counsel was not raised in Curtis's first petition for post-conviction relief. *Id.* at 134-35.

By contrast, Syed raised the issue of ineffective assistance of trial counsel at his first post-conviction hearing. The cell tower ground, however, was not one of the seven grounds supporting these ineffective assistance of trial counsel claims. The Court, therefore, concluded that the question of waiver regarding the failure to raise the issue of ineffective assistance of trial counsel was not present in the instant case.

In *Curtis*, the Court of Appeals identified non-fundamental rights as those that "fall within the category of tactical decisions by counsel or involve procedural defaults." *Id.* at 147. The Court of Special Appeals then held that the cell tower ground was based on a non-fundamental right, because the selection of a particular ground to support a claim of ineffective assistance of counsel is a quintessential tactical decision made by post-conviction counsel. Thus, under the general principles of waiver governing non-fundamental rights, the failure to assert the cell tower ground at Syed's first post-conviction hearing would constitute a waiver of a claim based on that ground, unless it was not possible to have raised it at that time. Because Syed's post-conviction counsel could have raised the cell tower ground at the first post-conviction proceeding, the Court held that Syed waived this claim of ineffective assistance of trial counsel.

**CRIMINAL LAW – POST-CONVICTION – INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL – DUTY TO SEEK PLEA OFFER – FAILURE TO ESTABLISH STATE WOULD HAVE OFFERED A PLEA**

Syed's first claim was that his right to effective assistance of counsel was violated when trial counsel failed to pursue a plea deal with the State.

The Court explained that a defendant has a right to effective assistance of counsel during "the plea-bargaining process[,]" but a defendant does not have a "right to be offered a plea. . . ." *Lafler v. Cooper*, 566 U.S. 156, 162, 168 (2012). The Court held that, assuming that defense counsel has the duty to pursue a plea offer when requested, the failure to pursue a plea offer cannot prejudice a defendant without evidence demonstrating that, if defense counsel had requested a plea offer, the State would have made a plea offer. *Cf. Delatorre v. United States*, 847 F.3d 837, 846 (7th Cir. 2017).

In Syed's case, the Court determined that the post-conviction court was not clearly erroneous when it found that Syed had failed to adduce evidence demonstrating that the prosecutor was prepared to make a plea offer if Syed's trial counsel had requested one. Moreover, the Court determined that there was sufficient evidence to support the post-conviction court's factual finding that the Baltimore City State's Attorney's Office did not have a policy of always offering a plea deal. Accordingly, the Court affirmed the post-conviction court's ruling that Syed failed to establish an ineffective assistance of counsel claim based on trial counsel's failure to pursue a plea offer.

**CRIMINAL LAW – POST-CONVICTION – INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL – DUTY TO INVESTIGATE A POTENTIAL ALIBI WITNESS – DEFICIENT PERFORMANCE**

**CRIMINAL LAW – POST-CONVICTION – INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL – DUTY TO INVESTIGATE A POTENTIAL ALIBI WITNESS – PREJUDICE**

Syed's second claim was that his right to effective assistance of counsel was violated when trial counsel failed to investigate McClain as a potential alibi witness.

The Court stated that the first issue was whether trial counsel's failure to investigate McClain as a potential alibi witness constituted deficient performance under *Strickland v. Washington*, 466 U.S. 668 (1984). The Court's research revealed no controlling Maryland case on such issue, and therefore, the Court proceeded to analyze cases outside of Maryland. The Court held that, once a defendant identifies potential alibi witnesses, defense counsel has the duty "to make some effort to contact them to ascertain whether their testimony would aid the defense." *Grooms v. Solem*, 923 F.2d 88, 90 (8th Cir. 1991). Such identification normally includes names and addresses of potential alibi witnesses, but need not if sufficient information is provided or acquired to enable defense counsel to contact the witnesses. The identification also includes sufficient information to suggest that the witness's testimony could provide the defendant with an alibi.

The Court held that Syed's trial counsel had the duty to make an effort to contact McClain. The Court determined that this duty arose when Syed told trial counsel about McClain, gave trial counsel McClain's contact information, and gave trial counsel McClain's affidavits, which demonstrated that McClain's testimony had the potential to provide Syed with an alibi. The Court then ruled that trial counsel's failure to attempt to contact McClain was manifestly unreasonable when the State claimed that Syed murdered Hae between 2:15 p.m. and 2:35 p.m. on January 13, 1999, and trial counsel was aware that McClain saw Syed in the library from "2:15 – 3:15" that day. Accordingly, the Court held that trial counsel's failure to make any effort to contact McClain as an alibi witness fell below the objective standard of a reasonably competent attorney acting under prevailing norms, taking into consideration all of the circumstances existing at the time of counsel's conduct with a strong presumption of reasonable professional assistance.

As to the prejudice prong of *Strickland*, the Court determined that it had to analyze the impact McClain's testimony may have had in light of "the totality of the evidence before the judge or jury." 466 U.S. at 695. Hence, the Court determined that the impact of McClain's testimony must be analyzed in light of the State's theory of the case: Syed murdered Hae in the Best Buy parking lot between 2:15 p.m. and 2:35 p.m. on January 13, 1999.

The Court acknowledged that the State presented a strong circumstantial case against Syed, which was largely based on the testimony of Wilds, Syed's actions after the murder, and Syed's cell phone records. The glaring weakness, however, was the State's lack of any direct evidence placing Syed and Hae in the Best Buy parking lot on January 13, 1999, between 2:15 p.m. and 2:35 p.m. The Court reasoned that McClain's testimony would have directly contradicted the State's theory of the case by placing Syed at the Woodlawn Public Library at the exact time the State theorized that Syed murdered Hae; a critical element the State had to prove to convict Syed. When considering McClain's testimony in light of all of the other evidence the State presented to the jury, the Court held that, if McClain's testimony had been presented to the jury, it would have "alter[ed] the entire evidentiary picture." *Id.* at 696. The Court, therefore, held that "the jury was deprived of the [opportunity] to hear testimony that [would or] could have supplied [ ] 'reasonable doubt'" in at least one juror's mind leading to a different outcome: a hung jury. *Avery v. Prelesnik*, 548 F.3d 434, 439 (6th Cir. 2008). Under the circumstances of the case *sub judice*, the Court concluded that there was a reasonable probability that, but for trial counsel's deficient performance, the result of Syed's trial would have been different.

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND
———————————————————
CONSOLIDATED CASES

No. 2519
September Term, 2013

ADNAN SYED
v.
STATE OF MARYLAND
———————————————————

No. 1396
September Term, 2016

STATE OF MARYLAND
v.
ADNAN SYED
———————————————————

Woodward, C.J.,
Wright,
Graeff,

JJ.*
———————————————————

Opinion by Woodward, C.J.
Dissenting Opinion by Graeff, J.
———————————————————

Filed: March 29, 2018


*Judge Matthew J. Fader did not participate in
the Court's decision to designate this opinion for
publication pursuant to Md. Rule 8-605.1.

**TABLE OF CONTENTS**

I. BACKGROUND.................................................................................................. 5

    A. Trial …………………………………………………………………..…..  5

        1. Day of the Murder ……………………………..…..........................  6

            a.  Morning of January 13, 1999 ……..……………….................  6

            b.  Midday …………. …………………………………………..  6

            c.  Afternoon ……………………………………………………..  7

            d.  Evening …………………………………………………….  10

            e.  Nighttime ……………………………………………………. 12

        2. Forensic Evidence.................................................................... 14

        3. Verdict and Appeal.................................................................  16

    B. Post-Conviction Proceedings........................................................ 16

**THE STATE'S PROCEDURAL QUESTIONS** …...................................................... 21

**I.  The Scope of this Court's May 18, 2015 Remand Order** ………………………  21

    A.  Background …………………………………………………………… 21

    B.  Contentions …………………………………………………………… 24

    C.  Analysis …………………………………………………………………  25

**II. The Reopening of Syed's Post-Conviction Proceeding** ........................................ 27

    A.  Background …………..……………………………………………… 27

    B.  Contentions …………..…………………………………………….. 28

    C.  Analysis ………………………………………………………………… 29

**III. Waiver of Syed's Claim of Ineffective Assistance of Counsel Pertaining to the Cell**

    **Tower Location Evidence**........................................................................... 35

    A.  Legal Background....................................................................  35

    B.  Reopened Post-Conviction Proceeding...................................... 41

    C.  Contentions on Appeal ……………………………………………… 42

    D.  Analysis ……………….………………… …………………….....  43

**SYED'S QUESTIONS ON HIS CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL**................................................................................................. 54

 Standard of Review ……………………………………….......................... 54

**I. Trial Counsel's Failure to Pursue a Plea Deal with the State** …………………… 55

 A. Background ……………………………………………………………. 55

 B. Memorandum Opinion I …………………………………………….… 58

 C. Analysis ……………………………………………………………… 59

**II. Trial Counsel's Failure to Investigate McClain as a Potential Alibi Witness** …. 61

 A. Background ……………………………………………………….. 61

  1. First Hearing……………………………………………….… 61

  2. First Appeal ……………………………………………...… 64

  3. Second Hearing …………………………………………… 65

  4. Memorandum Opinion II …………………………………….. 73

 B. Deficient Performance …………………………………………. 74

  1. Contentions ………………………………………………… 74

  2. Relevant Case Law ………………………………………………76

  3. Analysis ……………………………………………………… 85

 C. Prejudice ……………………………………………………… 94

  1. Contentions ………………………………………………… 95

  2. Analysis ……………………………………………………. 96

 D. Conclusion ……………………………………………………104

Hae Min Lee ("Hae")[1] was last seen on the afternoon of January 13, 1999, at Woodlawn High School in Baltimore County, Maryland. Less than a month later, on February 9, 1999, Hae's body was discovered in a shallow grave in Leakin Park located in Baltimore City, Maryland. Through investigation, Baltimore City authorities came to believe that appellant/cross-appellee, Adnan Syed, was responsible for Hae's death and charged Syed with first degree murder and related crimes.

On February 25, 2000, a jury in the Circuit Court for Baltimore City returned verdicts of guilty against Syed for first degree murder, kidnapping, robbery, and false imprisonment. The court subsequently sentenced Syed to life imprisonment for first degree murder, thirty years for kidnapping (to run consecutive to the life sentence), and ten years for robbery (to run consecutive to the life sentence but concurrent to the thirty years for kidnapping). The conviction for false imprisonment was merged for sentencing purposes. On direct appeal, this Court affirmed the convictions in an unreported opinion, and in June 2003, the Court of Appeals denied Syed's petition for writ of certiorari. *Syed v. State*, No. 923, Sept. Term 2000 (filed March 19, 2003), *cert. denied*, 376 Md. 52 (2003).

The unusual procedural posture of this case began ten years after Syed's convictions, when he filed a petition for post-conviction relief on May 28, 2010. After a two-day hearing, the circuit court denied all nine of Syed's claims for post-conviction relief in January 2014.

---

[1] Because the brother of Hae Min Lee is mentioned in the Background Section, *infra*, we will refer to Hae and her brother by their first names for the sake of clarity. We intend no disrespect in doing so.

Syed filed a timely application for leave to appeal to this Court, which we granted on February 6, 2015. After considering Syed's request to remand his appeal because of a newly obtained affidavit from Asia McClain, a potential alibi witness, we remanded the case to the circuit court by order dated May 18, 2015, for that court to decide whether to reopen Syed's post-conviction proceeding. We stayed the remaining question raised in Syed's appeal.

On remand, the circuit court reopened Syed's post-conviction proceeding and conducted a five-day evidentiary hearing in February 2016. Ultimately, the circuit court granted Syed a new trial on the grounds of ineffective assistance of trial counsel[2] for counsel's failure to properly challenge the reliability of the evidence relating to the location of Syed's cell phone at the time that incoming calls were received on the night of the murder.

The State filed a timely application for leave to appeal on August 1, 2016, and Syed filed a conditional cross-application for leave to appeal. We granted both applications, lifted the stay imposed pertaining to Syed's original appeal, and consolidated the appeals. Accordingly, we will consider the questions and issues raised in both appeals, which we have rephrased and organized into the following questions:[3]

---

[2] Syed's trial counsel was M. Cristina Gutierrez, Esq. Unfortunately, Gutierrez passed away prior to the filing of Syed's petition for post-conviction relief. Unless otherwise stated, "trial counsel" or "Syed's trial counsel" will refer to Gutierrez.

[3] In their briefs, the parties presented the following questions and issues:

Syed's Appeal Questions – No. 2519-2013:

2

1. Did the post-conviction court abuse its discretion by exceeding the scope of this Court's May 18, 2015 remand order?

_____

1. Was [Syed's] trial counsel constitutionally ineffective when she failed to investigate a potential alibi witness, then told [Syed] that "nothing came of" the alibi witness?

2. Was [Syed's] trial counsel constitutionally ineffective when [Syed] asked her to seek a plea offer, but counsel failed to do so, and counsel falsely reported back to [Syed] that the State refused to tender an offer?

The State's Appeal Issues – No. 1396-2016:

1. Whether the post-conviction court abused its discretion in reopening the post-conviction proceeding to consider Syed's claim that his trial counsel's failure to challenge the reliability of the cell phone location data evidence, based on the cell phone provider's "disclaimer" about the unreliability of incoming calls for location purposes violated Syed's Sixth Amendment right to the effective assistance of counsel.

2. Whether the post-conviction court erred in finding that Syed had not waived his claim regarding trial counsel's failure to challenge the reliability of the cell phone location data for incoming calls by failing to raise it earlier.

3. Whether the post-conviction court erred in finding that Syed's trial counsel's failure to challenge the State's cell phone location data evidence, based on the cell phone provider's "disclaimer," violated Syed's Sixth Amendment right to effective assistance of counsel.

Syed's Cross-Appeal Issue – No. 1396-2016:

1. Whether the post-conviction court erred in concluding that – despite the finding Syed's trial counsel rendered ineffective assistance in failing to investigate a potential alibi witness – counsel's deficient representation did not violate Syed's Sixth Amendment right because Syed was purportedly not "prejudiced."

3

2. Did the post-conviction court abuse its discretion when it reopened Syed's post-conviction proceeding to consider the claim of ineffective assistance of counsel for trial counsel's failure to properly challenge the reliability of the cell tower location evidence?

3. Did the post-conviction court err by determining that Syed did not waive his ineffective assistance of counsel claim pertaining to trial counsel's failure to properly challenge the reliability of the cell tower location evidence?[4]

Syed's Questions on His Claims of Ineffective Assistance of Counsel:

1. Did the post-conviction court err by holding that Syed's right to effective assistance of counsel was not violated when trial counsel failed to pursue a plea deal with the State?

2. Did the post-conviction court err by holding that Syed's right to effective assistance of counsel was not violated when trial counsel failed to investigate McClain as a potential alibi witness?

For the reasons set forth below, we affirm the judgment of the circuit court, but do so by concluding that Syed's Sixth Amendment right to effective assistance of counsel was violated by trial counsel's failure to investigate McClain as a potential alibi witness. Accordingly, we remand the case for a new trial.

---

[4] Because, as discussed *infra*, we conclude that Syed waived his claim of ineffective assistance of counsel regarding trial counsel's failure to properly challenge the reliability of the cell tower location evidence, we need not address the State's challenge to the post-conviction court's ruling in favor of Syed on that claim.

## BACKGROUND

### *A. Trial*

At trial,[5] the State's theory was one of a scorned lover. The State described Syed as resentful when Hae ended her and Syed's on-again, off-again relationship in November of 1998. According to the State, this resentfulness only grew after Syed discovered that at the beginning of January 1999, Hae had begun dating Donald Cliendinst ("Don"). To make matters worse, Hae's new relationship quickly became common knowledge among students and teachers at Woodlawn High School, where both Hae and Syed were enrolled as students in the Magnet program for gifted students.

The State theorized that sometime before the school day ended on January 13, 1999, Syed asked Hae for a ride so that he could pick up his car at the repair shop, knowing that she would say yes. During that ride, Syed, a regular operator of Hae's Nissan Sentra, drove them to the Best Buy parking lot situated off Security Boulevard in Baltimore County, a location frequented by them during their courtship. Central to the State's theory was that Syed murdered Hae between 2:15 p.m. and 2:35 p.m. in the Best Buy parking lot by strangling her and then placing her body in the trunk of her car. The State adduced evidence showing that later that night, Syed and Jay Wilds (the State's key witness) buried Hae's body in Leakin Park.

A summary of the evidence adduced at trial in a light most favorable to the State is set forth below.

---

[5] Syed's first trial ended in a mistrial on December 15, 1999. The second trial began on January 27, 2000, and concluded on February 25, 2000.

1. The Day of the Murder

a. Morning of January 13, 1999

At 10:45 a.m. on January 13, 1999, Syed used his newly purchased cell phone[6] to call Wilds's home phone. Syed asked Wilds if he had any plans that day, to which Wilds replied that he needed to go to the mall to purchase a birthday present for his girlfriend. Syed stated that he would give Wilds "a lift." Later that morning, Syed arrived at Wilds's house in a tan four-door Honda Accord, and the two drove to Security Square Mall.

After shopping, Syed told Wilds that he had to get back to school, because his lunch period was ending. During the drive to school, Syed told Wilds "how [Hae] made him mad," and declared, "I'm going to kill that bitch . . . ." Wilds dropped Syed off at school, and Syed permitted Wilds to drive his car and keep Syed's cell phone. Syed said that he would give Wilds a call when he was ready to be picked up.

b. Midday

As Wilds was leaving school, he used Syed's phone to call his close friend, Jennifer Pusateri, to see if he could come over to her house. Syed's cell phone records indicate that a call was placed to Pusateri's phone at 12:07 p.m. Pusateri's brother answered the phone and told Wilds to come over, even though Pusateri was still at work. Pusateri was supposed to leave work around noon but was delayed that day. While at Pusateri's house, Wilds received a call from Syed, who stated that he was not ready to be picked up yet but that he needed to be picked up "at like 3:45 or something like that[.]"

---

[6] Syed purchased and activated a new cell phone two days before Hae's murder.

When Pusateri got home from work, she observed that Wilds had a cell phone with him and had driven a tan four-door car to her house. Pusateri also noted that Wilds "wasn't acting like [he] normally acts[,]" and "[h]e wasn't as relaxed as he normally is[.]"

### c. Afternoon

Aisha Pittman, Hae's best friend, said that she saw Hae "[r]ight at the end of the school day at 2:15 [p.m.] in Psychology class." When Pittman saw Hae, Hae was talking to Syed. Rebecca Walker, a student and friend of Hae and Syed, said that she too "saw [Hae for] a few seconds after class let out" at 2:15 p.m. that day. Walker said that she "saw [Hae] heading towards the door [that would have led to where her car was parked] but [ ] did not see [Hae] actually leave." Hae told Walker that "she had to be somewhere after school." But Hae did not say where she was going.

Inez Butler Hendricks, a teacher and athletic trainer at Woodlawn High School, saw Hae at the concession stand in the gym lobby at "about 2:15, 2:20 [p.m]." She recalled that Hae was wearing "[a] little short black skirt, light colored blouse, [ ] black heels[, and] . . . some [clear] nylon stockings [on her legs]" that day.[7]

Young Lee, ("Young"), Hae's brother, stated that Hae was supposed to pick up their cousin from elementary school around 3:00 p.m. that day. Young discovered that Hae had not picked up the cousin when the elementary school called to notify him that the cousin needed to be picked up.

Meanwhile, Wilds received a phone call from Syed. According to Wilds, "[Syed]

---

[7] These were the clothes found on Hae's body.

asked [him] to come and get him from Best Buy." Syed's cell phone records indicate an incoming call was received at 2:36 p.m.[8]

Upon receiving the call from Syed, Wilds stated that he went straight to Best Buy where he saw Syed standing next to a pay phone wearing a pair of red gloves. Syed instructed Wilds to drive to the side of the building and park the car next to a gray Nissan Sentra, which was later identified as Hae's car. Wilds got out of the car and walked towards Syed. Syed asked Wilds if he was "ready for this." According to Wilds, Syed "opened the trunk and [Hae] was dead in the trunk."

Syed then closed the trunk and instructed Wilds to follow him as he drove Hae's car. In a self-described state of bewilderment, Wilds followed Syed to the Interstate 70 Park and Ride where Syed parked Hae's car. Syed got into the driver's seat of his car and drove away with Wilds as a passenger. Syed asked Wilds if he wanted to go buy some marijuana, to which Wilds agreed.

On their way to the house of Patrick Furlow, Wilds's friend and marijuana dealer, Wilds made a call to Pusateri to see if she knew if Furlow was home; Pusateri replied that she did not. Syed's cell phone records indicate that a call was made to Pusateri's phone at 3:21 p.m.

During their drive to Furlow's house, Syed also made a call to Nisha Tanna, a friend of his who lived in Silver Spring. Syed asked Wilds if he wanted to talk to Tanna and

---

[8] Syed's phone records set forth the time, duration, and number dialed of each outgoing call. For incoming calls, however, the records showed the time and duration of each call, but not the number of the incoming call, listing it simply as "incoming call."

passed the cell phone to Wilds.  Not feeling like talking, Wilds said, "hello, my name is Jay" and passed the phone back to Syed.  According to Tanna, Syed asked her how she was doing and then "put his friend Jay [Wilds] on the line, and he basically asked the same question."  Syed's cell phone records indicate that a call was made to Tanna's phone at 3:32 p.m.

Wilds called Furlow at 3:59 p.m. and learned that he was not home.  At this point, Syed and Wilds changed course and drove to Forest Park to purchase marijuana.  Wilds stated that he called Pusateri to see if she knew if Kristina Vinson,[9] a mutual friend of Pusateri and Wilds, was home.   Syed's cell phone records indicate that a call was made to Pusateri's phone at 4:12 p.m.

Syed told Wilds that he wanted to go to track practice at Woodlawn High School, because "he needed to be seen."[10]  During the ride to Woodlawn High School, Syed expressed that "it kind of hurt him but not really, and when someone treats him like that, they deserve to die."  Syed asked: "How can you treat somebody like that, that you are

---

[9] "Vinson" is occasionally spelled as "Vincent" throughout the record and in this Court's unreported opinion in the direct appeal.  *Syed v. State*, No. 923, Sept. Term 2000, slip op. at 4-5 (filed Mar. 19, 2003), *cert. denied*, 376 Md. 52 (2003). Upon our review of the record, we believe that "Vinson" is the correct spelling and will use that spelling to reference her in this opinion.

[10] Hendricks stated that Syed was on the track team at Woodlawn High School.  She testified that she would see Syed go to track practice, because Syed would come over and talk to her or would purchase things from the concession stand located in the gym lobby.  Track practice began at 3:00 p.m., and the athletes had to be at practice by at least 3:30 p.m.  Because no attendance was taken at track practice, it is unclear whether Syed attended practice on January 13, 1999, and if so, when he arrived for practice.

9

supposed to love?"   Wilds stated that Syed spoke about the murder and confessed that "he thought [Hae] was trying to say something to him like apologize or say she was sorry, and that she had kicked off the turn signal in the car, and he was worried about her scratching him on the face or something like that . . . ."[11]   When they arrived at Woodlawn High School, Syed told Wilds, "mother-fuckers think they are hard, I killed somebody with my bare hands."

Wilds then drove to Vinson's apartment to smoke marijuana and debate with himself about what to do.   Wilds received a call from Syed on the cell phone half an hour later saying that he was at school ready to be picked up, and Wilds left Vinson's apartment to retrieve Syed.

### d. Evening

Wilds stated that, after he picked up Syed, they both went to Vinson's apartment. Vinson stated that Wilds and Syed arrived at her apartment around 6:00 p.m.   According to Vinson, it was memorable, because "they were acting real shady when they got there." While they were at Vinson's apartment, Wilds recalled that Syed received three phone calls.  The first call was from Hae's parents asking if Syed knew where Hae was, to which he stated, "I haven't seen Hae, I don't know where she is, try her new boyfriend."

Wilds said that the second call occurred when "Hae's cousin or someone had called back[,] but it was the wrong number.  They thought it was the new boyfriend's number[,]

---

[11] Kevin Forrester, former homicide Sergeant for the Baltimore City Police Department, stated that on February 28, 1999, Wilds led him, Detective Gregory MacGillivary, and another detective to Hae's abandoned car.  According to Sergeant Forrester, the windshield wiper control was broken.

and it was his cellphone number or something like that." Young testified that "[he] looked around the house to look for [Hae's] friends' phone numbers and such," and discovered a phone number listed in Hae's diary as "443 253-9023."[12] Young called that phone number believing that it was the number of Hae's new boyfriend, Don, because the sheet of paper had "Don" written all over it. After talking for a while, Young realized that he was speaking to Syed, because he recognized Syed's voice. Young asked Syed "if he knew where [Hae] was, or where she could be." According to Young, Syed did not say whether he knew where Hae was.

The third phone call, according to Wilds, was "from a police officer who was asking about Hae." Officer Scott Adcock testified that he called Syed between 6:00 p.m. and 6:30 p.m. and spoke to him for "no more than three to four minutes." Syed responded to the police officer stating, "I don't know where Hae is." Syed also "advised [him] that he did see her at school and that [Hae] was going to give him a ride home from school, but he got detained and felt that she probably got tired of waiting for him and left."

Vinson testified that after receiving the last phone call, Syed said, "they're going to come talk to me" and then "ran out of the apartment." According to Vinson, Wilds "jumped up and ran out of the apartment, too." Vinson looked out the window of her apartment and observed Syed and Wilds drive away. Syed's cell phone records indicate that three incoming calls were received by Syed's cell phone at 6:07 p.m., 6:09 p.m., and 6:24 p.m.

---

[12] This is Syed's cell phone number.

11

## e. Nighttime

Wilds recounted that after leaving Vinson's apartment, Syed drove them to Wilds's house. There, Syed told Wilds that he needed his help getting rid of Hae's body, stating that "he knew what [Wilds] did," and "how [he] did it[.]" Fearing that this comment was a threat to report Wilds to the police for his drug dealing, Wilds agreed to help. Syed then "grabbed two shovels and put them in the back seat of his car. [Wilds] got in [Syed's] car with him." The two went back to the Interstate 70 Park and Ride where Syed got out of his car and got into Hae's parked car. Wilds followed Syed, and they drove around for forty-five minutes, ultimately arriving at Leakin Park.

Wilds stated that, because he was supposed to meet Pusateri at 7:00 p.m. that evening, he paged her to tell her that he was going to be late for their meeting. Syed's cell phone records indicate that a call was made to Pusateri's pager number at 7:00 p.m.

When Syed and Wilds arrived at Leakin Park, Syed parked Hae's car on a nearby hill, got into his car, and instructed Wilds to drive down the hill. They then went about 150 feet[13] into the woods and used the shovels to begin digging.

Wilds stated that, "while we were digging, [Pusateri] had called back, and [Syed] just told her [Wilds] was busy now and hung up the phone." Pusateri testified that at 7:00 p.m. she received "a page from [Wilds,] and it was a voice message." She was confused by Wilds's page and "didn't understand the message [about] where [Wilds] wanted [her]

---

[13] According to Technician Romano Thomas and Detective Gregory MacGillivary of the Baltimore City Police Department Homicide Unit, the burial site of Hae's body was 127 feet from the road.

to pick him up and what time. So [she] thought that it was necessary to call him." When she called the number on her caller I.D., "[s]omeone answered the phone and said [Wilds] will call me when he was ready for me to come and get him. He was busy." Syed's cell phone records indicate an incoming call was received at 7:09 p.m. Abraham Waranowitz, the State's expert in "cell phone network design and functioning[,]" testified that this call registered with cell site "L689B[,]" which was the strongest cell site for the location of Hae's body in Leakin Park.

After digging the grave, Wilds and Syed went back to Syed's car and put the shovels in the passenger side. Wilds then drove up the hill and parked behind Hae's car. According to Wilds, "[Syed] asked me for like five to ten minutes, he was like I don't think I'm going to be able to get her out by myself, I think I need your help." When Wilds responded that he was not going to help, Syed drove Hae's car down the hill.

Soon thereafter, Syed came back up the hill, parked Hae's car, got into his car, and told Wilds that they needed to bury Hae. Wilds returned with Syed to the woods where Hae was "laying kind of twisted face down." While they were burying the body, Syed received another phone call. Wilds did not know who the caller was, but noted that part of the conversation was not in English. Syed's cell phone records indicate an incoming call was received at 7:16 p.m. and registered with the same cell site, "L689B."

After Wilds and Syed finished burying Hae's body, Syed put the shovels in his car, and they drove up the hill to Hae's parked car. Syed drove away in Hae's car, with Wilds following behind driving Syed's car. Wilds recalled that the two

traveled towards the [C]ity on Route 40 and some of the back streets. We cut north and south, up and down roads. [Syed] pulled into like this alcove in the back of a whole lot of apartments. He parked [Hae's] car and came back to his vehicle.[14] At that time, I told him just flat out to take me home. He started driving me home.

Wilds further testified that Syed stopped his car at Westview Mall where he threw Hae's wallet, prom picture, and other possessions into a dumpster. Wilds then told Syed to pull behind Value City in Westview Mall where he threw the two shovels into a dumpster.[15]

Wilds stated that he paged Pusateri, and she testified that she received a page to pick Wilds up from Westview Mall around 8:00 p.m. Pusateri testified further that she picked Wilds up from the Value City in Westview Mall about ten to fifteen minutes after receiving his page. When Wilds got into her car, "the first thing he said was like put on your seat belt and let's go." When they left the parking lot, Wilds confessed that he had something to tell her that she could not tell anybody. Wilds then disclosed that Syed had strangled Hae in the Best Buy parking lot and that he had seen Hae's body in the trunk of a car.

## 2. Forensic Evidence

Although there were no eyewitnesses to the murder, there was forensic evidence that the State theorized linked Syed to the crimes. Margarita Korell, M.D., an assistant medical examiner at the Office of the Chief Medical Examiner in Baltimore City, was accepted as "an expert in forensic pathology" at trial. Dr. Korell testified that on February

[14] Hae's vehicle was found parked at this location.

[15] Detective MacGillivary testified that Hae's possessions, as well as the shovels, were never recovered.

14

10, 1999, she performed an autopsy on Hae. Dr. Korell opined that "the cause of death was strangulation" and that the manner of death was "[h]omicide." Dr. Korell noted that the hyoid bone in Hae's neck was broken, and the strap muscles of the neck showed hemorrhaging, which indicated that pressure had been applied to the skin on the neck. Dr. Korell stated that in her experience, "if [ ] pressure [is applied] on the neck for ten seconds or so," that could lead to unconsciousness and death within "a couple of minutes."

Romano Thomas, a crime lab technician with the Baltimore City Police Department Mobile Crime Lab Unit, testified that on February 28, 1999, he supervised the inspection of Hae's vehicle. Thomas stated that one of the items recovered from the car was a map of the Leakin Park area that was torn out of a map book. The torn out piece was found in the rear seat area of the vehicle.

Sharon Talmadge, an employee at the Baltimore City Police Department Latent Print Unit, testified that her duties were to "evaluate partial latent prints to determine if they [were] suitable for comparison." Talmadge would "then compare suitable partial latent prints to the prints of victims, suspects[,] or defendants. [She would also] process physical evidence to determine if there [were] any partial latent prints on that particular piece of evidence." Talmadge said that she was asked to determine if there were any partial latent prints on the map and map book that were recovered from Hae's vehicle. Talmadge made a comparison to Syed and Wilds, and testified that "[a] partial latent print developed on the back cover of the map [book] . . . was identified as an impression of the left palm of [ ] Syed."

15

### 3. Verdict and Appeal

After six weeks of trial, the jury spent only about three hours deliberating before finding Syed guilty on February 25, 2000, of the charges of first degree murder, robbery, kidnapping, and false imprisonment. Syed was sentenced on June 6, 2000, to a total term of life imprisonment plus thirty years.

On direct appeal, Syed did not challenge the sufficiency of the State's evidence pertaining to any of his convictions. *See Syed v. State*, No. 923, Sept. Term 2000, slip op. at 1 (filed March 19, 2003), *cert. denied*, 376 Md. 52 (2003). Instead, he raised numerous evidentiary issues and alleged violations of *Brady v. Maryland*, 373 U.S. 83 (1963). *Id.* at 1-2. In an unreported opinion, filed on March 19, 2003, this Court found no merit to Syed's contentions and affirmed all of his convictions. *Id.* at 57. The Court of Appeals denied Syed's petition for writ of certiorari on June 20, 2003.

### B. Post-Conviction Proceedings

On May 28, 2010, Syed filed a petition for post-conviction relief, and later supplemented his petition on June 27, 2010. Syed raised nine claims of ineffective assistance of counsel concerning trial counsel, sentencing counsel, and appellate counsel, which the post-conviction court summarized as follows:

> I. Trial counsel failed to establish a timeline that would have disproved the State's theory and shown that [Syed] could not have killed [Hae] in the manner described by [the] State[']s witness Jay Wilds[;]
>
> II. Trial counsel failed to call or investigate an alibi witness, Asia McClain, who was able and willing to testify;

16

III.	Trial counsel failed to move for a new trial based on the statements of Asia McClain, which exonerated [Syed];

IV.	Trial counsel failed to adequately cross-examine Deborah Warren, a State witness;

V.	Trial counsel failed to approach the State about a possible plea deal;

VI.	Trial counsel failed to inform [Syed] of his right to request a change of venue;

VII.	Trial counsel failed to investigate the State's key witness, Jay Wilds, for impeachment evidence;

VIII.	Appellate counsel failed to challenge testimony of [the] State's expert witness that strayed outside of his expertise; and

IX.	[Syed's] counsel at sentencing failed to request that the [sentencing court] hold [Syed's] hearing on Motion for Modification of Sentence in abeyance.[16]

On October 11, 2012, and October 25, 2012, a post-conviction hearing was held ("first hearing"). In a Memorandum Opinion and Order ("Memorandum Opinion I"), issued on January 6, 2014, the post-conviction court denied Syed post-conviction relief.

On January 27, 2014, Syed filed a timely application for leave to appeal to this Court, which requested that we review "(1) whether his trial counsel rendered ineffective assistance [of counsel] by failing to interview or even contact Asia McClain, a potential alibi witness; and (2) whether [his trial counsel rendered ineffective assistance of counsel

_____

[16] In his petition, Syed also raised the issue of cumulative error, but the post-conviction court did not address it. In Syed's first application for leave to appeal, he did not challenge the failure of the post-conviction court to address this issue, and Syed did not raise it in his motion to reopen the post-conviction proceeding.

17

by] failing to pursue a plea offer and purportedly misrepresenting to Syed that she had."

On January 20, 2015, Syed supplemented his application for leave to appeal, requesting that this Court remand the case for additional fact-finding in light of an affidavit by McClain, dated January 13, 2015. In that affidavit, McClain reaffirmed her recollection of seeing Syed at the Woodlawn Public Library at the time that the State alleged that Syed murdered Hae. McClain also stated in the affidavit that in telephone conversations with the Assistant State's Attorney, Kevin Urick, she was discouraged from attending the first hearing.

After granting leave to appeal on February 6, 2015, and receiving briefs from both the State and Syed, this Court, on May 18, 2015, issued an order staying Syed's appeal on the issue of ineffective assistance of trial counsel for failure to pursue a plea offer. We further granted Syed's request to remand the case to the circuit court for further proceedings pursuant to the Uniform Postconviction Procedure Act ("UPPA"), Maryland Code (2001, 2008 Repl. Vol.), § 7-109(b)(3)(ii)(2) of the Criminal Procedure Article ("CP") and Maryland Rule 8-604(a)(5), (d). In our order, we instructed the post-conviction court to consider reopening the post-conviction proceeding if Syed were to file a motion to reopen within 45 days of our order.

On remand, on June 30, 2015, Syed filed, pursuant to CP § 7-104, a Motion to Reopen Post-Conviction Proceedings ("Motion to Reopen"), based upon the January 13, 2015 affidavit of McClain. On August 24, 2015, Syed filed a "Supplement to Motion to Re-Open Post-Conviction Proceedings" ("Supplement"), requesting that the post-conviction court reopen the post-conviction proceeding to consider new claims of

18

ineffective assistance of trial counsel and a *Brady* violation concerning the reliability of certain cell tower location evidence admitted at trial. The State filed a consolidated response, and Syed, in turn, filed a reply. The post-conviction court granted Syed's request to reopen his post-conviction proceeding to consider those "issues raised by McClain's January 13, 2015 affidavit[,] and [Syed's] Supplement concerning the matter of cell tower location reliability."

On February 3, 2016, the post-conviction court began a five-day hearing ("second hearing") to consider the aforementioned issues raised by Syed, and on June 30, 2016, the post-conviction court issued its "Memorandum Opinion II." In this opinion, the post-conviction court first considered the issue of "[w]hether trial counsel's alleged failure to contact McClain as a potential alibi witness violated [Syed's] Sixth Amendment right to effective assistance of counsel." On this issue, the post-conviction court concluded that Syed's trial counsel was deficient by failing to investigate McClain as a potential alibi witness but that such deficiency did not prejudice Syed. Accordingly, the post-conviction court denied Syed post-conviction relief on that claim.

Next, the post-conviction court considered "[w]hether the State withheld potentially exculpatory evidence related to the reliability of cell tower location evidence in violation of the disclosure requirements under *Brady*." The post-conviction court ruled that Syed had waived this claim by failing to raise it in his petition for post-conviction relief and accordingly, denied post-conviction relief.[17]

---

[17] In the instant appeal, Syed does not challenge the post-conviction court's decision that Syed waived his claim of a *Brady* violation.

Lastly, the post-conviction court considered Syed's claim that "trial counsel's alleged failure to challenge the reliability of the cell tower location evidence violated [his] Sixth Amendment right to effective assistance of counsel." The post-conviction court first held that Syed had not knowingly and intelligently waived this claim. On the merits, the post-conviction court determined that the performance of Syed's trial counsel was deficient because of her failure to cross-examine Waranowitz concerning a fax cover sheet for Syed's cell phone records that contained a disclaimer stating: "Any incoming calls will NOT be considered reliable information for location." The post-conviction court then concluded that such deficiency was prejudicial to Syed, because the State's case relied heavily on placing Syed at Leakin Park at the alleged time of the burial of Hae's body. Accordingly, on this issue, the post-conviction court granted Syed's petition for post-conviction relief. The court vacated Syed's convictions and granted him a new trial.

On August 1, 2016, the State filed a timely application for leave to appeal to this Court. Syed then filed a conditional application for leave to cross-appeal. On January 18, 2017, this Court issued an order granting the State's application for leave to appeal and Syed's conditional application for leave to cross-appeal. We further lifted the stay of Syed's first appeal imposed by our remand order and consolidated the appeals.

Additional facts will be provided as they become necessary to the resolution of the questions presented in the case *sub judice*.

## THE STATE'S PROCEDURAL QUESTIONS

## I. Did the Post-Conviction Court Abuse Its Discretion by Exceeding the Scope of This Court's May 18, 2015 Remand Order?

*A. Background*

In our May 18, 2015 remand order, this Court wrote, in relevant part:

> **The purpose of the stay and the remand is to provide Syed with the opportunity to file with the circuit court a request, pursuant to § 7-104 of the Criminal Procedure Article of Md. Code, to re-open the previously concluded post-conviction proceeding in light of [ ] McClain's January 13, 2015, affidavit**, **which has not heretofore been reviewed or considered by the circuit court.** Moreover, because the affidavit was not presented to the circuit court during Syed's post-conviction proceeding, as it did not then exist, it is not a part of the record and, therefore, this Court may not properly consider it in addressing the merits of this appeal. This remand, among other things, will afford the parties the opportunity to supplement the record with relevant documents and even testimony pertinent to the issues raised by this appeal.

> **We shall, therefore, remand the case to the circuit court**, without affirmance or reversal, **to afford Syed the opportunity to file such a request to re-open the post-conviction proceedings. In the event that the circuit court grants a request to re-open the post-conviction proceedings, the circuit court may, in its discretion, conduct any further proceedings it deems appropriate.** If that occurs, the parties will be given, if and when this matter returns to this Court, an opportunity to supplement their briefs and the record.

> Accordingly, it is this 18th day of May 2015, by the Court of Special Appeals,

> ORDERED that the above-captioned appeal be and hereby is STAYED; and it is further

> ORDERED that [Syed's] request for a remand to the circuit court is GRANTED and the case be and hereby is REMANDED to the Circuit Court for Baltimore City, without affirmance or reversal, for the purpose set forth in this Order; and it is further

21

ORDERED that [Syed] shall file his motion to re-open the closed post-conviction proceeding within 45 days of the date of this Order and, if he fails to do so, the stay shall be lifted and this Court will proceed with the appeal without any reference to or consideration of [Syed's] Supplement to Application for Leave to Appeal or any documents not presently a part of the circuit court's record; and it is further

ORDERED **that, after taking any action it deems appropriate, the circuit court shall forthwith re-transmit the record to this Court for further proceedings.**

(Emphasis added).

As authorized by our remand order, Syed timely filed the Motion to Reopen, which was based on the McClain affidavit. Almost two months later, however, Syed filed the Supplement that raised, among other things, a claim of ineffective assistance of counsel pertaining to trial counsel's failure to properly challenge the reliability of the cell tower location evidence, which claim had never been raised before in any proceeding arising out of the charges against Syed. In the Supplement, Syed explained why such claim should be heard at the same time as the claim raised in his Motion to Reopen:

> [A]s a matter of judicial economy, the [c]ourt should consider this issue now. If it does not, and if Syed's conviction is not vacated on the alibi issue, Syed would have to raise the issue in a successive motion to re-open post-conviction proceedings. Not only could this lead to another separate proceeding, but it could lead to another appeal. It is in the interest of all parties to resolve this matter – and get to the heart of the problem – once and for all. Now is the time to do so.

In its consolidated response, the State acknowledged that Syed appeared to be advocating for his Supplement to be considered as a new motion to reopen under CP § 7-104, but argued that the post-conviction court should not reopen, because the issue

concerning the failure of trial counsel to properly challenge the reliability of the cell tower location evidence had "been repeatedly waived."

In its "Statement of Reasons" regarding Syed's Motion to Reopen and Supplement, the post-conviction court first observed that "[t]his [c]ourt may reopen [Syed's] previously concluded post-conviction proceedings if the [c]ourt determines that reopening the matter is in the interests of justice. Crim. Pro. § 7-104." With respect to Syed's Motion to Reopen, which was based on the McClain affidavit, the court determined, "in its own discretion," that "reopening the post-conviction proceedings would be in the interests of justice for all parties[,]" because "[t]his [would] allow [Syed] to introduce the January 13, 2015 affidavit from McClain, the potential testimony of McClain, and relevant evidence concerning [Syed's] claims of ineffective counsel and alleged prosecutorial misconduct during the post-conviction proceedings," and also would give the State "an equal opportunity to introduce testimony and other evidence to refute [Syed's] claims."

Next, the post-conviction court addressed Syed's Supplement, and stated in relevant part:

> [Syed] also moves this [c]ourt to reopen the post-conviction proceedings to allow him to raise the issue of cell tower location reliability, **which is not currently before the Court of Special Appeals and was not raised at the previously concluded post-conviction proceedings. Although this [c]ourt is aware that the Court of Special Appeals issued a limited remand, the Remand Order provided this [c]ourt with the discretion to conduct any further proceedings it deems appropriate**.

(Emphasis added).

23

The post-conviction court concluded by ordering that "[Syed's] Motion to Reopen [ ] *and* Supplement thereto is hereby **GRANTED**[.]" (Bold emphasis in original) (italic emphasis added).

### B. Contentions

The State argues that the post-conviction court abused its discretion when it exceeded the scope of this Court's remand order by reopening Syed's post-conviction proceeding to consider issues that were not raised in the first hearing, and not the subject of our remand order. The State interprets the scope of our remand order as follows: "the plain and natural reading of the order gave the post-conviction court considerable discretion to conduct a full range of proceedings, so long as they were related to [ ] McClain and the issue of Syed's alibi defense." From that reading of the "limited" remand order, the State concludes that to allow the court to reopen Syed's post-conviction proceeding and consider any issue other than those arising out of the McClain affidavit would run counter to the order's purpose and would constitute "an open invitation to litigate unpreserved issues altogether unconnected to McClain and the issue of an alibi."[18]

---

[18] The State also argues that this Court's remand order prohibited the post-conviction court from considering the Supplement, because the Supplement was filed after the 45-day deadline specified in the order. We disagree. First, the 45-day deadline in our remand order was a procedural mechanism to prevent the instant appeal from entering a state of limbo. The remand order specified that either the appeal would be stayed pending the post-conviction court's consideration of a motion to reopen filed within 45 days, or the appeal would proceed without this Court's consideration of any document not made part of the circuit court record, e.g., the McClain affidavit. Because Syed filed the Motion to Reopen within 45 days, the purpose of that deadline was satisfied. Second, as will be discussed *infra*, the Supplement sets forth a separate motion to reopen Syed's post-conviction proceeding under CP § 7-104. CP § 7-104 does not specify a limitation on the number of motions to reopen that can be filed or on the time that any such motion must be

24

Syed responds that this Court delegated to the post-conviction court the latitude to "conduct further proceedings it deem[ed] appropriate." In Syed's view, our remand order was sufficiently broad to allow the post-conviction court to reopen Syed's post-conviction proceeding for any reason that it deemed was in the interests of justice.

## C. Analysis

This Court concludes that the post-conviction court did not exceed the scope of our May 18, 2015 remand order. In remanding Syed's appeal, we did not require that the post-conviction court reopen Syed's previously concluded post-conviction proceeding. Instead, we provided Syed "with the opportunity to file" with the post-conviction court a motion, pursuant CP § 7-104, "to re-open the previously concluded post-conviction proceeding in light of [ ] McClain's January 13, 2015, affidavit." Syed did in fact take such opportunity by filing the Motion to Reopen, which was based on McClain's affidavit.

Upon Syed's filing of the Motion to Reopen, the post-conviction court was required by the remand order to decide whether to reopen the post-conviction proceeding under CP § 7-104. CP § 7-104 states: "The court may reopen a post[-]conviction proceeding that was previously concluded if the court determines that the action is in the interests of justice." Here, the post-conviction court decided to grant the Motion to Reopen, because the reopening of the post-conviction proceeding to consider the issues raised by the McClain affidavit would be "in the interests of justice for all parties." In the instant appeal,

_____

filed. *See Gray v. State*, 388 Md. 366, 380, 380 n.6 (2005) (stating that CP "§ 7-104 does not prohibit a person from filing more than one petition to reopen" and that "the statute does not specify when a defendant must file a petition to reopen").

25

the State does not challenge the post-conviction court's granting of the Motion to Reopen.

The remand order goes on to provide that "[*i*]*n the event that the circuit court grants a request to re-open the post-conviction proceedings*, the circuit court may, in its discretion, conduct any further proceedings it deems appropriate." Because the post-conviction court granted Syed's Motion to Reopen, the court was specifically authorized to "conduct any further proceedings it deem[ed] appropriate."

As the State properly points out, the authority granted by our remand order for the post-conviction court to "conduct further proceedings it deem[ed] appropriate" was not a *carte blanche* grant for the court to hear any matter raised by the parties. Here, however, the Supplement was, in effect, a separate motion to reopen the post-conviction proceeding under CP § 7-104 for the court to consider, among other things, a new claim of ineffective assistance of counsel, namely, the failure of trial counsel to properly challenge the reliability of the cell tower location evidence. Clearly, as Syed suggests, it would be in the interests of judicial economy for the post-conviction court to hear both of Syed's claims of ineffective assistance of trial counsel under CP § 7-104 in one proceeding. Therefore, under the circumstances of the instant case, the post-conviction court acted within the scope of the May 18, 2015 remand order to conduct a "further proceeding[]" regarding the Supplement.

Nevertheless, because we conclude that the Supplement is a separate motion to reopen under CP § 7-104, there is a condition precedent to the post-conviction court's consideration of the Supplement with the Motion to Reopen — the court must determine whether a reopening for the Supplement is in the "interests of justice." *See* CP § 7-104.

26

As will be discussed, *infra*, the post-conviction court exercised its discretion and concluded that the reopening of the post-conviction proceeding to consider the Supplement was "in the interests of justice." We shall now turn to the issue of whether the post-conviction court abused its discretion in so doing.

**II. Did the Post-Conviction Court Abuse Its Discretion When It Reopened Syed's Post-Conviction Proceeding to Consider the Claim of Ineffective Assistance of Counsel for Trial Counsel's Failure to Properly Challenge the Reliability of the Cell Tower Location Evidence?**

*A. Background*

As previously stated, the post-conviction court first granted Syed's Motion to Reopen concerning his claim of ineffective assistance of counsel for trial counsel's failure to investigate a potential alibi witness, McClain. After recognizing its authority under the remand order "to conduct any further proceedings it deems appropriate[,]" the post-conviction court stated, in relevant part:

> *After careful consideration of the parties' pleadings, this [c]ourt in the exercise of its discretion, concludes that reopening the post-conviction proceedings to allow [Syed] to raise the issue of cell tower location reliability and supplement the record with relevant materials would be in the interests of justice.* The issue of cell tower location reliability is premised upon [Syed's] claims of ineffective assistance of counsel and potential prosecutorial misconduct during trial, which are grounds for reopening the post-conviction proceedings under Maryland law. [*Gray v. State*, 388 Md. 366, 382 n.7 (2005)]. [The State] can, of course, submit relevant materials to rebut [Syed's] claims.
>
> * * *
>
> **ORDERED,** that this [c]ourt shall limit its consideration to:
>
> * * *

27

2) Relevant evidence relating to a) trial counsel's alleged failure to cross[-]examine [the State's] expert on the reliability of the cell tower location evidence and b) potential prosecutorial misconduct during trial[.]

(Bold emphasis in original) (italic emphasis added).

## B. Contentions

The State argues that the post-conviction court abused its discretion by reopening the post-conviction proceeding to consider the claim of ineffective assistance of trial counsel raised in the Supplement, because "there was no new evidence, no change in law, no connection to the reason for the remand, and no excuse for why the claim was not raised earlier." Recognizing that Maryland appellate courts have interpreted the "interests of justice" standard to give wide discretion to a post-conviction court to consider whether to reopen a previously concluded post-conviction proceeding, the State, nevertheless, contends that, "the 'interests of justice' standard must operate as a *standard*." (Emphasis in original). According to the State, if "the 'interests of justice' standard is satisfied whenever [an] attorney[ ] can conjure a 'potentially meritorious' claim based on a decades-old record, despite there being no new evidence, no change in the law, no misconduct, and no other special circumstances, then the 'interests of justice' standard amounts to no standard at all."[19]

---

[19] The State also argues that Syed's Supplement should be considered a second post-conviction petition, which is forbidden under CP § 7-103(b)(1). We have searched the record in vain to find where the State has ever articulated this argument. Our review of the record reveals that on remand, the State never characterized Syed's Supplement as a second petition for post-conviction relief. Moreover, the State's procedural argument has consistently been that Syed's cell tower location claims fell outside the scope of our remand order and that those claims were waived. Accordingly, we do not consider the State's

Syed responds that the interests of justice standard has been interpreted to give a post-conviction court broad discretion in determining whether it is in the interests of justice to reopen a post-conviction proceeding. Acknowledging that the Court of Appeals gave examples of meritorious reasons to reopen a post-conviction proceeding in *Gray v. State*, 388 Md. 366 (2005), Syed argues that those examples are just examples, and a post-conviction court is not required to grant a motion to reopen only on grounds that Maryland courts have heretofore suggested are proper. Syed further points out that the State cannot cite to any case where a post-conviction court's reopening of a post-conviction proceeding has been overturned on appeal.

### C. Analysis

We begin by briefly reciting the history of CP § 7-103, which governs a petition for post-conviction relief, and its relationship to CP § 7-104. This Court has articulated such history as follows:

> Since the enactment of the UPPA in 1958, the General Assembly has acted to limit the number of post[-]conviction petitions that a person may file for each conviction. Originally, the UPPA "did not place any limit on the number of post[-]conviction petitions which a petitioner was entitled to file." *Mason v. State*, 309 Md. 215, 217-18, 522 A.2d 1344 (1987). But, effective July 1, 1986, Art. 27, § 645A was amended by adding subsection (a)(2), which provided that a "person may not file more than two petitions, arising out of each

---

argument, because it was not "raised in or decided by the trial court." Md. Rule 8-131(a) ("Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court[.]"); *see also Conyers v. State*, 367 Md. 571, 593-95 (2001). Even if this Court were to consider the State's argument, we would conclude that the post-conviction court did not abuse its discretion when it interpreted Syed's Supplement as a new motion to reopen and not a second petition for post-conviction relief. *See Gray v. State*, 388 Md. 366, 383-84 (2005).

29

trial, for relief under this Subtitle," *Grayson v. State*, 354 Md. 1, 3, 728 A.2d 1280 (1999).

In 1995, the General Assembly again changed the number of petitions that could be filed to challenge a particular conviction. By Ch. 110 of the Acts of 1995, which primarily amended provisions relating to the death penalty, (I) and (II) were added to subsection (a)(2) and subsequently codified as Art. 27, [§] 645A(a)(2)(i) and (iii). Under subsection (a)(2)(i), a person was permitted to "file only one petition[,] arising out of each trial," *id.* at 4, 728 A.2d 1280, and subsection (a)(2)(iii) provided that "[t]he court may in its discretion reopen a post[-]conviction proceeding that was previously concluded if the court determines that such action is in the interests of justice." *Id.*

In 2001, the UPPA was repealed and reenacted at CP §§ 7-101 *et seq.* The provision relating to the reopening of a post[-]conviction proceeding is now codified at CP § 7-104 and contains "new language derived without substantive change." Revisor's Note. The words "in its discretion" were "deleted as surplusage." *Id.*

*Gray v. State*, 158 Md. App. 635, 645-46 (2004), *aff'd*, 338 Md. 366 (2005).

We further noted that

[t]here are significant differences between the filing of a petition for post[-]conviction relief and a request to reopen a post[-]conviction proceeding. For example, a person is entitled, as a matter of right, to file one post[-]conviction petition. CP § 7-103(a). The reopening of a closed post[-]conviction proceeding, however, is at the discretion of the circuit court. CP § 7-104.

Also, as a matter of right, a person filing a petition for post[-]conviction relief is entitled to a hearing and the assistance of counsel. CP § 7-108(a); Md. Rule 4-406(a). A request that a post[-]conviction proceeding be reopened does not entitle a person to either. Under the statute, the circuit court determines if a hearing and the assistance of counsel "should be granted." CP § 7-108(b)(1). Md. Rule 4-406(a) provides that, in the absence of a stipulation that the applicable facts and law justify the requested relief, the circuit court may not reopen a proceeding or grant relief without a hearing, but a request to reopen can be denied without a hearing.

*Id.* at 645.

The Court of Appeals has determined that the proper standard of review for a ruling on a motion to reopen is an abuse of discretion standard, which

> is one of those very general, amorphous terms that appellate courts use and apply with great frequency but which they have defined in many different ways. . . . [A] ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling. **The decision under consideration has to be well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.** That kind of distance can arise in a number of ways, among which are that the ruling either does not logically follow from the findings upon which it supposedly rests or has no reasonable relationship to its announced objective. **That, we think, is included within the notion of untenable grounds, violative of fact and logic, and against the logic and effect of facts and inferences before the court.**

*Gray*, 388 Md. at 383-84 (alternations in original) (emphasis added) (internal quotation marks omitted).

Relevant to the instant appeal, the Court of Appeals has discussed the meaning of the phrase "interests of justice:"

> The phrase "interests of justice" has been interpreted to include a wide array of possibilities. *See Love v. State*, 95 Md. App. 420, 427, 621 A.2d 910, 914 (1993) (mentioning a long list of reasons for granting a new trial in the interests of justice). **While it is within the trial court's discretion to decide when "the interests of justice" require reopening, we note that some reasons for reopening could include, for example,** ineffective assistance of post[-]conviction counsel or a change made in the law that should be applied retroactively. *See Oken v. State*, 367 Md. 191, 195, 786 A.2d 691, 693 (2001) (noting Oken's motion to reopen a post[-]conviction proceeding on the basis that the Supreme Court's opinion in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed.2d 435 (2000) rendered his sentencing proceeding invalid); *see Harris v. State*, 160 Md. App. 78, 862 A.2d 516 [(2004)] (discussing the

defendant's motion to reopen post[-]conviction proceeding on the ground that he had ineffective assistance of post[-]conviction counsel, in addition to ineffective assistance of trial and appellate counsel); [*Stovall v. State*, 144 Md. App. 711, 715, A.2d 31, 34 (2002)] (holding that a defendant may petition to reopen a post[-]conviction proceeding if post[-]conviction counsel was ineffective).

*Id.* at 382 n.7 (emphasis added).

It is clear to us that the Court of Appeals' discussion of the phrase "interests of justice" in *Gray*, quoted above, reaffirmed the broad discretion accorded to trial courts in deciding, "when 'the interests of justice' require reopening[.]" *See id.* The Court cited to a number of cases as examples of the reasons found by the courts to support a reopening of a post-conviction proceeding. *Id.* The examples cited by the Court of Appeals are just that — examples. *See id.* They are by no means intended to circumscribe the trial court's discretion in deciding whether or not the "interests of justice" warrant a reopening of a post-conviction proceeding.

In the case *sub judice*, the post-conviction court determined that it was in the interests of justice to reopen Syed's post-conviction proceeding to consider Syed's claims that (1) trial counsel rendered ineffective assistance when she failed to properly challenge the reliability of the cell tower location evidence, and (2) the State failed to disclose potentially exculpatory evidence related to the reliability of the cell tower location evidence in violation of the State's obligation under *Brady*. The aforementioned claims revolve around the AT&T fax cover sheet for Syed's phone records, which cover sheet contained a disclaimer stating that "[a]ny incoming calls will NOT be considered reliable information for location." Although trial counsel had the disclaimer at the time of trial, she never cross-

examined the State's cell tower expert, Waranowitz, about the reliability of the location of

Syed's cell phone based on the location of the cell tower when the cell phone received an

incoming call. Also, Waranowitz filed an affidavit in which he averred that the State never

gave him the disclaimer before he testified as to the phone records' reliability for

determining cell phone location.

Syed's claims of ineffective assistance of trial counsel and violation of *Brady* by the

State regarding the reliability of the cell tower location evidence are clearly cognizable

under the UPPA. *See* CP § 7-102(a).[20] If his claims were not waived, and if he adduced

sufficient evidence to satisfy the test of *Strickland* or *Brady*, Syed would be entitled to the

remedy of a new trial under the UPPA. Therefore, it was not "violative of fact and logic"

for the post-conviction court to conclude that reopening Syed's post-conviction proceeding

to consider his claim regarding the reliability of the cell tower location evidence was in the

---

[20] CP § 7-102(a) provides:

(a) *In general* – Subject to subsection (b) of this section, §§ 7-103 and 7-104 of this subtitle and Subtitle 2 of this title, a convicted person may begin a proceeding under this title in the circuit court for the county in which the conviction took place at any time if the person claims that:
  (1) the sentence or judgment was imposed in violation of the Constitution of the United States or the Constitution or laws of the State;
  (2) the court lacked jurisdiction to impose the sentence;
  (3) the sentence exceeds the maximum allowed by law; or
  (4) the sentence is otherwise subject to collateral attack on a ground of alleged error that would otherwise be available under a writ of habeas corpus, writ of coram nobis, or other common law or statutory remedy.

"interests of justice." *See Gray*, 388 Md. at 383-84. Hence, the post-conviction court did not abuse its discretion in so doing.

Nevertheless, the State argues that the post-conviction court abused its discretion by reopening Syed's post-conviction proceeding, because his claim regarding the reliability of the cell tower location evidence could have been raised in his petition for post-conviction relief and prosecuted at the first hearing but were not. In other words, the State contends that the decision of whether to reopen a post-conviction proceeding under CP § 7-104 necessarily includes a decision on whether the subject claim has been waived, and if so, whether the waiver can be excused under the circumstances of the case. *See, e.g.*, CP § 7-106(b)(1)(ii) (stating that "[f]ailure to make an allegation of error shall be excused if special circumstances exist").

We need not decide whether the issue of waiver is part of the decisional process regarding a motion to reopen under CP § 7-104. In the instant case, the post-conviction court did not address the State's waiver argument when it decided that the reopening of the post-conviction proceeding to hear Syed's claims set forth in the Supplement was "in the interests of justice." Nonetheless, the court fully considered the waiver issue during the reopened post-conviction proceeding and ruled on that issue in its Memorandum Opinion II. Therefore, even if the post-conviction court erred by failing to address the waiver issue when it decided to reopen the post-conviction proceeding under CP § 7-104 to hear the Supplement, such error was harmless.

**III.** **Did the Post-Conviction Court Err by Determining That Syed Did Not Waive His Ineffective Assistance of Counsel Claim Pertaining to Trial Counsel's Failure to Properly Challenge the Reliability of the Cell Tower Location Evidence?**

*A. Legal Background*

The UPPA's waiver provision in CP § 7-106(b) states as follows:

> (b) *Waiver of allegation of error.* – (1) (i) Except as provided in subparagraph (ii) of this paragraph, **an allegation of error is waived when a petitioner could have made but intelligently and knowingly failed to make the allegation:**
>    1. before trial;
>    2. at trial;
>    3. on direct appeal, whether or not the petitioner took an appeal;
>    4. in an application for leave to appeal a conviction based on a guilty plea;
>    5. in a habeas corpus or coram nobis proceeding began by the petitioner;
>    6. **in a prior petition under this subtitle**; or
>    7. in any other proceeding that the petitioner began.
> (ii) 1. **Failure to make an allegation of error shall be excused if special circumstances exist.**
>    2. The petitioner has the burden of proving that special circumstances exist.
> (2) **When a petitioner could have made an allegation of error at a proceeding set forth in paragraph (1)(i) of this subsection but did not make an allegation of error, there is a rebuttable presumption that the petitioner intelligently and knowingly failed to make the allegation.**

(Italic emphasis in original) (bold emphasis added).

In the seminal case of *Curtis v. State*, 284 Md. 132, 133 (1978), the Court of Appeals addressed the application of CP § 7-106(b), then known as Article 27, § 645A,[21] to claims

---

[21] The waiver provision in Maryland Code (1957, 1976 Repl. Vol.), Article 27, § 645A (c) read as follows:

of ineffective assistance of counsel.  Because both parties in the instant appeal focus their arguments on *Curtis*, we shall begin with an examination of that case.

In 1967, Curtis "was convicted of first degree murder . . . in . . . Prince George's County[;]" a conviction that was subsequently upheld on direct appeal.  *Id.* at 134.  With the aid of counsel different from his trial and appellate counsel, Curtis filed his first petition for post-conviction relief.  *Id.*  Curtis's petition alleged several errors, but it did not contain any claim of ineffective assistance of counsel.  *Id.*  "After a hearing on the merits, the [post-conviction] court denied relief" in 1970.  *Id.*

In 1976, when the UPPA still allowed an unlimited number of post-conviction petitions,[22] Curtis filed a second petition for post-conviction relief with the aid of new post-

---

(c) *When allegation of error deemed to have been waived. –* For the purposes of this subtitle, an allegation of error shall be deemed to be waived when a petitioner could have made, but intelligently and knowingly failed to make, such allegation before trial, at trial, on direct appeal (whether or not said petitioner actually took such an appeal), in any habeas corpus or coram nobis proceeding actually instituted by said petitioner, in a prior petition under this subtitle, or in any other proceeding actually instituted by said petitioner, unless the failure to make such allegation shall be excused because of special circumstances. The burden of proving the existence of such special circumstances shall be upon the petitioner.

When an allegation of error could have been made by a petitioner before trial, at trial, on direct appeal (whether or not said petitioner actually took such an appeal), in any habeas corpus or coram nobis proceeding actually instituted by said petitioner, in a prior petition under this subtitle, or in any other proceeding actually instituted by said petitioner, but was not in fact so made, there shall be a rebuttable presumption that said petitioner intelligently and knowingly failed to make such allegation.

[22] "Ch. 110 of the Acts of 1995," "permitted [a petitioner] to 'file only one petition arising out of each trial,' . . . [and] provided that '[t]he court may in its discretion reopen a

conviction counsel. *See id.* at 134. In that petition, Curtis raised for the first time, among

other things, the issue of ineffective assistance of trial counsel. *Id.* at 134-35. Upon

consideration of the State's motion to dismiss, the post-conviction court dismissed Curtis's

second petition for post-conviction relief, reasoning that, because Curtis failed to raise the

issue of ineffective assistance of trial counsel in his first post-conviction petition, he waived

the issue. *Id.* at 135-36.

After this Court granted Curtis leave to appeal and upheld the post-conviction

court's dismissal, the Court of Appeals granted certiorari. *Id.* at 136-37. The Court stated

that the issue before it was whether

> the General Assembly, by use of the term 'waiver' in the [UPPA],
> intend[ed] that [that] definition of 'waiver' set forth in subsection (c)
> [now CP § 7-106(b)] determine in all cases the right to raise for the
> first time any issue in a post[-]conviction action, regardless of the
> nature of prior procedural defaults, tactical decisions of counsel, or
> omissions of counsel[.]

*Id.* at 141.

The Court determined that, because the term "waiver" possesses inherent ambiguity,

the waiver provision in the UPPA did not necessary apply to "all allegations made in post[-

]conviction actions." *Id.* at 142. The Court reasoned:

> **If, in defining "waiver" for purposes of the [UPPA], the
> General Assembly intended to make subsection (c), with its
> "intelligent and knowing" definition, applicable every time
> counsel made a tactical decision or a procedural default
> occurred, the result could be chaotic. For example, under such
> an interpretation of the statute, for a criminal defendant to be**

post[-]conviction proceeding that was previously concluded if the court determines that
such action is in the interests of justice.'" *Gray*, 158 Md. App. at 645-46 (quoting *Grayson
v. State*, 354 Md. 1, 4 (1999)).

**bound by his lawyer's actions, the lawyer would have to interrupt a trial repeatedly and go through countless litanies with his client.** One of the basic principles of statutory construction is that a statute should not be construed to lead to an unreasonable or illogical result. *Grosvenor v. Supervisor of Assess.*, 271 Md. 232, 242, 315 A.2d 758 (1974); *Coerper v. Comptroller*, 265 Md. 3, 6, 288 A.2d 187 (1972); *Pan Am. Sulphur Co. v. State Dep't of Assessments and Taxation*, 251 Md. 620, 627, 248 A.2d 354 (1968); *Sanza v. Maryland Board of Censors*, 245 Md. 319, 340, 226 A.2d 317 (1967). It is hardly conceivable that the Legislature, in adopting § 645A (c) [now CP § 7-106(b)], could have intended to use the word "waiver" in its broadest sense, thereby requiring that the "intelligent and knowing" standard apply every time an issue was not raised before.

*Id.* at 149 (emphasis added). The Court then turned its attention to "what type of situations the Legislature intended to" require an intelligent and knowing waiver. *See id.* at 142, 149.

The Court held that the UPPA's "intelligent and knowing" requirement applies "in those circumstances where [a knowing and intelligent] waiver" is required to relinquish certain fundamental constitutional rights such as the right to counsel, the right to a jury trial, the right against self-incrimination, and the right against double jeopardy. *Id.* at 143-44, 49. The Court cautioned, however, that not all rights are so fundamental as those rights that require a knowing and intelligent waiver. *Id.* at 145. For example, even though "a defendant has a constitutional right not to be tried in [prison] attire, only by affirmatively asserting this right will it be given effect." *Id.* This is because when competent trial counsel represents a defendant, that counsel may determine as a matter of trial tactics to decline to invoke this right. *Id.* at 145-46. In addition, the Court stated that the Supreme Court has recognized that "a 'procedural default' in certain circumstances, even where a defendant may personally have been without knowledge or understanding of the matter,

38

may result in his being precluded from asserting important rights[,]" such as a procedural requirement that a defendant timely object to the racial composition of a grand jury. *Id.* at 146-47.

In sum,

> whether one is precluded from asserting a constitutional right because of what may have occurred previously, even though the failure was not "intelligent and knowing," depends upon the nature of the right and the surrounding circumstances. A defendant may forego a broad spectrum of rights which are deemed to fall within the category of tactical decisions by counsel or involve procedural defaults.

*Id.* at 147.

The Court concluded that

> the term "waiver" could be said to connote the intelligent and knowing relinquishment of certain basic constitutional rights under circumstances where the courts have held that only such intelligent and knowing action will bind the defendant. In our view, the Legislature was using the word "waiver" in this narrow sense in the Maryland Post Conviction Procedure Act, Art. 27, § 645A [now CP § 7-106(b)].

*Id.* at 148.

Returning to the case before it, the Court addressed Curtis's claim "that the representation by his trial counsel was so inadequate that he was deprived of his Sixth Amendment right to have the Assistance of Counsel for his defense." *Id.* at 150 (internal quotation marks omitted). The Court held "that a criminal defendant cannot be precluded from having this *issue* considered because of his [or her] mere failure to raise the *issue* previously." *Id.* (emphasis added). The Court explained:

39

The question of the constitutional adequacy of trial counsel's representation is governed by the *Johnson v. Zerbst* standard of an "intelligent and knowing" waiver. *Hawk v. Olson*, 326 U.S. 271, 274, 279, 66 S. Ct. 116, 90 L. Ed. 61 (1945); *Glasser v. United States*, 315 U.S. 60, 70-72, 62 S. Ct. 457, 86 L. Ed. 680 (1942); *United States v. Garcia*, 517 F.2d 272 (5th Cir. 1975); *Kelly v. Peyton*, 420 F.2d 912, 914 (4th Cir. 1969); *Sawyer v. Brough*, 358 F.2d 70, 73-74 (4th Cir. 1966). Consequently, subsection (c) of the [UPPA] is applicable to Curtis's contention, and it can only be deemed "waived" for purposes of the [UPPA] if Curtis "intelligently and knowingly" failed to raise it previously. **The proffered facts**, accepted as true by the circuit court for purposes of the State's motion to dismiss on the ground of waiver, **clearly disclose that Curtis did not "intelligently and knowingly" fail to previously raise the matter of his trial counsel's alleged inadequacy. Therefore, the issue cannot be deemed to have been waived.**

*Id.* at 150-51 (emphasis added).

The *Curtis* Court's holding that the UPPA waiver provision is only applicable when allegations of error raised by a petitioner invoke a narrow set of fundamental constitutional rights has created "a dual framework" for analyzing whether a petitioner has waived a particular issue for failure to raise that issue in a previous proceeding. *See Hunt v. State*, 345 Md. 122, 137-38 (1997). A court must examine whether the "nature of the right involved" is recognized by the Supreme Court as requiring an intelligent and knowing waiver, and thereby a fundamental right governed by CP § 7-106(b), *see id.* at 137-38, or, whether the "nature of the right involved" is a non-fundamental right and thereby governed by the "general legal principles" of waiver. *See State v. Torres*, 86 Md. App. 560, 568 (1991) (stating that for claims invoking non-fundamental rights "waiver is determined by general legal principles. The most significant of these principles is that the failure to

40

exercise a prior opportunity to raise an allegation of error generally effects a waiver of the right to raise the matter at a later time."). In other words,

> when [a] court finds that the possibility existed for a petitioner to have previously raised a particular allegation but he [or she] did not do so, the allegation will be deemed waived because of the failure to have previously raised it only if the right upon which the allegation is premised is a non-fundamental right. Conversely, if the right upon which the allegation is premised is a fundamental right, the allegation will not be deemed waived simply because it was not raised at a prior proceeding. Fundamental rights . . . may be waived only where the petitioner intelligently and knowingly effects the waiver.

*Wyche v. State*, 53 Md. App. 403, 407 (1983).[23] With the above legal background in mind, we return to the case before us.

### B. Reopened Post-Conviction Proceeding

Syed argued at the second hearing that his trial counsel rendered ineffective assistance of counsel on the ground that she failed to challenge the reliability of the cell tower location evidence by cross-examining Waranowitz about the fax cover sheet disclaimer, which stated: "Any incoming calls will NOT be reliable information for

---

[23] To be sure, however, if a post-conviction court determines that a petitioner has waived his or her allegation of error, a petitioner still has the opportunity to argue that the court should excuse the waiver and proceed to the merits. *Hunt*, 345 Md. at 139. If a petitioner waived an allegation premised on a fundamental right, then the petitioner has the burden of proving that "special circumstances" exist. *See* CP § 7-106(b)(1)(ii). If a petitioner has waived an allegation premised on a non-fundamental right, then a court, in a post-conviction proceeding, can excuse a waiver "if the circumstances warrant such action." *See Walker v. State*, 343 Md. 629, 647-48 (1996) ("Nevertheless, as the circuit court recognized in the present case, this Court has taken the position that a court, in a post[-]conviction proceeding can excuse a waiver based upon an earlier procedural default if the circumstances warrant such action. In effect, we have upheld the application of the 'plain error' or 'special circumstances' principles to waivers of the type here involved."); *see also Cirincione v. State*, 119 Md. App. 471, 512-17 (1998).

location" ("cell tower ground"). Syed asserted that the disclaimer was important, because the State relied on the cell tower location for two incoming calls to place him at the burial site after 7:00 p.m. on January 13, 1999. The State responded that Syed waived this allegation of error, because he failed to raise it during the first hearing.

In considering the State's waiver argument, the post-conviction court, relying on *Curtis*, stated that "the Sixth Amendment right to effective assistance of counsel [w]as a fundamental right in the context of waiver." The post-conviction court then determined that Syed had sufficiently rebutted the presumption that he intelligently and knowingly waived such claim, reasoning:

> Although [Syed] alleged that trial counsel may have been ineffective on other grounds in his initial petition, he has never alleged that trial counsel rendered ineffective assistance for her alleged failure to challenge the State's cell tower expert with the disclaimer. More importantly, [Syed] was never advised that trial counsel may have been ineffective for her alleged failure to challenge the State's cell tower expert at trial with the disclaimer in prior proceedings. In fact, [Syed's] counsel for the post-conviction proceedings did not advise [Syed] about the issue until shortly before August 24, 2015, when counsel consulted with a cell tower expert about the potential ramifications of the disclaimer. . . . Since [Syed] did not know about the potential implications of trial counsel's failure to challenge the cell tower evidence, he could not have knowingly waived his right to raise the allegation.

The post-conviction court then proceeded to address the merits of such claim and granted Syed post-conviction relief.

### C. *Contentions on Appeal*

The State contends that the post-conviction court erred in ruling that Syed's ineffective assistance of counsel claim was based on a fundamental constitutional right and

42

thus required a knowing and intelligent waiver pursuant to CP § 7-106(b) and *Curtis*. The State asserts that the post-conviction court erroneously relied on *Curtis*, because in that case, Curtis never raised the issue of ineffective assistance of trial counsel in his first post-conviction petition while in the instant case, Syed did raise the issue of ineffective assistance of trial counsel at the first hearing, but failed to raise the cell tower ground. Accordingly, the State urges this Court to conclude that Syed waived his new claim of ineffective assistance of counsel.

Syed responds that the post-conviction court properly ruled that a knowing and intelligent waiver was required for Syed to waive his claim of ineffective assistance of counsel pursuant to *Curtis*. Syed contends that *Curtis* has not been overturned, is still good law, and is not distinguishable. Moreover, Syed asserts that he did not knowingly and intelligently waive his claim of ineffective assistance of counsel on the cell tower ground, because he did not discover such ground until after this Court stayed and remanded his first appeal and his post-conviction counsel informed him of the significance of the fax cover sheet disclaimer.[24]

### *D. Analysis*

In our view, the question that the State raises in the instant appeal is as follows:

---

[24] At oral argument before this Court, Syed's counsel suggested that waiver is not applicable in this case, because Syed's original post-conviction proceeding was not finally litigated when his case was remanded by this Court's May 18, 2015 remand order. The record is devoid of any instance in which Syed has ever articulated this argument. Therefore, Syed's argument is not preserved for appellate review. Md. Rule 8-131(a); *see also Conyers v. State*, 367 Md. 571, 593-95 (2001) ("Ordinarily, an argument not raised in the proceedings below is not preserved for appellate review.").

Where the *issue* of ineffective assistance of trial counsel has been raised and decided in a previous post-conviction proceeding, does a petitioner, absent a knowing and intelligent waiver, have the right to raise such *issue again but on a different ground* in a reopening of that proceeding? The post-conviction court answered this question by announcing that *Curtis* stood for the proposition that the issue of ineffective assistance of counsel may be raised a second time on a ground not raised previously, and a petitioner only waives this issue when he or she does so knowingly and intelligently as to that particular ground. We disagree with this broad reading of *Curtis*.

We are not aware of any decision by the Supreme Court, Court of Appeals of Maryland, or this Court holding that for waiver to apply, a petitioner in his or her first post-conviction proceeding must intelligently and knowingly waive the grounds not raised in support of a claim of ineffective assistance of counsel. Moreover, Syed has not directed our attention to any precedent to support such principle, except that of a broad reading of *Curtis*. Our research, however, has identified two Maryland cases that point us to the answer.

In *Wyche*, this Court reviewed the denial of Wyche's third petition for post-conviction relief, in which he contended "that he was denied his constitutional right to be present at his trial because he was not present when the trial judge . . . reinstructed the jury." 53 Md. App. at 404. Because Wyche had failed to raise such error at trial, on appeal, or in either of his prior post-conviction petitions, the post-conviction court held that Wyche had waived his right to raise it. *Id.* at 404-05. Consequently, we were called upon to decide whether the post-conviction court correctly determined that there had been a waiver

44

because of Wyche's failure to raise the claim in a prior proceeding. *Id.* at 405. In our discussion of the law, we set forth a synthesis of the holdings in *Curtis* and its progeny regarding waiver under Article 27, § 645A. *Id.* at 405-06. At the conclusion of our summary of the dichotomy between the waiver of a fundamental right, which requires an intelligent and knowing waiver by the petitioner, and a non-fundamental right, which occurs from the failure to raise a violation in a prior proceeding when it was possible to do so, we added the following footnote:

> If an allegation concerning a fundamental right has been made and considered at a prior proceeding, a petitioner may not again raise that same allegation in a subsequent post[-]conviction petition by assigning new reasons as to why the right had been violated, unless the court finds that those new reasons could not have been presented in the prior proceeding.

*Id.* at 407 n.2.

We recognize that the above footnote is *dicta* and that no legal authority was cited in support of it. Nevertheless, we believe that the language in the footnote identifies an important distinction in the UPPA waiver analysis. Specifically, the distinction between *the issue* of a violation of a fundamental right, such as a claim of ineffective assistance of counsel, and *the grounds* supporting such claim where the fundamental right can be violated in many different ways. The footnote suggests that the "intelligent and knowing" requirement for waiving a fundamental right is limited to a failure to raise a claim of a violation of that right in a prior proceeding and does not extend to the grounds for such claim where the issue has been raised in a prior proceeding. In other words, the many

45

different grounds that may be advanced in support of a claim of a violation of a fundamental right are not themselves a fundamental right.

We also find *Arrington v. State*, 411 Md. 524 (2009), to be instructive. In *Arrington*, "Arrington was convicted of second degree murder in connection with the stabbing death of Paul Simmons" in 1995 and filed his post-conviction petition in 2000. *Id.* at 527, 530. In his post-conviction petition, Arrington raised the issue of ineffective assistance of counsel on the ground of trial counsel's failure "to have the blood evidence presented in the case tested through a DNA analysis[,]" despite Arrington's request for testing. *Id.* at 530. The blood evidence at trial showed only that the bloodstains on Arrington's sweatpants "were consistent with the blood type of the victim in this particular case, *or any other individual with the same blood type*[.]" *Id.* at 529 (emphasis added) (internal quotation marks omitted). According to Arrington, DNA testing would have shown that the blood on his sweatpants was not the victim's blood. *Id.* at 531. The post-conviction court, however, determined from the testimony of Arrington's trial counsel that counsel made the tactical decision not to have Arrington's sweatpants tested, because of, among other things, the risk that the DNA testing would show that the victim's blood was indeed on Arrington's sweatpants. *Id.* at 532-33. Thus the post-conviction court denied Arrington's request for a finding of ineffective assistance of counsel. *Id.* at 532.

In 2006, Arrington filed a motion to reopen his post-conviction proceeding and request for a new trial pursuant to CP § 8-201[25] on the basis of "newly discovered DNA

_____

[25] "Maryland is among the many states in this country that have enacted post-conviction DNA testing statutes. Section 8–201 was enacted in Maryland in 2001, in line

46

testing results" that proved that the blood on Arrington's sweatpants was not from the victim. *Id.* at 534. Arrington asserted that he was entitled to a new trial, because the blood evidence at trial misled the jury. *Id.* In addition to this claim, Arrington made claims of ineffective assistance of trial counsel based on grounds not previously raised, including, *inter alia*, grounds that "his trial counsel[ ] fail[ed] to cross-examine the State's expert regarding the percentage of the population that possesse[d] the blood type or enzyme at issue in the case[,]" and that his trial counsel allegedly failed "to make use of critical exculpatory evidence contained in various police reports." *Id.* at 535.

The post-conviction court dismissed the new claims of ineffective assistance of trial counsel as waived, and the Court of Appeals quoted the post-conviction court's reasoning at length. *Id.* at 539-40. That reasoning was as follows:

> **Petitioner also claims ineffective assistance of counsel stemming from counsel's failure to use critical exculpatory evidence contained in various police reports, as well as failure to establish the percentage of individuals having the same blood type as both Petitioner and the victim. Petitioner raised ineffective assistance of counsel at his first post[-]conviction proceeding. It is Petitioner's position that a reopening of post[-]conviction proceedings pursuant to § 8–201, *ipso facto* reopens all issues, regardless of any claims of waiver, abandonment or that claims have been fully litigated.** Petitioner fails to cite any authority for such a reading of § 8–201. The legislature intended § 8–201 to provide a mechanism for those with claims of "actual innocence" to utilize favorable scientific evidence at any time to prove their innocence. **The statute was not designed to open the floodgates of otherwise structured and constricted post[-]conviction law.** Nor was it designed to provide a "super-appeal"

with a nationwide trend to adopt post[-]conviction DNA testing statutes designed to provide an avenue for the exoneration of the actually innocent." *Blake v. State*, 395 Md. 213, 218-19 (2006) (footnote omitted).

as an end-run around the entire body of post[-]conviction law. An additional question for the [c]ourt is whether it is in the interests of justice to reopen the issue of ineffective assistance of counsel at this juncture.

**Petitioner points to trial counsel's failure to utilize exculpatory information contained within certain police reports to demonstrate ineffective assistance of trial counsel. All of the information was known prior to trial, let alone prior to the first post[-]conviction hearing. Petitioner had the benefit of counsel on appeal and failed to raise these issues. Further, Petitioner had the benefit of counsel during his initial post[-]conviction and failed to raise these issues in support of his allegation of ineffective assistance of counsel. Consequently, Petitioner has waived the right to now assert these claims. Furthermore, it would not be in the interests of justice to reopen the ineffective assistance of counsel claim where, as here, the Petitioner had access to the information complained of prior to his appeal, as well as his first post[-]conviction hearing, and failed to raise these issues in those forums.**

*Id.* (emphasis added).

On a direct appeal to the Court of Appeals, pursuant to CP § 8-201(j)(6) (2001, 2008 Repl. Vol.), Arrington argued that the post-conviction court erred in failing to reopen his post-conviction proceeding to consider his claims of ineffective assistance of counsel on new grounds. *Id.* at 540-42. In rejecting Arrington's argument, the Court stated:

This Court has yet to decide whether a petitioner in a reopened post[-]conviction proceeding may raise claims that would normally be precluded under the statutory provisions about waiver in the Uniform Post[-]conviction Procedure Act ("UPPA"), CP Sections 7–101 through 7–301 (2008 Repl. Vol.). We decide today, for the reasons explained below, that a petitioner may not assert, in a post[-]conviction proceeding reopened under the authority of CP Section 8–201, claims that could have been, but were not, raised in the original post[-]conviction proceeding, other than claims based on the results of the post[-]conviction DNA testing.

*Id.* at 545.

48

The above language in *Arrington* implies that "under the statutory provisions about waiver in the [UPPA,]" *id.*, Arrington had waived his right to assert claims of ineffective assistance of counsel on the new grounds alleged in his motion to reopen, where (1) all of the information about the new grounds was known prior to the first post-conviction hearing; (2) Arrington had the benefit of post-conviction counsel during the initial post-conviction proceeding; and (3) his post-conviction counsel failed to raise those grounds in support of his claims of ineffective assistance of trial counsel. *See id.* at 539. The issue before the Court of Appeals in *Arrington* was whether the waived claims of ineffective assistance of counsel could still be raised "in a post[-]conviction proceeding reopened under the authority of CP Section 8-201[.]" *Id.* at 545. The Court held that those waived claims could not be raised. *Id.*

Considering *Curtis*, *Wyche*, and *Arrington* together, we conclude that the UPPA's "intelligent and knowing" requirement for the waiver of a fundamental right is limited to situations where the *issue* of a violation of a fundamental right was not raised in a prior proceeding. In *Curtis*, the issue of ineffective assistance of counsel was not raised in the first petition for post-conviction relief. 284 Md. at 134-35. The Court of Appeals determined that the issue of ineffective assistance of counsel was premised on a fundamental constitutional right, and thus "a criminal defendant cannot be precluded from having this issue considered because of his mere failure to raise the issue previously." *Id.* at 150. In the instant case, by contrast, Syed did raise the issue of ineffective assistance of trial counsel at the first hearing. Syed's post-conviction counsel advanced seven claims that trial counsel's representation was constitutionally inadequate, each on a separate

49

ground. The cell tower ground was not one of those grounds. Consequently, the question of waiver regarding the failure to raise the issue of ineffective assistance of trial counsel is not present here.

In *Curtis*, the Court of Appeals identified non-fundamental rights, which can be precluded without an "intelligent and knowing" waiver, as those that "fall within the category of tactical decisions by counsel or involve procedural defaults." *Id.* at 147. "Tactical decisions, when made by an authorized competent attorney, as well as legitimate procedural requirements, will normally bind a criminal defendant."[26] *Id.* at 150. In our view, the selection of a particular ground to support a claim of ineffective assistance of counsel is a quintessential tactical decision of counsel. Counsel must (1) decide whether the record supports a particular ground for a claim of ineffective assistance of counsel, (2) identify and develop evidence in support of such ground, (3) assess the strength of the evidence, and (4) evaluate the likelihood of success. Therefore, although the issue of ineffective assistance of counsel is premised on a fundamental right under *Curtis*, a ground supporting that issue is not. *Cf. Arrington*, 441 Md. at 545; *Wyche*, 53 Md. App. at 407 n.2. Accordingly, the cell tower ground supporting Syed's new claim of ineffective

---

[26] Although Curtis also asserted that first post-conviction counsel was ineffective because that attorney failed to raise the issue of ineffective assistance of trial counsel in the first petition, this Court held that the representation of first post-conviction counsel was not constitutionally inadequate, and Curtis did not challenge that holding before the Court of Appeals. *Curtis*, 284 Md. at 135, 137-41. Likewise, in the instant case, the failure to raise the cell tower ground at the first hearing was done by competent post-conviction counsel. Nowhere in the Motion to Reopen or the Supplement did Syed assert that his post-conviction counsel was ineffective at the first hearing.

50

assistance of trial counsel is based on a non-fundamental right for the purpose of waiver under the UPPA.

As the Court of Appeals has explained:

> As to lesser or non-fundamental rights, the petitioner will be deemed to have waived any claim of error if petitioner or petitioner's counsel failed to exercise a prior opportunity to raise it notwithstanding a lack of personal knowledge of the right of which petitioner was deprived, except when the failure to allege the error is excused by special circumstances.

*McElroy v. State*, 329 Md. 136, 140-41 (1993) (footnote omitted). We thus conclude that, where the issue of ineffective assistance of counsel is raised in a prior proceeding, the failure to assert a particular ground in support of the issue will constitute a waiver of that ground, unless the court finds that the ground could not have been presented in the prior proceeding.[27]

Our conclusion is consistent with the legislative history of the UPPA; specifically, Chapter 110 of the Acts of 1995, which reduced the number of petitions allowed to one and created the procedure for reopening a post-conviction proceeding. *See Alston v. State*, 425 Md. 326, 335 (2012). In examining the legislative history of Chapter 110 of the Acts of 1995, the Court of Appeals observed that the purpose of this provision was to amend the UPPA to allow for a petitioner to have one petition for post-conviction relief but "provide a safeguard for the occasional meritorious case" through the reopening procedure, now codified in CP § 7-104. *See id.*

---

[27] Even if a particular ground has been waived, the court has the authority to excuse such waiver if the circumstances so warrant. *See supra* note 23.

51

The Court explained the new provision by pointing to the testimony of "the Governor's Chief Legislative Officer [ ] before the Senate Judicial Proceedings Committee on Senate Bill 340, which became Ch. 110," and was as follows:

> "In [1986], the General Assembly capped the number of post[-]conviction petitions to two.  However, there is no apparent rationale for not limiting the defendant to one petition.  **Common sense dictates that the defendant should include all grounds for relief in one petition.  The right to file a second post[-]conviction petition simply affords the . . . defendant an unwarranted opportunity for delay.**  Senate Bill 340 limits the *defendant* to one post[-]conviction petition unless the court determines that reopening the case is necessary to prevent a miscarriage of justice."

*Id.* at 336 (italic emphasis in original) (bold emphasis added).  In addition,

> [t]he Chairperson of the Governor's Commission on the Death Penalty, which drafted Senate Bill 340, also testified on the Bill before the Senate Judicial Proceedings Committee.  He stated:

> > "This amendment would reduce the number of post[-]conviction petitions from two to one, but would permit a court to reopen a previously concluded proceeding if necessary to avoid a miscarriage of justice.  This balances the need for procedural safeguards with the need for stemming cost and delay.  **There simply is no need for routine second petitions—counsel can and should put all claims into a first petition.**  At the federal level, a defendant gets only one habeas corpus petition; **he should not get more than one post[-]conviction petition**."

*Id.* (emphasis added).

As we read the legislative history, the General Assembly intended that a petitioner raise all claims cognizable under the UPPA in his or her original petition.  *See id.*  To extend *Curtis*'s requirement of a knowing and intelligent waiver from the issue of ineffective assistance of counsel to every ground that could support such claim would run

counter to the legislative history and purpose of Chapter 110 of the Acts of 1995, because it would allow a petitioner to raise claims of ineffective assistance of counsel on grounds not previously raised *ad infinitum*.

Finally, because the cell tower ground is premised on a non-fundamental right, the failure to assert such ground at the first hearing constituted a waiver of the claim of ineffective assistance of trial counsel based on that ground, unless it was not possible for Syed to have raised it at that time. *See Wyche*, 53 Md. App. at 407 n.2. Syed has not argued that it was not possible for his post-conviction counsel to raise in the initial petition the claim of ineffective assistance of counsel based on the cell tower ground, and we see no support in the record for the argument that it was not possible for Syed's post-conviction counsel to assert such ground at that time. Specifically, there is no dispute that Syed's trial counsel and post-conviction counsel possessed the fax cover sheet disclaimer, which is the basis of Syed's new ineffective assistance of trial counsel claim. Because Syed's post-conviction counsel could have raised at the first hearing the claim of ineffective assistance of counsel based on trial counsel's failure to challenge the reliability of the cell tower location evidence by cross-examining Waranowitz about the fax cover sheet disclaimer, we hold that Syed waived this claim of ineffective assistance of counsel.[28]

---

[28] We note that Syed did not argue that his waiver should be excused under general waiver principles in his reopened post-conviction proceeding. *See, e.g.*, *Walker v. State*, 343 Md. 629, 647-650 (1996) (concluding that the petitioner did not present circumstances sufficient to excuse waiver of jury instruction error). Accordingly, such issue is not before us in the instant appeal. *See* Md. Rule 8-131(a).

**SYED'S QUESTIONS ON HIS CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL**

A defendant has the right to effective assistance of counsel pursuant to the Sixth Amendment of the United States Constitution and Article 21 of the Maryland Declaration of Rights. *State v. Sanmartin Prado*, 448 Md. 664, 681 (2016). When a defendant claims that this right has been violated, he or she must satisfy a two-step test known as the *Strickland* test. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.*

### Standard of Review

When a claim of ineffective assistance of counsel is considered on appeal, as in this case, we apply the following standard of review:

> [T]he [trial] court's determinations regarding issues of effective assistance of counsel is a mixed question of law and fact. We will not disturb the factual findings of the post-conviction court unless they are clearly erroneous. But, a reviewing court must make an independent analysis to determine the ultimate mixed question of law and fact, namely, was there a violation of a constitutional right as claimed. In other words, the appellate court must exercise its own independent judgment as to the reasonableness of counsel's conduct and the prejudice, if any. . . . [The appellate court] will evaluate anew the findings of the [trial] court as to the reasonableness of counsel's

54

conduct and the prejudice suffered. As a question of whether a constitutional right has been violated, we make our own independent analysis by reviewing the law and applying it to the facts of the case.

*Sanmartin Prado*, 448 Md. at 679 (some alterations in original) (internal quotation marks and citation omitted).

## I.    Did the Post-Conviction Court Err by Holding that Syed's Right to Effective Assistance of Counsel Was Not Violated When Trial Counsel Failed to Pursue a Plea Deal With the State?

### *A. Background*

In his petition for post-conviction relief, Syed claimed, *inter alia*, that his trial counsel was ineffective for failing to pursue a plea offer. The following relevant testimony was adduced at the first hearing.

Syed testified that he consistently expressed his innocence to trial counsel, but after speaking with fellow inmates at the Baltimore City jail, he was urged to ask trial counsel about the possibility of the State offering a plea. Consequently, according to Syed, he took the following actions prior to his first trial:

> [SYED]:        [ ] I asked [trial counsel] if the State offered a plea deal. She said no. My next question [ ] was to her, could she speak to the State's Attorney or request some type of a plea. And I explained to her that I didn't really have confidence that I'd be able to prove I was somewhere else when the murder take [sic] place and when the State's theory that the murder took place, from the information that we were getting. So that's what I asked her.
>
> [PC1
> COUNSEL]:    And how did she respond to your request?

[SYED]: She responded in the affirmative. And I took it to mean that, okay, she was going to ask [the State].

[PC1
COUNSEL]: And did she ever follow-up on this?

[SYED]: Well, my [sic] next time that I saw her, I asked her, what was the end result? Did she get a chance to speak to the State's Attorney? And her response was, "They're not offering you a plea deal." So, when she said that, that's what it was. There was nothing else for me to ask her after that, because I believed that she went and spoke to the State's Attorney, the State's Attorney said no, and that's what it was.

After the first trial ended in a mistrial but before the second trial began, Syed recalled:

[SYED]: [ ] I expressed to [trial counsel] again that, I really didn't have confidence in the case because now, my fears are confirmed that, that's essentially to me what it came down to. The perception in my mind was, this is what this case comes down to. Where was I at this time. So, I asked [trial counsel] once again, do you think the State will offer a deal? Could you talk to them again?

[PC1
COUNSEL]: And, did she respond?

[SYED]: She responded that, they're not offering you a deal.

Kevin Urick, the lead prosecutor for Syed's case, testified as to his recollection of any plea discussions, as follows:

[PC1
COUNSEL]: Okay. So . . . to the best of your knowledge, it's your recollection and it's [co-counsel's] recollection, that **[trial counsel] never once**

56

|  |  |
|---|---|
|  | **approached either of you about a plea, a plea deal for [ ] Syed?** |
| [URICK]: | That's correct.  **She never made any presentation other than that they were seeking a finding of actual innocence for [Syed].** |
| [PC1 COUNSEL]: | **And when we spoke on the phone, you told me that you had no idea what kind of plea [ ] Syed might have received if one had been requested; is that correct?** |
| [URICK]: | **That is correct.** |

(Emphasis added).

When asked whether there was any "plea bargaining policy that existed within the State's Attorney's Office" at the time of Syed's trial, Urick stated that "[t]here's never been an established plea bargaining policy.  At least not in the time [he] was [t]here."  Moreover, Urick explained that in a high profile case like Syed's, he would have had to take multiple steps in order to find out if he could even make a plea offer:

| [STATE]: | Had you been asked to extend any kind of an offer in a case such as this one, how would you handle that? |
|---|---|
| [URICK]: | The first thing I would have done, would have been to talk to the family.  In a case like this, you give even more consideration to a family of a homicide victim.  You try always to be considerate of a victim, and the victim's family in all cases.  But a homicide case, it's even more so.  So, I would have talked to Ms. Lee's family, see what they thought.  Then after I talked to them, I would have gone probably to Sal Fili[, Urick's supervisor and Division Chief of Felony Narcotics ], and told him that we were beginning to talk about [a] plea and I was planning to go to Mark Cohen[, the head of the |

> Homicide Unit at the time,] to discuss it. . . . I would have then gone to talk to Mark Cohen to see what he felt. And I'm pretty certain that in this particular case, he would have suggested that we go to Ms. Jessamy[, the Baltimore City State's Attorney at the time,] with it and see where she stood on it as well.

Urick was never asked whether, after the above consultations were conducted, he would have made a plea offer to Syed. Finally, Urick recalled that he handled at least three other high profile murder cases, like Syed's, and he did not recall any plea discussions with defense counsel in those cases.

Syed called Margaret Meade as an expert in the practice of criminal defense of murder cases in the Circuit Court for Baltimore City, and she testified about her experience with the prosecutors at the State's Attorney's Office in Baltimore City. In Meade's experience, she could not "even imagine" the State not offering a plea if she were to ask for it.

### B. Memorandum Opinion I

In its Memorandum Opinion I, the post-conviction court addressed Syed's claim of ineffective assistance of trial counsel for failure to pursue a plea offer:

> **[T]here is nothing in the record indicating that the State was prepared to make a plea offer had trial counsel pursued such negotiations.** In fact, [Syed] provided no convincing evidence that a plea offer was even contemplated or discussed by the State. **[Syed's] bald assertion that the policy of the State's Attorney's Office at the time was to offer plea[s] to defendants charged with murder is unfounded** and is inconsistent with the State's claim that there was never a plea available in [Syed's] case.

(Emphasis added). The post-conviction court concluded that trial counsel was not deficient, and even if she was deficient, Syed failed to prove prejudice, because there was

58

no indication that Syed would have accepted any type of plea offer after maintaining his innocence throughout the trial and sentencing. The post-conviction court, therefore, denied Syed post-conviction relief on that claim.

*C. Analysis*

On appeal, Syed contends that trial counsel had a duty to pursue plea negotiations, and trial counsel was deficient for failing to explore a possible plea offer when Syed requested her to do so. Moreover, Syed argues that he was prejudiced, because he "was denied the basic right to make a choice of whether to go to trial or to accept a plea bargain[,]" and had trial counsel done what Syed requested, "it is extremely likely that Syed would have had a choice" of whether to go to trial or to plea.

The State responds by arguing that, "[e]ven assuming Syed raised a cognizable ineffective assistance of counsel claim, he still failed to establish that [his trial counsel] acted deficiently in the context of his case." Specifically, the State contends that Syed failed to show that the State would have made a plea offer, and there was "no evidence regarding a specific charge or sentence that Syed would have been offered[,]" much less accepted.

"Defendants have a Sixth Amendment right to counsel, a right that extends to the plea-bargaining process." *Lafler v. Cooper*, 566 U.S. 156, 162 (2012). Defendants do not, however, have the "*right to be offered a plea . . . .*" *Id.* at 168 (emphasis added). Therefore, assuming that defense counsel has the duty to pursue a plea offer when requested, the failure to pursue a plea offer cannot prejudice a defendant without evidence demonstrating that, if defense counsel had requested a plea offer, the State would have made a plea offer.

*Cf. Delatorre v. United States*, 847 F.3d 837, 846 (7th Cir. 2017) ("Because [the defendant's] prejudice argument centers on his attorney's inability to secure a plea agreement for him, [the defendant] had to show—at a minimum—that the prosecutor would have actually offered him a deal had his attorney been competent.").

In the case *sub judice,* Urick testified that, if Syed's trial counsel had asked for a plea, Urick would have begun a process of speaking with Hae's family and his superiors to ascertain whether he could offer a plea. Urick, however, was never asked whether, after completing such process, he would have made Syed a plea offer. Thus the post-conviction court was not clearly erroneous when it found that "there is nothing in the record indicating that the State was prepared to make a plea offer had trial counsel pursued such negotiations."

Moreover, Urick testified that there was no "plea bargaining policy" within the State's Attorney's Office while he was there, and with regard to three high profile murder cases that he handled, Urick did not recall any plea discussions with defense counsel. On the other hand, Syed's expert stated that in her experience, the prosecutor always made a plea offer when requested and could not "even imagine a State's Attorney saying, we're not offering anything." By crediting Urick's testimony, the post-conviction court had sufficient evidence to support its finding that Syed's "assertion that the policy of the State's Attorney's Office at the time was to offer plea[s] to defendants charged with murder is unfounded."

Because Syed failed to prove that the State would have made him a plea offer if trial counsel had requested one, the post-conviction court correctly concluded that Syed had not

established a claim of ineffective assistance of counsel based on trial counsel's failure to pursue a plea offer. We, therefore, affirm the post-conviction court's denial of relief on that claim.

**II.  Did the Post-Conviction Court Err by Holding that Syed's Right to Effective Assistance of Counsel Was Not Violated When Trial Counsel Failed to Investigate McClain as a Potential Alibi Witness?**

*A. Background*

1. First Hearing

In his petition for post-conviction relief, Syed raised the issue of ineffective assistance of counsel for trial counsel's failure "to call or investigate an alibi witness, Asia McClain, who was able and willing to testify[.]"

On October 25, 2012, the second day of the first hearing, Syed testified that, after he was arrested on February 28, 1999, he "received two letters from [McClain] back to back." He "received these letters within the first week of being arrested," and "immediately notified" trial counsel. According to Syed, "the next time that [he] saw [trial counsel] on a visit, [he] showed her the two letters and she read them. And [he] asked her, could she please do two things, contact [ ] McCla[in], and try to go to the library to retrieve whatever security footage was there." Syed stated that prior to the first trial, he told trial counsel's law clerk, Ali Pournader, about McClain; specifically, that "[he] remembered being in the

public library with her that day from right after school, which is about 2:15 to around 2:40, 2:45'ish, close to three [p.m]."[29]

Syed stated further that during the next visit he had with trial counsel, he "immediately asked her . . . did [she] speak to [ ] McCla[in]?" Trial counsel responded that she had "looked into it and nothing came of it." Syed then testified that, "[w]hen I asked her, and her response was that, I asked her again, well, [trial counsel], did you go speak to her? You know, did they say that -- I just began in my mind to try to understand what she meant, but she moved onto another subject."

Shortly after his conviction, Syed mentioned McClain to Rabia Chaudry, a family friend who was a law student at the time. Syed stated that he "wish[ed] there was some way that [he] could [have] prove[n] that [he] was somewhere else at this time." Syed explained to Chaudry that trial counsel "checked into it and obviously it didn't pan out." At that point, Chaudry requested Syed to send her the information about McClain, and Syed sent her copies of the two letters. Chaudry then contacted McClain by calling McClain's grandparents' phone number, listed on one of the letters. After contacting McClain, Chaudry told Syed that "McCla[in] informed her that she was never contacted."

---

[29] An affidavit written and signed by Ali Pournader was admitted as an exhibit at the second hearing. It stated:

> I remember that on at least one occasion I visited [ ] Syed in jail. . . .
> [I]t appears that I may have visited Syed at BCDC on July 13, 1999.
> [ ] I reviewed a copy of some handwritten notes, dated '7/13,' and
> those notes (attached) are in my handwriting. [ ] Those notes mention
> an individual named Asia McClain, and say, among other things,
> "Asia McClain → saw him in the library @ 3:00."

Chaudry testified at the first hearing and confirmed that she had spoken with McClain about Syed's case. Chaudry stated that during their brief phone conversation, McClain "seemed very happy that somebody was reaching out to her. And she was very willing to meet." The day following the phone conversation, Chaudry met with McClain in the parking lot of the Woodlawn Public Library. Chaudry stated that from their conversation, she "learned [ ] that, [McClain] had seen [Syed] after school that day at the library, which was next door to the school. And she recalled the day very clearly. She recalled very specific things about the day and she had spent the time immediately after school with him for about 15, 20 minutes." Chaudry asked McClain if she would put her story down on paper, and McClain agreed. That same day, McClain signed an affidavit dated March 25, 2000, which was then notarized.

Chaudry gave Syed a copy of McClain's affidavit, and Syed called trial counsel from the jail. Syed testified:

> I read through the affidavit and I reminded her about the letters. **And I said, [trial counsel], did you speak to her? Did you talk to her? Did you contact her? And she said, no. And I was very upset at that point. Because I said, [trial counsel], it's the exact same time. And I asked her, did she ever try to go to the library to secure the video footage? And she said, no.** So, I became very upset with her. And I asked her, was there anything we can do at this point? And she said, no. We need to focus on the appeal.

(Emphasis added).

Trial counsel did not testify at the first hearing, because she had passed away before the hearing took place. McClain also did not testify at the first hearing.

63

On January 6, 2014, the post-conviction court issued its Memorandum Opinion I denying Syed post-conviction relief. The post-conviction court determined, among other things, that Syed's trial counsel was not deficient for failing to investigate McClain for two reasons. First, "the letters sent from [ ] McClain to [Syed] [did] not clearly show [ ] McClain's potential to provide a reliable alibi for [Syed]." The court explained that the letters did not state an exact time the encounter at the library took place and thus "trial counsel could have reasonably concluded that [ ] McClain was offering to lie in order to help [Syed] avoid conviction." Second, McClain's story conflicted with Syed's version of events and thus "pursuing [ ] McClain as a potential alibi witness would not have been helpful to [Syed's] defense and may have, in fact, harmed the defense's ultimate theory of the case." The post-conviction court concluded that trial counsel's failure to investigate McClain as an alibi witness was the result of sound and reasonable trial strategy, and thus was not deficient performance.

## 2. First Appeal

On January 27, 2014, Syed filed a timely application for leave to appeal to this Court, raising two issues, one of which was whether Syed's trial counsel rendered ineffective assistance of counsel by failing to interview or even contact the potential alibi witness, McClain. As previously indicated, on January 20, 2015, Syed supplemented his application for leave to appeal, requesting that this Court remand the case back to the post-conviction court for additional fact-finding on the alibi witness issue in light of McClain's January 13, 2015 affidavit. On February 6, 2015, this Court granted Syed's application for

64

leave to appeal, reserving a decision on Syed's request to remand. After reviewing the briefs, Syed's supplement, and other pleadings, this Court by order dated May 18, 2015, stayed Syed's appeal and remanded to the post-conviction court for Syed to file a motion to reopen the post-conviction proceeding.

### 3. Second Hearing

Pursuant to this Court's remand order, Syed filed a Motion to Reopen, and the post-conviction court granted the motion "to introduce the January 13, 2015 affidavit from McClain, the potential testimony of McClain, and relevant evidence concerning [Syed's] claims of ineffective counsel and alleged prosecutorial misconduct during the post-conviction proceedings[.]" The second hearing began on February 3, 2016, and lasted until February 9, 2016.

At the second hearing, McClain[30] testified to being with Syed at the Woodlawn Public Library on January 13, 1999. That day, McClain had a conversation with Syed "[s]hortly after 2:15 [p.m.]" while McClain was waiting for her boyfriend to pick her up from the library. McClain noted that Syed's demeanor was "[c]ompletely normal." The conversation lasted "about 15 to 20 minutes" and ended when McClain's boyfriend and his friend arrived to pick her up. McClain further stated that school was closed the next two days, January 14 and January 15, 1999, due to bad weather.[31]

---

[30] At the time of the second hearing, Asia McClain was known as Asia Chapman.

[31] At the first hearing, Chaudry testified to a conversation that she had with McClain in March of 2000, during which McClain mentioned that school was closed for two days following her conversation with Syed due to heavy snowfall. Chaudry stated that she

McClain testified that, after Syed was arrested on February 28, 1999, she and her friend, Justin Adger, went to Syed's house to inform his family that she had seen Syed and spoke to him at the library on January 13, 1999. On March 1, 1999, McClain wrote a letter ("first letter") to Syed. The first letter,[32] which was admitted into evidence at the second hearing, stated the following:

> It's late.
> I just came from your house an hour ago.
> March 1, 1999
> Dear Adnon, (hope I sp. it right)
>
> I know that you can't visitors, so I decided to write you a letter. **I'm not sure if you remember talking to me in the library on Jan. 13th, but I remembered chatting with you.** Throughout you're actions that day I have reason to believe in your innocense. I went to your family's house and discussed your "calm" manner towards them. **I also called the Woodlawn Public Library and found that they have a survailance system inside the building. Depending on the amount of time you spend in the library that afternoon, it might help in your defense. I really would appreciate it if you would contact me between 1:00pm-4pm or 8:45pm →until . . . My number is [redacted]. More importantly I'm trying to reach your lawyer to schedule a possible meeting with the three of us. We aren't really close friends, but I want you to look into my eyes and tell me of your innocence. If I ever find otherwise I will hunt you down and wip your ass, ok friend.**
>
> I hope that you're not guilty and **I hope to death that you have nothing to do with it. If so I will try my best to help you account for some of your unwitnessed, unaccountable lost time (2:15-8:00; Jan 13th.)**

---

verified the two-day school closure because of snow, and that such verification was significant to her, because "[t]hat showed [her] that there were details about that day. It was not just any other day for [McClain]. She remembered specific details about that day, and her details were verifiable."

[32] The typographical errors therein have not been altered.

The police have not been notified Yet to my knowledge maybe it will give your side of the story a particle head start. I hope that you appreciate this, seeing as though I really would like to stay out of this whole thing. Thank Justin, he gave me a little more faith in you, through his friendship and faith. I'll pray for you and that the "REAL TRUTH" comes out in the end.

"I hope it will set you free"                    Only trying to help
Asia McClain

*P.S. **If necessary my grandparents line number is [redacted]**. Do not call that line after 11:00 O.K.

Like I told Justin if your innocent I do my best to help you.
But if you're not only God can help you.

If you were in the library for awhile, tell the police and I'll continue to tell what I know even louder than I am. My boyfriend and his best friend remember seeing you there too.

Your amiga
  Asia McClain

(Emphasis added).

McClain testified that she wrote Syed a second letter ("second letter"), dated March 2, 1999. The second letter,[33] which was admitted into evidence at the second hearing, stated in relevant part:

Adnon Syed #992005477<br>
301 East Eager Street<br>
Baltimore, MD. 21202

Dear Adnon,
**How is everything? I know that we haven't been best friends in the past, however I believe in your innocence.** I know that central booking is probably not the best place to make friends, so I'll attempt to be the best friend possible. I hope that nobody has attempted to harm you (not that they will). Just remember that if someone says something to you, that their just f\*\*king with your emotions. I know

---

[33] *See supra* note 32.

that my first letter was probably a little harsh, but I just wanted you to know where I stode in this entire issue (on the centerline). **I don't know you very well, however I didn't know Hae very well. The information that I know about you being in the library could helpful, unimportant or unhelpful to your case.** I've been think a few things lately, that I wanted to ask you:

1. **Why haven't you told anyone about talking to me in the library? Did you think it was unimportant, you didn't think that I would remember? Or did you just totally forget yourself?**
2. How long did you stay in the library that day? Your family will probably try to obtain the library's surveillance tape.
3. Where exactly did you do and go that day? What is the so-called evidence that my statement is up against? And who are these WITNESSES?

* * *

You'll be happy to know that the gossip is dead for your associates, it's starting to get old. Your real friends are concentrated on you and your defense. I want you to know that I'm missing the instructions of Mrs. Ogle's CIP class, writing this letter. **It's weird, since I realized that I saw you in the public library that day, you've been on my mind. The conversation that we had, has been on my mind. Everything was cool that day, maybe if I would have stayed with you or something this entire situation could have been avoided.** Did you cut school that day? Someone told me that you cut school to play video games at someone's house. Is that what you told the police? This entire case puzzles me, you see I have an analytical mind. I want to be a criminal psychologist for the FBI one day. I don't understand how it took the police three weeks to find Hae's car, if it was found in the same park. I don't understand how you would even know about Leakin Park or how the police expect you to follow Hae in your car, kill her and take her car to Leakin Park, dig a grave and find you way back home. As well how come you don't have any markings on your body from Hae's struggle. I know that if I was her, I would have struggled. I guess that's where the SO-CALLED witnesses. White girl Stacie just mentioned that she thinks you did it. Something about your fibers on Hae's body…something like that (evidence). I don't mean to make you upset talking about it…if I am. I just thought that maybe you should

68

know. Anyway I have to go to third period. I'll write you again. Maybe tomorrow.

Hope this letter brightens your day…Your Friend,
Asia R. McClain

P.S: Your brother said that he going to tell you to maybe call me, it's not necessary, save the phone call for your family. You could attempt to write back though. So I can tell everyone how you're doing (and so I'll know too).

> Asia R. McClain
> 6603 Marott Drive
> Baltimore, MD 21207

Apparently a whole bunch of girl were crying for you at the jail…Big Playa Playa (ha ha ha he he he).

(Emphasis added).

McClain testified that no one from Syed's defense team contacted her, but had they, she would have spoken to them. McClain stated that after Syed's conviction, Chaudry came to her house and asked if she had a conversation with Syed in the library on January 13, 1999. McClain told Chaudry that she did have a conversation with Syed, to which Chaudry requested McClain write an affidavit. The notarized affidavit, dated March 25, 2000 ("March 25, 2000 affidavit"), [34] was admitted into evidence at the second hearing and stated the following:

> Affidavit
> A.R.M.

Asia McClain having been duly sworn, do depose and state:

---

[34] *See supra* note 32.

I am 18 years old. I attend college at Catonsville Community College of Baltimore County. In January of 1999, I attended high school at Woodlawn Senior High. I have known Adnan Syed since my 9th grade freshmen year (at high school.) **On 1/13/99, I was waiting in the Woodlawn Branch Public Library. I was waiting for a ride from my boyfriend (2:20), when I spotted Mr. Syed and held a 15-20 minute conversation.** We talked about his girlfriend and he seemed extremely calm and very caring. He explained to me that he just wanted her to be happy. **Soon after my boyfriend (Derrick Banks) and his best-friend (Gerrod Johnson) came to pick me up. Spoke to Adnan (briefly) and we left around 2:40.**

A.R.M.
**No attorney has ever contacted me about January 13, 1999 and the above information**

Asia McClain 3/25/00
[signature of notary listed below]

(Emphasis added).

After moving across the country to the State of Washington, McClain testified that Syed's first post-conviction counsel attempted to contact her in April of 2010. She then contacted the lead prosecutor from Syed's trial, Kevin Urick, to see if he could provide her with unbiased information as to what was going on with the case. Urick explained to her the evidence of the case, the absence of alibi witnesses at trial, and the likely result of the post-conviction proceeding. Because of Urick's advice "that it was [ ] a waste of time for [McClain] to get involved with something that was just obviously a tactic to manipulate the court system[,]" McClain did not respond to the inquiries of Syed's post-conviction counsel. McClain stated that in January of 2014, she was contacted by National Public Radio ("NPR") and was interviewed about the case. According to McClain, the NPR

70

podcast changed her outlook on the case and caused her to realize how important her information was.

McClain contacted Syed's post-conviction counsel in December of 2014, after learning that Urick had testified at Syed's first hearing that McClain wrote the March 25, 2000 affidavit because of pressure from Syed's family. Thereafter, McClain wrote the January 13, 2015 affidavit, which was admitted into evidence at the second hearing. The January 13, 2015 affidavit[35] stated in relevant part:

ASIA MCCLAIN

1. I swear to the following, to the best of my recollection, under penalty of perjury:
2. I am 33years old and competent to testify in a court of law.
3. I currently reside in Washington State.
4. I grew up in Baltimore County, MD, and attended high school at Woodlawn High School. I graduated in 1999 and attended college at Catonsville Community College.
5. While a senior at Woodlawn, I knew both Adnan Syed and Hae Min Lee. I was not particularly close friends with either.
6. On January 13, 1999, I got out of school early. At some point in the early afternoon, I went to Woodlawn Public Library, which was right next to the high school.
7. I was in the library when school let out around 2:15 p.m. I was waiting for my boyfriend, Derrick Banks, to pick me up. He was running late.
8. At around 2:30 p.m., I saw Adnan Syed enter the library. Syed and I had a conversation. We talked about his ex-girlfriend Hae Min Lee and he seemed extremely calm and caring. He explained that he wanted her to be happy and that he had no ill will towards her.
9. Eventually my boyfriend arrived to pick me up. He was with his best friend, Jerrod Johnson. We left the library around 2:40. Syed was still at the library when we left.

---

[35] *See supra* note 32.

10. I remember that my boyfriend seemed jealous that I had been talking to Syed. I was angry at him for being extremely late.

11. The 13th of January 1999 was memorable because the following two school days were cancelled due to hazardous winter weather.

12. I did not think much of this interaction with Syed until he was later arrested and charged in the murder of Hae Min Lee.

13. Upon learning that he was charged with murder [sic] related to Lee's disappearance on the 13th, I promptly attempted to contact him.

14. I mailed him two letters to the Baltimore City Jail, one dated March 1, the other dated March 2. (See letters, attached). In these letters I reminded him that we had been in the library together after school. At the time when I wrote these letters, I did not know that the State theorized that the murder took place just before 2:36 pm on January 13, 1999.

15. I also made it clear in those letters that I wanted to speak to Syed's lawyer about what I remembered, and that I would have been willing to help his defense if necessary.

16. The content of both of those letters was true and accurate to the best of my recollection.

17. After sending those letters to Syed in early March, 1999, I never heard from anybody from the legal team representing Syed. Nobody ever contacted me to find out my story.

18. If someone had contacted me, I would have been willing to tell my story and testify at trial. My testimony would have been consistent with the letters described above, as well as the affidavit I would later provide. *See below*.

\* \* \*

[Signature]
ASIA MCCLAIN
DATE 1/13/15

David Irwin, Esquire, was called to testify at the second hearing as an expert in criminal defense practices and *Brady* disclosure duties of the prosecution. Irwin opined that McClain's story was "[p]owerfully credible." Irwin explained that back in 1999, based on what trial counsel had and was on notice for, she

had to meet the minimal objective standard of reasonable defense care. She had to go talk to [ ] McClain. She had to investigate what [ ] McClain was saying and she had to then determine if -- she had to investigate the two young guys that were with her. She had to go talk to them. Somebody had to talk to those people because the testimony could have been critical.

Irwin stated further that "now we know that [ ] McClain is a fabulous witness, lovely lady, credible, intelligent and she would have been material and changed the ball game's result. It's pretty obvious to me." It was Irwin's opinion that trial counsel's performance "was well below the minimum required by *Strickland*[.]" (Emphasis added). Irwin concluded that McClain's testimony "was a game changer. It would have made an incredible difference in the outcome of the case. It's material. It's important. It certainly takes away any confidence that one would have in the verdict in that case."

### 4. Memorandum Opinion II

In addressing the deficiency prong of *Strickland* in its Memorandum Opinion II, the post-conviction court held that trial counsel's "failure to investigate McClain as a potential alibi witness fell below the standard of reasonable professional judgment." In reaching its holding, the post-conviction court found that after learning about McClain, trial counsel "failed to make any effort to contact McClain and investigate the bona fides of the March 1, 1999 and March 2, 1999 letters, or ascertain whether McClain's testimony would aid [Syed's] defense." According to the post-conviction court, trial counsel learned about the potential alibi witness "nearly five months prior to trial, and thus, she had ample time and opportunity to investigate the potential alibi."

73

The post-conviction court rejected the State's argument that trial counsel's failure to investigate was a "strategic decision not to investigate McClain because the potential alibi was in fact a scheme manufactured by [Syed] to secure a false alibi." The post-conviction court stated that, because adopting the State's argument "would require the [post-conviction court] to retroactively supply key assumptions and speculations, the [c]ourt rejects the State's invitation to indulge in such hindsight sophistry, given that it is contrary to the legal framework set forth under *Strickland*."

The post-conviction court summarized its holding of deficient performance by Syed's trial counsel, succinctly and articulately, as follows:

> As the [c]ourt has explained, reasonable professional judgment under the facts of the present case required trial counsel to contact the potential alibi witness and investigate whether her testimony would aid [Syed's] defense. The facts in the present matter are clear; trial counsel made *no effort* to contact McClain in order to investigate the alibi and thus, trial counsel's omission fell below the standard of reasonable professional judgment.

(Emphasis in original).

### B. Deficient Performance for Failure to Investigate McClain as a Potential Alibi Witness

#### 1. Contentions

Syed contends that the post-conviction court correctly ruled that trial counsel's failure to investigate McClain as an alibi witness rendered her performance deficient, because trial counsel "was aware that McClain would have testified that Syed was in the Woodlawn Public Library at the time of the murder." The State responds that the post-conviction court erred in holding that trial counsel rendered deficient performance. The

74

State contends that trial counsel had three justifiable reasons for not pursuing the McClain alibi defense: (1) "the alibi proposed by McClain threatened to suggest that Syed had lied to police and had gone to the public library, a place no one had ever associated with Syed[;]" (2) "the [public] library alibi ran the risk of placing Syed at the public library with the victim at critical junctures[;]" and (3) "pursuing the [ ] McClain alibi expose[d] Syed to the risk of being accused of colluding with a witness to falsify an alibi."  The State further argues that the defense theory adopted by trial counsel, which was based upon Syed's daily routine, was better than the McClain alibi, because "it covered a broader range of time, which was important since prosecutors could not narrow [the] time of death even after [trial counsel] inquired."

In his reply brief, Syed asserts that instead of providing support for the proposition that trial counsel's performance was not deficient, "the State relies on assorted after-the-fact rationalizations for why trial counsel could have ignored Syed's request that she pursue the McClain alibi."  Syed argues that the post-conviction court thus was proper in disregarding these rationalizations.  Lastly, Syed contends that, because the State disclosed the timeline for the murder five months before trial and further clarified that timeline during its opening statement at the first trial on December 9, 1999, trial counsel had plenty of time to contact McClain and determine whether her testimony would be helpful to Syed's defense.

We agree with the post-conviction court that trial counsel's performance was deficient under *Strickland*.  We shall explain.

75

## 2. Relevant Case Law

As stated *supra*, in *Strickland* the Supreme Court set forth a two-step process for determining whether an attorney's assistance was so defective as to require reversal of a conviction. 466 U.S. at 687. "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Id.*

In discussing the first step, commonly referred to as the deficiency prong, the Supreme Court stated that "the proper standard for attorney performance is that of reasonably effective assistance[,]" *id.*, and that "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. The Court noted that the reasonableness of attorney performance must be considered "under prevailing professional norms" and under "all the circumstances." *Id.* The Court then cautioned that "[j]udicial scrutiny of counsel's performance must be highly deferential[,]" with "every effort to be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. In other words, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* In sum, in deciding the deficiency prong of an ineffective assistance of counsel claim under *Strickland*, a court must assess counsel's performance under an objective standard of a reasonably competent attorney acting under prevailing norms, taking into consideration all of the circumstances existing at the time of counsel's conduct with a strong presumption of reasonable professional assistance.

76

In further defining the objective standard of reasonable professional assistance, the Court in *Strickland* identified certain basic duties of counsel's representation of a criminal defendant, to include a duty of loyalty, a duty to avoid conflicts of interest, and a duty to advocate the defendant's cause. *Id.* at 688. Like the instant case, the duty at issue in *Strickland* was "counsel's duty to investigate." *Id.* at 690. The Court discussed the duty to investigate as follows:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, **counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.**

*Id.* at 690-91 (emphasis added).

In the case *sub judice*, our inquiry is not on the general duty of trial counsel to investigate a possible defense for Syed, but rather a subset of that duty. Specifically, the duty in question here is trial counsel's duty to investigate a potential alibi witness, and the issue raised is whether trial counsel's failure to investigate McClain as a potential alibi witness was deficient performance under *Strickland*.

The Court of Appeals has defined an alibi witness as follows: "[A]n 'alibi' witness [is] a witness whose testimony 'must tend to prove that it was impossible or highly improbable that [the defendant] was at the scene of the crime when it was alleged to have occurred.'" *McLennan v. State*, 418 Md. 335, 352 (2011) (quoting *Ferguson v. State*, 488

77

P.2d 1032, 1039 (Alaska 1971)). In *Simms v. State*, this Court explained what an alibi defense is:

> An alibi is [a] defense that places the defendant at the relevant time of [the] crime in a different place than the scene involved . . . . The presence of the defendant at the scene of the crime at the time it was committed is obviously an essential element of the prosecutor's case[.] When a defendant raises an alibi defense, he is in effect denying the claim of the prosecution that he was present at the scene of the crime at the time it was committed. By claiming that he was at another place at the time when the alleged crime was committed, the defendant is denying by necessary implication, if not expressly, the allegations set forth in the charge.

194 Md. App. 285, 307-08 (2010) (internal quotation marks and citations omitted), *aff'd*, 420 Md. 705 (2011).

Our research has revealed no Maryland case that has addressed directly the issue of a defense counsel's failure to investigate a potential alibi witness in the context of an ineffective assistance of counsel claim. The closest Maryland case is *In Re Parris W.*, 363 Md. 717 (2001), but that case involved defense counsel's failure to subpoena alibi witnesses for the correct trial date. *Id.* at 727. Nevertheless, in *In Re Parris W.*, the Court of Appeals cited with approval, and discussed at length, three federal cases that considered, among other things, the issue of defense counsel's failure to investigate a potential alibi witness. *Id.* at 730-34. Thus a review of those cases first, along with others from outside of Maryland, will be instructive to our analysis.

In *Griffin v. Warden, Maryland Correctional Adjustment Center*, Griffin was identified by two security guards as being a participant in an armed robbery that occurred at 3:45 p.m. on July 24, 1983. 970 F.2d 1355, 1356 (4th Cir. 1992). Griffin provided his

78

trial counsel with a list of five alibi witnesses. *Id.* Defense counsel, however, failed to

contact these witnesses or to respond to the State's discovery request to be notified of an

alibi defense and the identities of alibi witnesses. *Id.* Defense counsel explained that he

did not contact any of the alibi witnesses, because he expected Griffin to take a plea. *Id.*

Among the "cogent tactical considerations" that the state court bestowed on defense

counsel was not calling one of the alibi witnesses, because a security guard had identified

that witness as a participant in the robbery and calling a witness who was an accomplice to

the robbery could have hurt Griffin's case. *Id.* at 1358. The Fourth Circuit rejected the

state court's rationale, because defense counsel did not even interview the witness, "let

alone make some strategic decision not to call him." *Id.* The Fourth Circuit warned:

> [C]ourts should not conjure up tactical decisions an attorney could
> have made, but plainly did not. The illogic of this approach is
> pellucidly depicted by this case, where the attorney's incompetent
> performance deprived him of the opportunity to even make a tactical
> decision about putting [the witness] on the stand. A court should
> evaluate the conduct from counsel's perspective at the time.
> Tolerance of tactical miscalculations is one thing; fabrication of
> tactical excuses is quite another.

*Id.* at 1358-59 (internal quotation marks and citations omitted).

In *Grooms v. Solem*, Grooms was convicted of selling stolen Native American

artifacts. 923 F.2d 88, 89 (8th Cir. 1991). Grooms's conviction was based on the testimony

of a police informant who was married to Grooms's ex-wife, and they were engaged with

Grooms "in a bitter and spiteful battle over the custody of the three children." *Id.* The

informant testified that on May 15, 1984, between 5:00 p.m. and 5:30 p.m. in Scenic, South

Dakota, Grooms sold him a stolen Native American beaded dress. *Id.* Grooms told his

counsel on the day of trial that he, his wife, and a friend spent that same day waiting at a garage for the mechanics to replace the transmission in his truck. *Id.* The garage was located in Rapid City, South Dakota, approximately fifty miles from Scenic, South Dakota. *Id.* Grooms had a cancelled check dated May 15, 1984, payable to the garage and labeled "trans repair" in the memo. *Id.* Grooms also produced a work order dated May 14, 1984, with the same check number written on the face of the order. *Id.* At the post-conviction hearing, the garage's employees who worked on Grooms's transmission testified that they did not finish working on Grooms's truck until 7:00 or 7:30 p.m. *Id.* at 90. Defense counsel did not look into this possible alibi defense nor did he request a short continuance of the trial for further investigation; "he assumed that the court would preclude any evidence of alibi[,] because counsel had not given the notice of an alibi . . . ." *Id.* The Eighth Circuit noted that, "[o]nce a defendant identifies potential alibi witnesses, it is unreasonable not to make some effort to contact them to ascertain whether their testimony would aid the defense." *Id.* The Eighth Circuit determined that defense counsel's failure to make any effort to check the bona fides of the alibi was unreasonable under the circumstances. *Id.* The Court concluded that, even though counsel discovered this alibi on the day of trial, "trial counsel had a duty to attempt to investigate and to argue on the record for the admission of the alibi witnesses' testimony." *Id.* at 91; *accord Washington v. Smith*, 219 F.3d 620, 630-32 (7th Cir. 2000) (holding that defense counsel rendered constitutionally deficient performance by failing to attempt to contact alibi witnesses who were not identified until immediately before trial).

The Seventh Circuit in *Montgomery v. Petersen* addressed whether defense counsel

was ineffective for failing to investigate and call the single disinterested alibi witness identified by the defendant. 846 F.2d 407, 407 (7th Cir. 1988). In *Montgomery*, Montgomery was charged with the commission of two burglaries in two different counties on the same day. *Id.* at 408. At the trial for one burglary, Montgomery's wife testified that she and her husband spent the afternoon of the robbery shopping for a bicycle for their son in Springfield, Illinois, and that Montgomery was at home the rest of the day and evening. *Id.* at 409. Such testimony was in direct contradiction to the testimony of the State's witnesses, who testified that they and Montgomery had spent the day committing burglaries. *Id.* at 408-09. Defense counsel called twelve other witnesses who were friends or close relatives of Montgomery to testify as to Montgomery's whereabouts on the day of the crime. *Id.* at 409. Defense counsel failed to investigate or call the sole disinterested witness, a Sears clerk who sold Montgomery and his wife the bicycle. *Id.* Montgomery was convicted of burglary. *Id.* At the trial for the other burglary, Montgomery's counsel called the clerk, and the trial resulted in an acquittal. *Id.* at 409.

At Montgomery's post-conviction hearing, defense counsel testified that Montgomery and his wife gave him a receipt for the purchase of the bicycle and requested that he investigate the Sears clerk, but he failed to do so. *Id.* at 409-10. Defense counsel stated that his failure to investigate "was merely due to 'inadvertence' on his part, as he was busy interviewing other potential witnesses" and did not believe Montgomery. *Id.* at 410. The Seventh Circuit agreed with the post-conviction court that, "[i]n light of the information available to counsel at the time, the *failure to investigate the only available disinterested alibi witness* fell below the standard of reasonably effective assistance

81

required by *Strickland*." *Id.* at 411-12 (emphasis in original) (internal quotations omitted). The Seventh Circuit stated that defense counsel should have recognized the crucial importance of the clerk as the only disinterested witness in the case. *Id.* at 414. The fact that defense counsel did not have the name or address of the clerk did not excuse defense counsel's failure to investigate, because Montgomery's wife and mother-in-law were able to find the clerk easily. *Id.* Nor did counsel's lack of belief in Montgomery's alibi serve as "an adequate basis for ignoring such an important lead. Indeed, if counsel had taken the few steps necessary to identify and interview the Sears clerk, he may well have formed a more favorable view of his client's veracity." *Id.*

In *Bryant v. Scott*, the Fifth Circuit determined that Bryant's counsel rendered ineffective assistance of counsel by failing to investigate and interview alibi witnesses made known to counsel three days before trial. 28 F.3d 1411, 1411 (5th Cir. 1994). At trial, Bryant was convicted of armed robbery. *Id.* at 1413-14. After exhausting state court remedies, Bryant filed a petition for writ of habeas corpus in the federal district court claiming, *inter alia*, that trial counsel was ineffective for failure to investigate alibi witnesses. *Id.* at 1414. Because the district court found that Bryant had not given defense counsel the names and addresses of any alibi witnesses prior to trial, the court concluded that defense counsel provided Bryant with effective assistance of counsel. *Id.* at 1415.

On appeal, the Fifth Circuit disagreed with the district court. *Id.* at 1416. The Court stated that defense counsel was well aware of Bryant's interest in pursuing an alibi defense. *Id.* The Court acknowledged that Bryant did not provide defense counsel with the names or addresses of alibi witnesses prior to the pre-trial hearing, *id.* at 1415, but defense counsel,

according to the Court, obtained sufficient information at the pre-trial hearing to contact Bryant's alibi witnesses. *Id.* at 1417. The Court also noted that there was seventy-two hours between the pre-trial hearing and the trial during which defense counsel had the opportunity to contact the alibi witnesses. *Id.* The Court concluded that "the record shows that [defense counsel] had information on potential alibi witnesses before trial, and had the opportunity to try to interview such witnesses." *Id.* Accordingly, the Court held that defense counsel

> abdicated his responsibility of investigating potential alibi witnesses and failed to "attempt to investigate and to argue on the record for the admission of the alibi witnesses' testimony." *Grooms v. Solem*, 923 F.2d 88, 91 (8th Cir. 1991). [Defense counsel's] failure to investigate potential alibi witnesses was not a "strategic choice" that precludes claims of ineffective assistance. *See Nealy* [*v. Cabana*, 764 F.2d 1173, 1178 (5th Cir. 1985).]

*Id.*

In summary, the Fifth Circuit stated:

> Thus, we disagree with the district court's conclusion that [defense counsel] was "hog-tied" or "stonewalled" from making any investigation of alibi witnesses. **[Defense counsel] knew of three alibi witnesses before trial and should have made some effort to contact or interview these people in furtherance of Bryant's defense**. [Defense counsel's] complete failure to investigate alibi witnesses fell below the standard of a reasonably competent attorney practicing under prevailing norms.

*Id.* at 1418 (emphasis added) (footnotes omitted).

In *Lawrence v. Armontrout*, Lawrence was convicted of capital murder and murder in the first degree. 900 F.2d 127, 128 (8th Cir. 1990). After his convictions were affirmed on appeal, Lawrence sought post-conviction relief in state court, claiming ineffective

assistance of counsel. *Id.* Lawrence claimed that defense counsel was ineffective because she "failed to interview or call as witnesses several people who would have corroborated his alibi on the evening of the murders." *Id.* According to the record, four potential alibi witnesses were identified to defense counsel: Betty Buie (Lawrence's girlfriend), Brenda Buie, Veronica Trice, and Felicia Longstreet. *Id.* at 128-29. At the evidentiary hearing, defense counsel testified that she interviewed Betty Buie and Brenda Buie, but decided not to use either of them at trial. *Id.* at 129. Defense counsel, however, made no effort to locate or interview the other two witnesses, relying instead on Betty Buie's assertions that Longstreet could not be located and Trice would not come to court. *Id.* After relief was denied in state court, Lawrence filed a petition for writ of habeas corpus in federal district court, which also denied any relief. *Id.*

On appeal, the Eighth Circuit reversed, stating that, "once Lawrence provided his trial counsel with the names of potential alibi witnesses, it was unreasonable of her not to make some effort to interview all these potential witnesses to ascertain whether their testimony would aid an alibi defense." *Id.* Moreover, according to the Court, defense counsel's "failure to attempt to find and interview Longstreet and Trice *herself* [fell] short of the diligence that a reasonably competent attorney would exercise under similar circumstances." *Id.* at 129-30 (emphasis added). The Court concluded that defense counsel "owed Lawrence a duty to pursue his alibi defense and to investigate all witnesses who allegedly possessed knowledge concerning Lawrence's guilt or innocence. Because she failed to do so, Lawrence [ ] satisfied the first prong of the *Strickland* standard." *Id.* at 130 (citation omitted); *see Avery v. Prelesnik*, 548 F.3d 434, 437-38 (6th Cir. 2008)

84

(finding deficient performance where defense counsel never personally attempted to contact any of the potential alibi witnesses, even though counsel's investigator had talked with one alibi witness).

There are also cases where courts have found defense counsel's performance was not deficient for failing to investigate an alibi witness. One such case is *Russell v. Lynaugh*. 892 F.2d 1205 (5th Cir. 1989), *cert. denied*, 501 U.S. 1259 (1991). The Fifth Circuit in *Russell* held that counsel's decision not to investigate alibi and character witnesses to testify on behalf of a murder defendant was not deficient performance. *Id.* at 1205. In 1977, Russell was convicted of capital murder and sentenced to death. *Id.* at 1207. After exhausting all state court remedies, Russell petitioned for writ of habeas corpus in federal district court, claiming, *inter alia*, that trial counsel was ineffective at trial and on appeal. *Id.* at 1212. Russell argued that "his lawyer failed to investigate the law and facts. In particular, *he failed to discover alibi witnesses* who could have testified in the guilt-innocence phase of the trial." *Id.* (emphasis added). On appeal, the Fifth Circuit affirmed the district court's decision to deny Russell post-conviction relief. *Id.* at 1213. Explaining that Russell "specifically identified no potential alibi witnesses who did not testify," the Court concluded that Russell failed to show that his counsel's "performance in this respect was deficient and prejudicial." *Id.* Accordingly, the Court denied relief. *Id.*

### 3. Analysis

We learn from the above cases that, once a defendant identifies potential alibi witnesses, defense counsel has the duty "to make some effort to contact them to ascertain whether their testimony would aid the defense." *Grooms*, 923 F.2d at 90; *accord*

85

*Lawrence*, 900 F.2d at 129; *Bryant*, 28 F.3d at 1415; *see Russell*, 892 F.2d at 1213. Such identification normally includes names and addresses of potential alibi witnesses, but need not if sufficient information is provided or acquired to enable defense counsel to contact the witnesses. *See Montgomery*, 846 F.2d at 414 (although defense counsel did not have the name or address of the Sears clerk, Montgomery's wife and mother-in-law were able to find him easily); *Bryant*, 28 F.3d at 1416-17 (defense counsel learned the names and contact information of potential alibi witnesses at a pre-trial hearing). Such identification also includes sufficient information to suggest that the witness's testimony could provide the defendant with an alibi.

In the case *sub judice*, Syed identified McClain as a potential alibi witness and requested trial counsel to contact her. Syed gave trial counsel two letters written by McClain, the first contained McClain's phone number and her grandparents' phone number and the second contained McClain's address in Baltimore. In the first letter, McClain reminded Syed that she had talked with him in the Woodlawn Public Library in the afternoon after school on January 13, 1999, and that she may be able to account for his "lost time" from "2:15–8:00" that day. She also told Syed that the library had a surveillance system inside the building. In the second letter, McClain again referred to their conversation at the library that day. In addition, trial counsel's file contained notes from her law clerk of an interview with Syed on July 13, 1999, wherein Syed said that McClain "saw him in the library @ 3:00 [p.m.]" and her "boyfriend saw him too." Trial counsel also noted in her file that "[McClain] + boyfriend saw [Syed] in library 2:15–3:15 [p.m.]." Finally, trial counsel was aware, at least six weeks before the second trial, that McClain's

alibi testimony probably covered the same time period as when the State theorized that Hae's murder occurred.[36] Therefore, we conclude that Syed's trial counsel had the duty to investigate McClain as a potential alibi witness, which required counsel to make some effort to contact McClain to ascertain whether her testimony would aid Syed's defense. *See Grooms*, 923 F.2d at 90.

The post-conviction court found that Syed's trial counsel "failed to make any effort to contact McClain and investigate the bona fides of the March 1, 1999 and March 2, 1999 letters, or ascertain whether McClain's testimony would aid [Syed's] defense." That finding is not challenged by the State.

"The failure to investigate a particular lead may be excused if a lawyer has made 'a reasonable decision that makes particular investigations unnecessary.'" *Washington*, 219 F.3d at 631 (quoting *Strickland*, 466 U.S. at 691). In other words, "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. Here, however, because of trial counsel's death, there is no record of why trial counsel decided not to make any attempt to contact McClain and investigate the importance *vel non* of her testimony to Syed's defense. In such a situation, we must guard against "the distorting effects of hindsight," *id.* at 689, or to "conjure up tactical decisions an attorney could have made, but plainly did not." *Griffin*, 970 F.2d at 1358. Yet, even without trial counsel's explanation for her failure to investigate McClain as an alibi witness, we must

---

[36] For a discussion of the State's disclosure to trial counsel of its timeline for the murder, see *infra* p. 92.

still assess trial counsel's performance under the objective standard of a reasonably competent attorney acting under prevailing norms.[37]

The State posits four reasons why Syed's trial counsel performed as a reasonably competent attorney when she failed to investigate McClain as an alibi witness. We conclude that none of these reasons have merit.

> *First*, the alibi proposed by McClain threatened to suggest that Syed had lied to police and had gone to the public library, a place no one had ever associated with Syed. There are a number of problems with the alibi proposed by McClain, especially compared to the alibi strategy [trial counsel] adopted based on habit and routine—Syed

---

[37] The dissent disagrees that trial counsel had a duty to make some effort to contact McClain to ascertain whether her testimony would aid Syed's defense. The dissent then argues that in *Strickland* "the Supreme Court has rejected a bright line rule with respect to ineffective assistance of counsel claims." Respectfully, the dissent misconstrues the analytical paradigm that we have just set forth. In sum, the first step in the paradigm is to determine whether the duty arose for defense counsel to investigate a potential alibi witness. If, and only if, such duty arose and defense counsel failed to make any effort to contact the alibi witness, we move to the second step of the paradigm and determine whether defense counsel's failure was deficient performance under the objective standard of a reasonably competent attorney acting under prevailing norms. Nowhere do we say, or imply, that there is "a bright line rule with respect to ineffective assistance of counsel claims."

The dissent also attempts to distinguish the cases on which we rely on the ground that "[i]n those cases there was testimony by defense counsel, or other statements in the record, indicating that the reason defense counsel did not interview the witness was something other than trial strategy." The dissent argues that "[t]he absence of testimony by trial counsel makes it difficult for Syed to meet his burden of showing deficient performance[,]" citing for authority to *Broadnax v. State*, 130 So.3d 1232 (Ala. Crim. App. 2013). *Broadnax* is clearly distinguishable from the case *sub judice*, because both of Broadnax's trial attorneys testified at the post-conviction hearing, but were never questioned about their investigation of Broadnax's alibi defense. *Id.* at 1256. The Alabama court concluded "that Broadnax, by failing to question his attorneys about this specific claim, failed to overcome the presumption that counsel acted reasonably." *Id.* at 1256 (footnote omitted). Under *Strickland*, the "deference to counsel's judgments" is part of, but not controlling over, the requirement that "a particular decision not to investigate must be directly assessed for reasonableness in all of the circumstances." 466 U.S. at 691.

> stayed at Woodlawn High School until track practice after which he attended prayers at his mosque.

In this argument, the State suggests that trial counsel rejected the McClain alibi because it was inconsistent with the alibi defense adopted by trial counsel "based on [Syed's] habit and routine." The record does contain trial counsel's alibi notice to the State in October of 1999, in which she appeared to adopt the alibi defense of Syed's routine of staying at the high school after class, going to track practice, then going home and to the mosque. It is important to note, however, that in her opening statement and closing argument, trial counsel did not raise *any* alibi defense for Syed. Specifically, trial counsel said *nothing* about Syed's whereabouts from 2:15 p.m. to 2:35 p.m. on January 13 — the precise twenty minute time period during which the State argued to the jury that Syed murdered Hae.[38]

Nevertheless, in our view, the bottom line is that no reasonable evaluation of the advantages or disadvantages of McClain's alibi testimony, as compared to an alibi defense based on Syed's habit or routine, could be made without first contacting McClain. Only by contacting McClain would trial counsel have been able to determine (1) exactly what McClain would say, (2) how certain McClain was concerning her interactions with Syed that day, (3) how credible McClain would appear to a jury, (4) what, if any, corroborating evidence was available, and (5) whether McClain's testimony would aid in Syed's defense.

In *Griffin*, the Fourth Circuit stated that the failure of defense counsel to "even talk

---

[38] In her closing argument, trial counsel did say that Syed told the police that he went to track practice on the day of the murder. But trial counsel then stated that, according to Coach Michael Sye, "track practice – no later than 4 to 5 or 5:30."

to [the alibi witness]" "deprived him of the opportunity to even make a tactical decision about putting [the alibi witness] on the stand."  970 F.2d at 1358; *see Avery*, 548 F.3d at 438 (stating that it was "impossible for [defense counsel] to have made a 'strategic choice' not to have [the two alibi witnesses] testify because he had no idea what they would have said").  Moreover, in *Lawrence*, defense counsel had decided to defend Lawrence on a theory of misidentification.  900 F.2d at 130.  The Eighth Circuit held that such decision "d[id] not excuse her failure to investigate all potential alibi witnesses."  *Id.*  Thus, without contacting McClain, trial counsel could not reasonably reject McClain's potential alibi testimony.

> *Second*, the [ ] alibi [proposed by McClain] ran the risk of placing Syed at the public library [and ultimately at Best Buy] with the victim at critical junctures.  A review of [trial counsel's] notes and her approach at trial also indicated that she identified and sought to exploit a weakness in the prosecution's case—it was unclear how Syed got into [Hae's] car the day she was killed. . . . Thus, placing Syed at or near the public library, where students were regularly picked up and where Hae [ ] could have picked up Syed, resolves a flaw [trial counsel] intended to exploit.

The State fails to provide a citation from the record to support the assertion that students were regularly picked up from the Woodlawn Public Library, nor is this a finding made by the post-conviction court.  Nevertheless, if we follow the State's adopted theory at trial, that the murder occurred between 2:15 p.m. and 2:35 p.m., McClain's testimony would have rendered irrelevant the aforementioned weakness in the prosecution's case.  In other words, Syed deviating from his routine to go to the Woodlawn Public Library and to speak with McClain from 2:20 p.m. to 2:40 p.m. would have placed him at a location other than the crime scene at precisely the time of Hae's murder.  Thus it would not matter

whether the alibi "ran the risk of placing Syed at the public library with the victim at critical junctures."

> *Third*, pursuing the [ ] McClain alibi exposes Syed to the risk of being accused of colluding with a witness to falsify an alibi. The State submitted that, with the knowledge and documents available to [trial counsel] . . . , she could easily have detected in the letters . . . clear warning signs that would have prompted this experienced criminal attorney to fear that her client was coordinating, either directly or indirectly, with McClain to falsify an alibi.

This argument was rejected by the post-conviction court in its Memorandum Opinion II. The post-conviction court observed that the details about Hae's murder and the investigation were a matter of public knowledge prior to when McClain wrote the letters. The post-conviction court ultimately concluded that, "[i]f trial counsel had reservations about the bona fides of the letters as the State suggests, trial counsel could have spoken to McClain about these concerns instead of rejecting the potential alibi outright." Such conclusion is consistent with the case law. In *Montgomery*, the Seventh Circuit rejected the argument that defense counsel's lack of belief in the defendant's credibility was a reasonable basis for foregoing the investigation of a potential alibi witness. 846 F.2d at 414. Moreover, trial counsel was aware of potential corroboration of McClain's information. Trial counsel's file noted that McClain's "boyfriend saw [Syed] in library." Also, in McClain's first letter she advised Syed of the surveillance system inside of the Woodlawn Public Library. Thus, whether McClain and Syed were involved in the falsification of an alibi defense could be determined by a reasonably competent attorney only after contacting McClain and investigating her potential alibi testimony.

Finally, the State asserts that the alibi adopted by trial counsel, which was based upon Syed's habit or routine, was advantageous, "[b]ecause a precise time of death was not identified by the State leading up to trial, [and thus trial counsel] had to establish an alibi that would account for Syed's whereabouts for an extended period of time after school on January 13." This argument is directly contrary to the facts in the record.

In its Amended State's Disclosure filed with the circuit court on July 8, 1999, the State notified Syed that, "to the best of the State's information, the victim was murdered *the afternoon of the day she was reported missing, shortly after she would have left school for the day*, January 13, 1999." (Emphasis added). This disclosure dating more than five months prior to the first trial was sufficient to put Syed's trial counsel on notice that Syed's whereabouts that afternoon needed to be accounted for. In addition, at Syed's first trial, the State noted in its opening statement that Wilds received the call from Syed around "2:30, 2:40" p.m. and Wilds went to meet Syed, which was when he saw the victim's body. Because the first trial ended in a mistrial, the State's opening statement was sufficient to put Syed's trial counsel on notice of the pertinent time frame for which Syed needed an alibi going into the second trial, which began six weeks later. There was only one call listed in Syed's cell phone records that fell within the time frame of "2:30, 2:40" p.m. and that was the 2:36 p.m. call. As a result, trial counsel had clear knowledge six weeks before the second trial that the time frame of 2:15 p.m. to 2:35 p.m. on January 13, 1999, was going to be the crux of the State's case, and therefore, an alibi covering this precise time frame was extremely important.

92

In sum, Syed gave to trial counsel McClain's name and contact information as a potential alibi witness. Trial counsel also was aware six weeks before the second trial that McClain's testimony could place Syed at a location other than the scene of the crime at the exact time that the State claimed Syed murdered Hae. Thus trial counsel had the duty to make some effort to interview McClain to ascertain whether her testimony would aid in Syed's defense. Trial counsel failed to make any effort to contact McClain, and neither a review of the record nor the State's arguments provide a reasonable basis to justify such failure. Moreover, regardless of the defense strategy that trial counsel had adopted for Syed's trial, once the State committed itself, at the first trial, to the period of 2:15 p.m. to 2:35 p.m. on January 13, 1999, as the time of the murder, it was manifestly unreasonable for trial counsel not to make any effort to contact McClain, who, along with her boyfriend, had seen Syed "in library 2:15–3:15[,]" according to trial counsel's own notes to the file. We, therefore, conclude that trial counsel's failure to make any effort to contact McClain as an alibi witness fell below the objective standard of a reasonably competent attorney acting under prevailing norms, taking into consideration all of the circumstances existing at the time of counsel's conduct with a strong presumption of reasonable professional assistance.[39] Accordingly, trial counsel's performance was deficient, and Syed has satisfied the first prong of the *Strickland* test.

---

[39] The dissent argues at length that trial counsel's strategy at trial was reasonable, and thus there was no deficient performance. The issue raised in the deficiency prong of the *Strickland* test in the instant case is not whether the apparent defense strategy adopted by trial counsel fell below the objective standard of a reasonably competent attorney acting under prevailing norms. Rather, the issue presented is whether trial counsel's failure to make any effort to contact McClain as a potential alibi witness fell below such standard.

*C. Prejudice for Trial Counsel's Failure to Investigate McClain as a Potential Alibi Witness*

Having found trial counsel's performance deficient, we now turn to the second step in the *Strickland* test, commonly known as the prejudice prong. To satisfy this prong, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. We, however, do not "focus solely on an outcome determination, but [also] consider 'whether the result of the proceeding was fundamentally unfair or unreliable.'" *Oken v. State*, 343 Md. 256, 284 (1996) (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993)).

In determining the prejudice of trial counsel's failure to investigate McClain as a potential alibi witness, we must consider "the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695; *see also Avery*, 548 F.3d at 439 ("[The] potential alibi witnesses coupled with an otherwise weak case renders the failure to investigate the testimony sufficient to 'undermine confidence' in the outcome of the jury verdict. . . . Here, the jury was deprived of the right to hear testimony that could have supplied such 'reasonable doubt.'"). In considering the totality of the evidence, we recognize that

> [s]ome of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. **Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.** Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected

94

findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

*Strickland*, 466 U.S. at 695-96 (emphasis added).

In addressing the prejudice prong of *Strickland*, the post-conviction court concluded

that trial counsel's failure to investigate McClain's alibi did not prejudice the defense because the crux of the State's case did not rest on the time of the murder. In fact, the State presented a relatively weak theory as to the time of the murder because the State relied upon inconsistent facts to support its theory.

The post-conviction court explained that, had "trial counsel investigated the potential alibi witness, she could have undermined [the State's] theory premised upon inconsistent facts. The potential alibi witness, however, would not have undermined the crux of the State's case: that [Syed] buried the victim's body in Leakin Park at approximately 7:00 p.m. on January 13, 1999." According to the post-conviction court, "Wilds's testimony and [Syed's] cell phone records created the nexus between [Syed] and the murder. Even if trial counsel had contacted McClain to investigate the potential alibi, McClain's testimony would not have been able to sever this crucial link." The post-conviction court thus concluded that Syed "failed to establish a substantial possibility that, but for trial counsel's deficient performance, the result of the trial would have been different."

## 1. Contentions

Syed argues that trial counsel's failure to investigate McClain was prejudicial, because "McClain was a disinterested witness whose testimony would have provided Syed an alibi for the entire period when, according to the State, the murder took place." In

95

Syed's view, "[a]t the very least, there is a reasonable probability that a credible alibi witness's testimony would have 'create[d] a reasonable doubt as to [Syed's] involvement,' which is enough to demonstrate *Strickland* prejudice. *In re Parris W.*, 363 Md. [717, 729 (2001)]."

The State responds that the post-conviction court's focus on the burial of Hae's body was correct, because the "time of death was hardly a key fact of the State's case[.]" The State also contends that Syed cannot meet his burden of establishing prejudice, because the State presented overwhelming evidence of Syed's guilt. The State points to several critical aspects of its case including, but not limited to, (1) evidence of motive from Hae's break up note found in Syed's room in which the words "I'm going to kill" are written on the back; (2) Wilds's testimony; (3) forensic evidence of Syed's partial palm print on the back cover of a map book with the Leakin Park page ripped out; and (4) witness testimony from Vinson, Pusateri, and Tanna that corroborated Wilds's testimony. The State concludes that, when such evidence is considered with the cell tower evidence, Syed fails to meet his burden of proving prejudice under *Strickland*.

### 2. Analysis

At the second trial, the State set forth in its opening statement the following timeline for Hae's murder:

> **One Inez Butler [Hendricks]**, who's a teacher [at Woodlawn High School] who runs a little concession stand for the athletic department, **talks briefly to Hae Lee about 2:15, 2:20 when she's leaving school.** She picks up a soda and a bag of snacks. She's going to come back and pay for them. That's her usual practice.
> She has a cousin who she picks up after school. She's leaving to pick up that relative who's a -- I think elementary student, take that

96

person home then come back to school.

> **About 2:35, 2:36, Jay Wilds receives a call on the cell phone from the defendant saying, "Hey, come meet me at the [Best Buy]."** This is the [Best Buy] off Security Boulevard just across from Security Square Mall. When he gets there, the defendant has Hae Lee's car.

> Defendant says, "I've done it. I've done it." He pops open the trunk of the car. **Jay Wilds see[s] the body of Hae Min Lee in the trunk dead.**

(Emphasis added).

Throughout the trial, the State presented evidence to support this timeline and eventually summarized the timeline in its closing argument:

> **We know that class ended at 2:15 that day**. And remember back to [ ] Pittman's testimony. [Syed] was talking to [Hae] Lee at that point in time and Inez Butler [Hendricks] sees [Hae] as she rushes out of school, grabs her snack, and heads out the door.[40] **Ladies and gentlemen, she's dead within 20 minutes**.

> **2:36 p.m. [Syed] calls Jay Wilds, come get me at Best Buy.** Jay Wilds is at the home of [Pusateri] at this point, and the records are clear. Call no. 28 occurs in the cell area covered by L651B. This is the area that the AT&T engineer told you covers house --

> So Jay drives to the Best Buy, and it is there that [Syed], for the first time, opens his trunk and shows Jay Wilds the body of [Hae] Lee. **By 3 p.m., by 3 p.m., her family knows she hasn't picked up her cousins.**

> [Syed] gets Jay to follow him to the I-70 parking lot where they leave [Hae's] car, and they then head back towards Woodlawn from the park and ride together.

> It's at that point, at 3:32 p.m., that [Syed] calls [Tanna] in Silver Spring. She says hello to Jay. We know they are together at that point in time. That call lasts for 2 minutes and 22 seconds. Jay

---

[40] The State theorized that Syed had driven Hae's car to the Best Buy.

> Wilds doesn't know [Tanna], and [Tanna] told you this is her own private line, nobody answers that line but her, and [Syed] is the only one who knows her. This occurs in the coverage area of L651C, the pink area, which would be consistent if they were heading back towards Woodlawn from the I-70 parking lot.

(Emphasis added).

According to the post-conviction court, during the second hearing, the State for the first time "suggested a new timeline that would have allowed [Syed] to commit the murder after 2:45 p.m. and then call Wilds at 3:15 p.m. instead of 2:36 p.m., which would negate the relevance of the potential alibi." The post-conviction court rejected this suggestion, stating that "[t]he trial record is clear, however, that the State committed to the 2:25–2:45 p.m. window as the timeframe of the murder and the 2:36 p.m. call as the call from the Best Buy parking lot."

The post-conviction court went on to observe:

> The State [ ] elicited testimony during the trial that is incongruent with the State's newly adopted timeline. Wilds testified on direct examination that he called Pusateri at 3:21 p.m. to go buy some marijuana after abandoning the victim's body and her vehicle at the Interstate 70 Park & Ride. Accordingly, the State's new timeline would create a six-minute window between the 3:15 p.m. call from [Syed] and the 3:21 p.m. call to Pusateri. Within this six-minute window, Wilds had to complete a seven-minute drive to the Best Buy on Security Boulevard from Craigmount Street, where he claimed he was located when he received [Syed's] call. Wilds then had to make a stop at the Best Buy parking lot, where [Syed] showed him the body in the victim's vehicle. Then, both parties had to take another seven-minute drive to the Interstate 70 Park & Ride to abandon the victim's body and her vehicle. It would be highly unlikely that Wilds could have completed this sequence of events within a six-minute window under the State's new timeline.

The post-conviction court concluded that "[b]ased on the facts and arguments reflected in

98

the record, the [c]ourt finds that *the State committed to the 2:36 p.m. timeline and thus, the [c]ourt will not accept the newly established timeline*." (Emphasis added).

In *Strickland*, the Supreme Court stated that a court must analyze "the totality of the evidence *before the* judge or *jury*." 466 U.S. at 695 (emphasis added). Accordingly, we agree with the post-conviction court's rejection of the State's attempt to alter its timeline of the murder and will analyze the prejudice prong relating to McClain's alibi testimony based on the State's timeframe of Hae's murder: between 2:15 p.m. and 2:35 p.m. on January 13, 1999.

We disagree, however, with the post-conviction court's conclusion that, because the crux of the State's case was the burial of Hae's body in Leakin Park, there was no prejudice from the absence of McClain's testimony at trial. Syed was charged with, *inter alia*, first degree murder, and the trial court properly instructed the jury as follows: "In order to convict the Defendant of first degree murder, the State must prove that the conduct of the Defendant caused the death of the victim, Ms. [Hae] Lee, and that the killing was willful, deliberate, and premeditated." *See, e.g.*, *Willey v. State*, 328 Md. 126, 132 (1992) (approving this portion of the pattern jury instruction). The burial of Hae was not an element that the State needed to prove in order to convict Syed. Instead, the State had to establish that Syed "caused the death" of Hae, and the State's theory of when, where, and how Syed caused Hae's death was critical to proving this element of the crime.

We acknowledge that evidence of Syed's involvement in the burial of Hae's body was significant, because Syed's actions after Hae's death did create an inference that he committed her murder. Syed's involvement in the burial, in other words, was

99

circumstantial evidence of his committing the murder of Hae. *See Circumstantial Evidence*, Black's Law Dictionary (10th ed. 2014) (defining circumstantial evidence as "[e]vidence based on inference and not on personal knowledge or observation"). It, however, did not directly establish that Syed caused Hae's death sometime between 2:15 p.m. and 2:35 p.m. in the Best Buy Parking lot on January 13, 1999.

McClain's alibi testimony, on the other hand, would have been direct evidence that Syed was not at the Best Buy parking lot between 2:15 p.m. and 2:35 p.m. *See Direct Evidence*, Black's Law Dictionary (10th ed. 2014) (defining direct evidence as "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption"). McClain's testimony at the second hearing demonstrated that she was a disinterested witness who would have testified about seeing Syed (1) at a specific location, the Woodlawn Public Library, (2) on a specific date, January 13, 1999, and (3) during a specific time frame, at about 2:20 p.m. for 15–20 minutes. Hence, if believed by a trier of fact, McClain's testimony would have "'tend[ed] to prove that it was impossible or highly improbable that [the defendant] was at the scene of the crime when it was alleged to have occurred.'" *McLennan v. State*, 418 Md. 335, 352 (2011) (second alteration in original) (quoting *Ferguson v. State*, 488 P.2d 1032, 1039 (Alaska 1971)).

McClain's alibi testimony, however, cannot be viewed in isolation. *Strickland*, 466 U.S. at 695. We must look to the totality of the evidence presented to the jury to determine whether McClain's testimony would "have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture," or whether her testimony would "have had an isolated, trivial effect." *Id.* at 695-96.

As indicated in the Background Section of this opinion, the State presented a strong circumstantial case. After six weeks of trial, the jury took only three hours to convict Syed of all charges, and on direct appeal, Syed made no claim of insufficiency of the evidence as to any of his convictions. But as with many criminal cases of a circumstantial nature, it had its flaws. With little forensic evidence, the case was largely dependent on witness testimony of events before and after Hae's death. Testimony of these witnesses often conflicted with the State's corroborating evidence, i.e., the cell phone records and the cell tower location testimony by its expert, Waranowitz. The State's key witness, Wilds, also was problematic; something the State readily admitted during its opening statement.[41] Wilds had given three different statements to police about the events surrounding Hae's death.

---

[41] In its opening statement, the State made the following remarks:

> You're going to hear how on the evening of the 12th of January, the defendant called Jay Wilds.
>
> Now, Jay Wilds was a high school student at Woodlawn, too. But he's not among the bright and gifted. He lives in that area. He lives with his mother, who's very poor. He's had to work most of his own life.
>
> And remember when you hear about Jay Wilds and you hear him, remember this is the person the defendant seated here, [chose] to use to put into effect his murder of his girlfriend.
>
> The State has to take -- take its witnesses where it finds them. We don't get to pick and choose. We can't go down and ask Bea Ga[ddy] to come in and testify for us because we need a good witness. We have to take the ones that the defendants leave us.

The State's case was weakest when it came to the time it theorized that Syed killed Hae.[42] As the post-conviction court highlighted in its opinion, Wilds's own testimony conflicted with the State's timeline of the murder.[43] Moreover, there was no video surveillance outside the Best Buy parking lot placing Hae and Syed together at the Best Buy parking lot during the afternoon of the murder; no eyewitness testimony placing Syed and Hae together leaving school or at the Best Buy parking lot; no eyewitness testimony, video surveillance, or confession of the actual murder; no forensic evidence linking Syed to the act of strangling Hae or putting Hae's body in the trunk of her car; and no records from the Best Buy payphone documenting a phone call to Syed's cell phone. In short, at trial the State adduced no direct evidence of the exact time that Hae was killed, the location where she was killed, the acts of the killer immediately before and after Hae was strangled, and of course, the identity of the person who killed Hae.

It is our opinion that, if McClain's testimony had been presented to the jury, it would have "alter[ed] the entire evidentiary picture," because her testimony would have placed Syed at the Woodlawn Public Library at the time the State claimed that Syed murdered Hae. *See Strickland*, 466 U.S. at 696. Such testimony would have directly contradicted the State's theory of when Syed had the opportunity and did murder Hae. The State even implicitly conceded the strength of McClain's testimony and its potential impact on the

_____

[42] The post-conviction court opined that "the State presented a relatively weak theory as to the time of the murder[.]"

[43] The post-conviction court cited to Wilds's testimony on cross-examination, wherein Wilds testified to receiving Syed's call to come and get him at Best Buy sometime after 3:45 p.m.

jury when it attempted to present a new timeline for the murder at the second hearing. The post-conviction court aptly noted that the new timeline "would [have] negate[d] the relevance of the potential alibi." The State's attempt to change the time of the murder further solidifies our own conclusion that "the jury was deprived of the [opportunity] to hear testimony that could have supplied [ ] 'reasonable doubt'" in at least one juror's mind leading to a different outcome: a hung jury. *Avery*, 548 F.3d at 439; *see Strickland*, 466 U.S. at 695 ("When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."). Accordingly, in considering the totality of the evidence at Syed's trial with the potential impact of McClain's alibi testimony, this Court holds that there is a reasonable probability that, but for trial counsel's deficient performance, the result of Syed's trial would have been different. *See Strickland*, 466 U.S. at 694. Thus Syed has satisfied the prejudice prong of *Strickland*.[44]

---

[44] In the State's Conditional Application for Limited Remand, it requested that this Court allow the State to supplement the record with two witnesses who claimed that McClain did not see Syed at the Woodlawn Public Library on January 13, 1999. Because the State is asking that the post-conviction record be supplemented with testimony or affidavits of these State witnesses, the State, like Syed, would be required to file a motion to reopen the post-conviction proceeding pursuant to CP § 7-104. The State, however, is precluded from doing so by the opinion of the Court of Appeals in *Alston v. State*, 425 Md. 326 (2012). The *Alston* Court stated:

> When a final judgment in a post[-]conviction case is adverse to the State, the **only remedy granted to the State in the Post[-]conviction Procedure Act** is to "apply to the Court of Special Appeals for leave to appeal the order."

\* \* \*

*D. Conclusion*

As previously stated, to establish an ineffective assistance of counsel claim under *Strickland*, the defendant must prove that (1) "counsel's performance was deficient[,]" and (2) "the deficient performance prejudiced the defense." 466 U.S. at 687. In the case *sub judice*, trial counsel rendered deficient performance when she failed to conduct any investigation of McClain as a potential alibi witness. McClain appeared to be a disinterested witness, and her testimony would have placed Syed at a location other than the scene of the crime at the exact time that the State claimed that Syed murdered Hae. McClain's testimony, if believed by the trier of fact, would have made it impossible for Syed to have murdered Hae. Trial counsel's deficient performance prejudiced Syed's defense, because, but for trial counsel's failure to investigate, there is a reasonable probability that McClain's alibi testimony would have raised a reasonable doubt in the mind of at least one juror about Syed's involvement in Hae's murder, and thus "the result of the proceedings would have been different." *Id.* at 694. Because Syed has proven both the performance and prejudice prongs of the *Strickland* test, we conclude that his claim of ineffective assistance of counsel has been established. Accordingly, Syed's murder

---

There is no support in the language of the Post[-]conviction Procedure Act, in the history of the Act, or in any of this Court's opinions, for the . . . position that the State could reopen a proceeding under [CP] § 7-104. **It is clear that the reopening provision is solely for the benefit of a "convicted person."**

*Id.* at 332, 338 (emphasis added) (internal citations omitted). Accordingly, we deny the State's request for a limited remand. We note, however, that if the State does re-prosecute Syed, the State will have the opportunity to present these witnesses at the new trial.

conviction must be vacated, and because Syed's convictions for kidnapping, robbery, and false imprisonment are predicated on his commission of Hae's murder, these convictions must be vacated as well. The instant case will be remanded for a new trial on all charges against Syed.[45]

> **JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; CASE REMANDED TO THAT COURT FOR NEW TRIAL ON ALL CHARGES; COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**

---

[45] In analyzing the prejudice prong of the *Strickland* test, a court is confined to the evidence presented at the defendant's trial. 466 U.S. at 695. Here, the potential impact of McClain's alibi testimony was measured against the timeline for the murder adopted by the State at Syed's trial. By our opinion, we do not and cannot suggest that the State is bound to that timeline in the event that the State decides to re-prosecute and a new trial commences on remand. A new trial on remand is a blank slate, and the State is free to adduce any evidence or adopt any theory that it believes supports the charges against Syed. *See Tichnell v. State*, 297 Md. 432, 440 (1983) ("With some exceptions, the defendant who successfully challenges his conviction may be retried, under the rationale that the defendant wiped the slate clean and the parties may start anew." (internal quotation marks and citation omitted)); *see also Hammersla v. State*, 184 Md. App. 295, 313 (2009) ("The reversal of appellant's conviction, with an order for a new trial, 'wiped the slate clean,' and the case began anew procedurally.").

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

———————————————————
CONSOLIDATED CASES
———————————————————

No. 2519
September Term, 2013

ADNAN SYED
v.
STATE OF MARYLAND

———————————————————————

No. 1396
September Term, 2016

STATE OF MARYLAND
v.
ADNAN SYED

———————————————————————

Woodward, C.J.,
Wright,
Graeff,

JJ.

———————————————————————

Dissenting Opinion by Graeff, J.

———————————————————————

Filed: March 29, 2018

I respectfully dissent. Although I agree with the majority opinion on the first four questions presented, I disagree with the majority's decision on the last issue, whether Syed received ineffective assistance of counsel due to defense counsel's failure to contact Asia McClain, an alleged alibi witness. After a review of the record, I conclude that Syed failed to meet his burden of showing that he received ineffective assistance of counsel in this regard.

In *Strickland v. Washington*, 466 U.S. 668, 686 (1984), the United States Supreme Court stated that the "benchmark" for judging a claim of ineffective assistance of counsel is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." To prevail on a claim of ineffective assistance of counsel, a defendant must satisfy a two-prong test: "First, the defendant must show that counsel's performance was deficient." *Id.* at 687. Second, the defendant must show that counsel's deficient performance prejudiced the defense, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The defendant must make both showings. *Id.* at 687. If he or she fails to show either prong, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Id.*

The Supreme Court has made clear that "'[s]urmounting *Strickland*'s high bar is never an easy task.'" *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Padilla v. Kentucky,* 559 U.S. 356, 371 (2010)). The *Strickland* test "must be applied with scrupulous

care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve." *Id.* (quoting *Strickland,* 466 U.S. at 689–690).

Although the performance and prejudice prong can be addressed in either order, I will address first the performance prong. To show that counsel's performance was deficient, the defendant must show that "counsel's representations fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The performance prong "is satisfied only where, given the facts known at the time, counsel's 'choice was so patently unreasonable that no competent attorney would have made it.'" *State v. Borchardt*, 396 Md. 586, 623 (2007) (quoting *Knight v. Spencer*, 447 F.3d 6, 15 (1st Cir. 2006)). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690).

In reviewing such a claim, the lens through which we view it is critical. We must begin our analysis with the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, and that counsel "made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690. Courts apply a highly deferential standard "to avoid the *post hoc* second-guessing of decisions simply because they proved unsuccessful." *Evans v. State*, 396 Md. 256, 274 (2006).

It is the defendant's burden to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)). The

defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.

Here, Syed contends that his trial counsel rendered deficient performance because she failed to contact Ms. McClain after becoming aware that Ms. McClain "would have testified that Syed was in the Woodlawn Public Library at the time of the murder." The post-conviction court rejected this claim in its first opinion, finding "several reasonable strategic grounds for trial counsel's decision to forego pursuing Ms. McClain as an alibi witness." First, the court found that the letters Ms. McClain sent to Syed did "not clearly show Ms. McClain's potential to provide a reliable alibi" for Syed, noting that the only indication of her potential as an alibi witness was her offer to "'account for some of [Syed's] un-witnessed, unaccountable lost time (2:15-8:00; Jan 13th).'" And the court concluded that "trial counsel could have reasonably concluded that Ms. McClain was offering to lie in order to help [Syed] avoid conviction." Second, the court stated that the information from Ms. McClain, that Syed was at the public library, contradicted Syed's "own stated alibi that he remained on the school campus from 2:15 p.m. to 3:30 p.m." It found that, "[b]ased on this inconsistency, trial counsel had adequate reason to believe that pursuing Ms. McClain as a potential alibi witness would not have been helpful to [Syed's] defense and may have, in fact, harmed the defense's ultimate theory of the case." Accordingly, the court determined that counsel's failure to investigate Ms. McClain as a potential alibi witness was "the result of a sound and reasonable trial strategy."

3

In its second opinion, the court reversed itself, based on "the expanded record and the legal arguments presented."[1] With respect to the State's argument that counsel made a strategic decision not to investigate Ms. McClain because there was evidence suggesting it was a false alibi, the court stated that, although the State presented "a compelling theory," its argument would "invite the [c]ourt to entertain speculations about strategic decisions that counsel made," and the court would not "indulge in such hindsight sophistry." The court found that, because trial counsel knew about the potential alibi witness approximately five months before trial, she had "ample time and opportunity to investigate the potential alibi," and "[u]nder these circumstances," counsel's "failure to contact and investigate McClain as a potential alibi witness fell below the standard of reasonable professional judgment."

The post-conviction court based its ruling on its factual finding that defense counsel was aware that Ms. McClain was a potential alibi witness and did not contact her, ruling that, based on these circumstances, counsel's performance was deficient. Counsel for Syed similarly stated at oral argument that, any time a defendant advises counsel of a potential alibi witness, counsel *must* contact that witness and pursue that potential alibi defense. The majority likewise asserts that, once trial counsel learned about Ms. McClain as a potential alibi witness, she "had the duty to . . . make some effort to contact McClain."

---

[1] The expanded record at the second post-conviction hearing included the testimony of David B. Irwin, who was admitted as an expert in criminal practice, that "to meet the minimal objective standard of reasonable defense care," trial counsel "had to go talk to Asia McClain."

I disagree. There may be good reasons for a reasonable attorney not to contact a potential alibi witness. For example, if the defense is that the defendant was in Maryland during the time a crime was committed in Virginia, defense counsel reasonably could conclude that there was no need to contact or follow up on a potential witness who said that he or she saw the defendant in California at the time of the crime.

Indeed, the Supreme Court has rejected a bright line rule with respect to ineffective assistance of counsel claims. It explained in *Strickland*:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. . . . **[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.** In any effectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

466 U.S. at 690-91 (emphasis added). Thus, counsel's "duty" may be satisfied by making a reasonable decision, based on all the circumstances, that it is not necessary to interview an alibi witness.

In determining whether counsel's failure to investigate is reasonable, a court must engage in "a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time,'" eliminating "'the distorting effects of hindsight.'" *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (quoting *Strickland*, 466 U.S. at 689). The information available to counsel is important, particularly statements and information given by the defendant:

5

[W]hen the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

*Strickland*, 466 U.S. at 691. *Accord Espinal v. Bennett*, 588 F. Supp. 2d 388, 399 (E.D.N.Y. 2008) ("A reasonable decision to forego investigation may be based on a reasoned judgment that such investigation would be fruitless, wasteful, or even counterproductive.").[2]

Several courts have held that a failure to investigate a potential alibi did not constitute ineffective assistance of counsel when counsel's decision to forgo investigation was reasonably based in trial strategy. In *Broadnax v. State*, 130 So.3d 1232, 1236 (Ala. Crim. App. 2013), the defendant was convicted of murdering his wife and her grandson. The State's evidence indicated that Broadnax, who had a prior conviction for murder, resided at a work release center and worked at Welborn Forest Products, both in Alexander City, Alabama. *Id.* at 1237. The State's theory was that, between 6:30 p.m. and 10:30 p.m., Broadnax killed his wife after she visited him at Welborn, put her body in the trunk of her car, drove the car to Birmingham, which was approximately one and one-half hours from Welborn, killed his wife's grandson, and found someone to drive him back to

---

[2] The court in *Espinal v. Bennett*, 588 F. Supp. 2d 388, 399 (E.D.N.Y. 2008), went on to state that "a failure to conduct reasonable investigation into possible alibi evidence, in the absence of such a reasonable explanation, falls below the standard of effective representation required by *Strickland*." As explained in more detail, *infra*, the cases cited by Syed and the majority fall into this category.

6

Welborn, where witnesses saw him around 10:30 p.m. *Id.* at 1238-39. The defense theory of the case was that the defendant was at Welborn all day and evening, "as Broadnax had said in his statements to police – and that the State's evidence was insufficient to prove that Broadnax had committed the murders." *Id.* at 1239.

After he was convicted of murder, Broadnax sought post-conviction relief, claiming that his trial attorneys were "ineffective for not adequately investigating and presenting" the alibi that he was at the work-release facility at 9 p.m. on the night of the murders. *Id.* at 1246. He argued that "a proper and adequate investigation would have resulted in the discovery of witnesses" who saw him at the facility at "'a time which would have made it impossible for him to have committed' the murders."[3] *Id.* at 1249.

The Alabama court rejected Broadnax's claim that counsel's performance was deficient, for several reasons. Initially, the court found that, "by failing to question his [trial] attorneys about this specific claim, [Broadnax] failed to overcome the presumption that counsel acted reasonably." *Id.* at 1256. The court stated: "It is extremely difficult, if not impossible, to prove a claim of ineffective assistance of counsel without questioning counsel about the specific claim, especially when the claim is based on specific actions, or inactions, of counsel that occurred outside the record." *Id.* at 1255. This is because "'[c]ounsel's competence . . . is presumed, and the [petitioner] must rebut this presumption

---

[3] In support of this argument, Broadnax identified five individuals who supported his alibi that he was at the work release facility, rather than at Welborn, and "[a]ll five witnesses stated that they had never been contacted by defense counsel or by a defense investigator." *Broadnax v. State*, 130 So.3d 1232, 1250-51 (Ala. Crim. App. 2013).

by *proving* that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy.'" *Id.* (quoting *Chandler v. U.S.*, 218 F.3d 1305, 1314 n. 15 (11th Cir. 2000)). The court stated: "'If the record is silent as to the reasoning behind counsel's actions, the presumption of effectiveness is sufficient to deny relief on [an] ineffective assistance of counsel claim.'" *Id.* at 1256 (quoting *Dunaway v. State*, 198 So.3d 530, 547 (Ala. Crim. App. 2009)).[4]

The court further held that Broadnax failed to overcome the presumption of effectiveness and prove that his counsel's performance was deficient. *Id.* at 1256. In that regard, the court noted that Broadnax's claim was based on an alibi that was inconsistent with what Broadnax told the police and his attorneys, i.e., that he was at Welborn, not the work release facility, until about 10:45 p.m. the night of the murder. *Id.* at 1249. Noting that the State had other evidence that Broadnax lied to the police,[5] the court stated: "[W]e cannot say that any decision to forgo attempting to further impugn the client's credibility by presenting additional evidence of Broadnax's lying to the police was unreasonable." *Id.* at 1258.

---

[4] In *Broadnax*, 130 So.3d at 1255, the defendant failed to call trial counsel at the post-conviction hearing. Here, trial counsel was unavailable to testify because she passed away prior to the post-conviction hearing. That distinction, however, does not change the legal analysis. *See Walker v. State*, 194 So.3d 253, 297 (Ala. Crim. App. 2015) ("the death of an attorney did not relieve postconviction counsel of satisfying the *Strickland* test when raising a claim of ineffective assistance of counsel.").

[5] Broadnax told the police that he called his brother from Welborn at approximately 9:00 p.m., but telephone records indicated that no such call was made. *Broadnax*, 130 So.3d at 1239. Broadnax also told the police that a bloody uniform belonging to him had been stolen, but no report of a stolen uniform had been made. *Id.*

Although *Broadnax* did not involve a failure to investigate an alibi witness identified by the defendant prior to trial, it does illustrate the principle that a decision not to investigate a certain defense does not constitute ineffective assistance of counsel if it is reasonably based in trial strategy. Two other cases, however, reach the same conclusion in the circumstance where the potential alibi witness was identified by the defendant.

In *Commonwealth v. Rainey*, 928 A.2d 215, 233 (Pa. 2007), Rainey argued that he was denied effective assistance of counsel because he made counsel aware of five alibi witnesses, who would have testified that the defendant was at their house on the night of the murder and did not leave, but counsel failed to reasonably "investigate, develop, and present" these witnesses. Trial counsel testified that, although Rainey had "mentioned the possibility of presenting alibi witnesses, 'he had never in my discussions persuaded me that he had witnesses, reliable witnesses to alibi.'" *Id.* The Supreme Court of Pennsylvania, in rejecting Rainey's claim, stated that, "[t]o show ineffectiveness for not presenting alibi evidence, [Rainey] must establish that counsel could have no reasonable basis for his act or omission," but in that case, a reasonable basis for not presenting this purported alibi evidence was "readily apparent from the record." *Id.* at 234.

The record showed that Rainey, who was charged with murder during a robbery, had told the police that he was present during the robbery, but his co-defendant shot the victim. *Id.* at 221. The defense theory was to concede Rainey's involvement in the crime but argue that the facts did not support first-degree murder. *Id.* The court held that, because pursuing Rainey's purported alibi evidence would have contradicted the defense strategy

9

and opened the door to the State admitting into evidence Rainey's statement to the police, counsel was not ineffective for failing to present the witnesses. *Id.* at 234.[6]

In *Weeks v. Senkowski*, 275 F. Supp. 2d 331, 341 (E.D.N.Y. 2003), Weeks alleged that he provided trial counsel with alibi witnesses who would testify that he was drinking with them on the day of the murder. Weeks asserted that he was denied the effective assistance of counsel because trial counsel refused to interview these witnesses. *Id.* at 340. The court rejected this argument, finding that this was a "sound strategic choice," not "ineffective assistance of counsel," where the witnesses had been "convicted of having participated in the same murders for which [Weeks] was being tried." *Id.* at 341.

These cases illustrate that counsel does not, contrary to Syed's argument, have an absolute duty to interview a witness identified as an alibi witness. Rather, the "duty" is "to make reasonable investigations *or* to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691 (emphasis added).

Thus, the finding by the post-conviction court that defense counsel did not contact Ms. McClain is only the first step in the inquiry. It is not the end of the inquiry.

The ultimate inquiry is whether defense counsel made a reasonable decision that interviewing Ms. McClain was not necessary. And more specifically, the question is whether Syed has met his burden to overcome the presumption that counsel's decision was based on reasonable trial strategy. *See Coleman v. State*, 434 Md. 320, 335 (2013)

---

[6] Although the court focused on the failure to present witnesses, the claim was the failure "to investigate and present" the alibi witnesses. *Commonwealth v. Rainey*, 928 A.2d 215, 233 (Pa. 2007).

("'Reviewing courts must thus assume, **until proven otherwise**, that counsel's conduct fell within a broad range of reasonable professional judgment, and that counsel's conduct derived not from error but from trial strategy.'") (quoting *Mosley v. State*, 379 Md. 548, 558 (2003) (emphasis added)).[7]

In addressing whether trial counsel made a reasonable decision not to contact Ms. McClain, the decision in *Weaver v. State*, 114 P.3d 1039 (Mont. 2005) is instructive. In that case, the Supreme Court of Montana stated: "'A claim of failure to interview a witness may sound impressive in the abstract, but it cannot establish ineffective assistance when the person's account is otherwise fairly known to defense counsel.'" *Id.* at 1043 (quoting *State v. Thomas*, 946 P.2d 140, 144 (Mont. 1997)). The court held that, where counsel knew the substance of the testimony that could be elicited from the potential witnesses identified by Weaver, counsel made a "reasonable decision" that it was not necessary to investigate those witnesses, and therefore, Weaver failed to prove that counsel's decision not to investigate fell below an objective standard of reasonableness. *Id.* at 1044.

Here, the evidence that trial counsel failed to obtain by not contacting Ms. McClain, as presented in Ms. McClain's post-conviction testimony, was that Ms. McClain had a 15-

---

[7] Syed, in his petition for post-conviction relief claiming ineffective assistance of counsel regarding the McClain alibi, relied on nothing more than the fact that defense counsel did not contact Ms. McClain, stating summarily that "[t]here is no possible strategic reason why a defense attorney would not even investigate a possible witness." Similarly, on appeal, Syed relies on "the basic fact that trial counsel knew of but failed to pursue a potential alibi witness," stating: "That should be the end of the deficiency inquiry." That counsel failed to contact Ms. McClain, however, is not sufficient to satisfy Syed's burden to overcome the presumption that counsel's decision not to interview Ms. McClain was a reasonable one, based on trial strategy.

20 minute conversation with Syed at the public library on the day of the murder, starting at "[s]hortly after 2:15" p.m.[8] Syed asserts that counsel unreasonably failed to contact Ms. McClain because her testimony provided an alibi for the time the State alleged that the murder occurred, i.e., between 2:15 p.m., when school let out, and 2:36 p.m., when the State alleged that Syed called Jay Wilds to pick him up at the Best Buy parking lot.

The record here reflects that, as in *Weaver*, trial counsel knew the gist of Ms. McClain's alibi. Trial counsel's file contained notes from her law clerk regarding an interview with Syed on July 13, 1999, indicating that Syed said that Ms. McClain "saw him in the library @ 3:00" and her "boyfriend saw him too." Trial counsel also noted in her file that "[McClain] + boyfriend saw [Syed] in library 2:15-3:15." Because counsel knew the gist of what Ms. McClain would say if counsel contacted her, the reviewing court must presume that she made a "reasonable decision," based on trial strategy, that it was not necessary to investigate this potential alibi.

The State has suggested several possible reasons why the decision not to contact Ms. McClain was a reasonable one, reasons suggesting that the substance of Ms. McClain's testimony would not be particularly helpful, and might be harmful, to the trial strategy counsel was pursuing. The post-conviction court, in its second opinion, rejected this argument, indicating that the reasons were speculative.

---

[8] Ms. McClain's testimony, that she spoke with Syed for 15-20 minutes, beginning shortly after 2:15 p.m., is similar to, but slightly different from, her January 13, 2015, affidavit, in which she stated that she saw Syed enter the library "around 2:30 p.m.," and Syed was still there when she left the library "around 2:40" p.m.

The majority similarly states that courts should not "'conjure up tactical decisions an attorney could have made, *but plainly did not*.'" (quoting *Griffin*, 970 F.2d at 1358). In *Griffin*, however, defense counsel testified that he did not interview the alibi witness because it was his impression that the case was "going to be pleaded." *Id.* at 1357. It was in that context that the court declined to consider other tactical decisions that the attorney "could have made, but plainly did not." *Id.* at 1358.

The Supreme Court has stated that, in applying "the strong presumption of competence that *Strickland* mandates," the court must "affirmatively entertain the range of possible reasons" trial counsel may have had for proceeding as he or she did. *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011). Here, a review of the record as a whole indicates possible reasons why trial counsel reasonably could have concluded that pursuing Ms. McClain's purported alibi, which was known to trial counsel, could have been more harmful than helpful to Syed's defense.

Trial counsel clearly prepared for an alibi defense. She provided the following alibi notice to the State:

> At the conclusion of the school day, the defendant remained at the high school until the beginning of his track practice. After track practice, Adnan Syed went home and remained there until attending services at his mosque that evening. These witnesses will testify . . . as to the defendant's regular attendance at school, track practice, and the Mosque, and that his absence on January 13, 1999 would have been missed.

This alibi was consistent with what Syed told Detective Joshua O'Shea on January 25, 1999, i.e., that on the day of the murder he was in class with the victim until 2:15 p.m., but "[h]e did not see her after school because he had gone to track practice."

13

The State, however, had strong evidence supporting Jay Wilds' testimony regarding what occurred the evening of January 13, 1999, which, according to his testimony, was when he and Syed buried the victim's body. Trial counsel's strategy, based on her opening statement, closing argument, and examination of witnesses, appears to have included, in addition to eliciting evidence consistent with the alibi notice: (1) attacking the credibility of Jay Wilds; (2) arguing that, although there were phone records supporting that Syed's phone was in locations consistent with Wilds' testimony, there was no evidence that Syed was in possession of his phone during that time; (3) noting that the State did not produce any evidence of the time the victim was murdered, and one witness stated that she saw the victim at 3:00 p.m. on the date of the murder; (4) presenting Syed, a young man from a good family, who was a gifted student and athlete, well-liked, well-mannered, and cooperative with the police, as a person of good character who would not commit murder; (5) minimizing the inconsistency in Syed's statements regarding whether the victim had agreed to give him a ride after school; and (6) suggesting that, once the police arrested Syed, they "disregarded anything else," including more likely culprits, such as Wilds and the person who found the victim's body.

Trial counsel did convey, consistent with the alibi notice, that Syed typically went to track practice after school, and then to mosque.[9] Counsel's focus, however, took the

---

[9] For example, trial counsel established during cross-examination of Detective O'Shea that the information that Syed gave, that after class with the victim he went to track practice, was consistent with what Detective O'Shea was able to confirm from other sources. Counsel established during examination of other witnesses that Syed was a regular attendee at track practice. Counsel also elicited testimony that Syed regularly attended mosque in the evening during Ramadan, the holy month from December 20, 1998,

14

long view, trying to cast doubt on the whole of the State's case. The circuit court similarly assessed the strength of the State's case, finding that the State "presented a relatively weak theory as to the time of the murder," and Ms. McClain "would not have undermined the crux of the State's case[,] that [Syed] buried the victim's body" with Wilds, which "created the nexus between [Syed] and the murder." Although the majority disagrees with this determination, it is hard to argue that trial counsel, adopting a strategy based on the view that it was not necessary to contact Ms. McClain, was "so patently unreasonable that no competent attorney" would take a similar view. *Borchardt*, 396 Md. at 623 (quoting *Knight*, 447 F.3d at 15).

Ms. McClain's testimony, although addressing the time immediately after school, did nothing to dispute the voluminous evidence connecting Syed to the burial of the body. And trial counsel's strategy with respect to the actual murder, based on her cross-examination of the medical examiner and her closing argument, was that there was no evidence regarding the victim's time of death. Although the State argued that the murder occurred by 2:36 p.m., when it alleged Syed called Wilds to request a ride from Best Buy, trial counsel argued that the medical examiner could not confirm this time of death, and Deborah Warren indicated that she had seen the victim at 3:00 p.m. the day of the murder.

---

through January 18, 1999, and Syed's father testified that he went to mosque with Syed on January 13, 1999, for prayers beginning at 8:00 p.m. During opening statement and closing argument, counsel stated that Syed consistently told people that he went to track practice after school, and in closing argument, counsel further argued that, during Ramadan, Syed was always at mosque.

The record supports the post-conviction court's conclusion that the State had limited evidence pinpointing the time of the murder. Indeed, as the post-conviction court noted, Jay Wilds' testimony, that Syed did not call Wilds to pick him up until after 3:45 p.m., was inconsistent with the State's argument that Syed called Wilds at 2:36 p.m.

The State did, however, present significant evidence connecting Syed to the burial of the victim's body, which implicated Syed in the murder. Under all the circumstances, counsel reasonably could have determined that contacting Ms. McClain to pursue her potential alibi, and focusing too much on Syed's whereabouts right after school, would not be particularly helpful, given the context of the State's entire case, especially when weighed against the potential pitfalls presented by pursuing Ms. McClain's testimony.

As indicated, Syed initially told the police that he had gone to track practice after school. He never mentioned going to the public library after school. Although, as the post-conviction court noted, there was evidence that the high school and the public library were in close proximity, that does not take away from the fact that Syed never mentioned going to the public library. The State already had one inconsistency in Syed's statement to the police, which the prosecutor highlighted for the jury. Syed initially told Officer Scott Adcock that he saw the victim at school and that she was going to give him a ride home, but "he got detained and felt that she probably got tired of waiting for him and left." Syed subsequently contradicted himself, telling Detective O'Shea that he drove his own vehicle to school "so he wouldn't have needed a ride from [the victim]."[10]

---

[10] The State argued in closing that the jury could consider Syed's actions in assessing his guilt. The prosecutor then noted that Syed told a classmate that the victim was giving

16

Defense counsel reasonably could have concluded that Ms. McClain's testimony that she saw Syed at the public library after school, when Syed never before had mentioned the public library, could be harmful because it would give the State another inconsistency or omission in Syed's statements to the police. Evidence of inconsistencies in two aspects of Syed's story to the police, whether he had asked the victim for a ride and where he was after school, was detrimental to the strenuous defense that Syed was a good person with nothing to hide.

Documents in the record further indicate potential cause for concern regarding the trustworthiness of Ms. McClain's alibi, and therefore, the reasonableness of counsel's decision not to contact Ms. McClain or pursue her alibi. The first letter Ms. McClain sent to Syed on March 1, 1999, stated that she hoped Syed was not guilty, and "[i]f so I will try my best to help you account for some of your unwitnessed, unaccountable lost time (2:15-8:00; Jan 13th.)." The letter further stated: "*If* you were in the library for awhile, tell the police and I'll continue to tell what I know even louder than I am." (Emphasis added). In its first post-conviction opinion, the circuit court found that, based on this language, "trial counsel could have reasonably concluded that Ms. McClain was offering to lie in order to help [Syed] avoid conviction."

Moreover, at the second post-conviction hearing, the State introduced into evidence trial counsel's file, as well as police records to which trial counsel had access. Included in

him a ride to get his car, which he also told Office Adcock, but Syed later "changed his story," telling Detective O'Shea that he had his own car and did not need a ride, so Officer Adcock "must have been incorrect."

17

those records were detective notes indicating that Syed had called and written to someone from school. The notes reflect that Syed:

> WROTE A LETER TO A GIRL TO
> TYPE UP WITH HIS ADDRESS ON IT
> BUT SHE GOT IT WRONG
>      101 EAST EAGER STREET
>      ASIA? 12TH GRADE
> I GOT ONE, JUSTIN AGER GOT ONE[11]

A review of the March 2nd letter shows a discrepancy between the address on the top of the letter, "301 East Eager Street" and the address referenced by Gordon: "101 EAST EAGER STREET."

To the extent that Ms. McClain's potential alibi could give the prosecution ammunition to argue that Syed and Ms. McClain were working together to falsify an alibi, it would be a reasonable decision not to contact Ms. McClain to pursue that alibi. *See Henry v. Poole*, 409 F.3d 48, 65 (2d Cir. 2005) ("[I]t is generally acknowledged that an 'attempt to create a false alibi' constitutes 'evidence of the defendant's consciousness of guilt.'") (quoting *Loliscio v. Goord*, 263 F.3d 178, 190 (2d Cir. 2001)). *See also Rogers v. Zant*, 13 F.3d 384, 387 (11th Cir. 1994) ("By its nature, 'strategy' can include a decision not to investigate . . . [and] a lawyer can make a reasonable decision that no matter what an investigation might produce, he wants to steer clear of a certain course."), *cert. denied*, 513 U.S. 899 (1994).

---

[11] In closing argument at the second post-conviction hearing, the State asserted that these notes were from a detective's interview with Ju'uan Gordon, one of Syed's best friends.

The majority states that trial counsel could not reasonably evaluate the advantages or disadvantages of Ms. McClain's alibi testimony without first contacting her. I disagree, under the facts here, where counsel knew the gist of Ms. McClain's testimony. In *Griffin v. Warden, Md. Corr. Adjustment Ctr.*, 970 F.2d 1355, 1357 (4th Cir. 1992), upon which the majority relies, defense counsel stated that he did not contact any alibi witnesses because it was his impression that the "case was going to be pleaded." It was in that context, where trial counsel "did not even talk to [the witness], let alone make some strategic decision not to call him," that the court found ineffective assistance of counsel. *Id.* at 1358. This case is not remotely analogous to the facts in that case.

Here, based on "all the circumstances, applying a heavy measure of deference to counsel's judgments," *Strickland*, 466 U.S. at 691, counsel's decision not to call Ms. McClain and pursue the public library alibi defense cannot be said to be "incompetence," *Harrington*, 562 U.S. at 105, or "'so patently unreasonable that no competent attorney would have made it,'" *Borchardt*, 396 Md. at 623 (quoting *Knight*, 447 F.3d at 15), as required to satisfy a finding of deficient performance. This is particularly the case where the post-conviction court, in its first opinion, agreed that counsel's decision was reasonable trial strategy, and in its second opinion, stated that Ms. McClain's testimony ultimately would not have been that helpful because it "would not have undermined the crux of the State's case[,] that [Syed] buried the victim's body" with Wilds, which "created the nexus between [Syed] and the murder."

This case is distinguishable from the cases relied upon by Syed and the majority, in which courts found ineffective assistance of counsel due to counsel's failure to contact a

19

witness identified by the defendant. In those cases, there was testimony by defense counsel, or other statements in the record, indicating that the reason defense counsel did not interview the witness was something other than reasonable trial strategy. *See Washington v. Smith*, 219 F.3d 620, 625, 630 (7th Cir. 2000) (defense counsel stated that he did not contact identified alibi witnesses because he did not receive the names until the first day of trial, and "at that late time," he "was busy trying the case"); *Bryant v. Scott*, 28 F.3d 1411, 1419 n.13 (5th Cir. 1994) (although making clear that the court was not holding that counsel must interview every claimed alibi witness, because it depends on the overall context of the case, the court found that counsel's failure to investigate potential alibi witness not a "strategic choice" where counsel stated that he "would have loved to have the [alibi] evidence."); *Griffin v. Warden, Md. Corr. Adjustment Ctr.*, 970 F.2d 1355, 1357 (4th Cir. 1992) (trial counsel failed to interview alibi witness, not because he thought the witness would be unhelpful or harmful, but because he thought the case was "going to be pleaded"); *Grooms v. Solem*, 923 F.2d 88, 90 (8th Cir. 1991) (where counsel was not advised of the potential alibi witness until the day of trial, the decision not to investigate, because he assumed that the court would preclude the evidence of an alibi due to the lack of an alibi notice, was deficient performance); *Montgomery v. Petersen*, 846 F.2d 407, 412 (7th Cir. 1988) (where trial counsel stated that he failed to investigate a potential alibi witness due to "inadvertence" and his disbelief of Montgomery, the failure was not a strategic decision, and therefore, counsel "did not make a reasonable decision that further investigation was unnecessary."). *See also Avery v. Prelesnik*, 548 F.3d 434, 437-38 (6th Cir. 2008) (where counsel testified that he was interested in talking with the alibi witness

20

identified by the defendant, but failed to follow up, and counsel had "no idea" what the witness would have said, counsel could not have made a strategic choice not to have the witness testify); *Lawrence v. Armontrout*, 900 F.2d 127, 130-31 (8th Cir. 1990) (counsel's admitted failure to interview potential witnesses was unreasonable where: (1) he relied on assertions of a third person that one witness could not be located and the other would not testify; and (2) the failure was based on the defense strategy to focus on the defense of misidentification, rather than alibi, but alibi witnesses "would bolster rather than detract from a defense of misidentification.").

Here, by contrast, there was no testimony by trial counsel regarding why she did not contact Ms. McClain. Although this was because counsel was deceased at the time the post-conviction hearing occurred, this did not relieve Syed of his duty to satisfy the *Strickland* test. *See Walker v. State*, 194 So.3d 253, 297 (Ala. Crim. App. 2015).

The absence of testimony by trial counsel makes it difficult for Syed to meet his burden of showing deficient performance. As the court stated in *Broadnax*, 130 So.3d at 1255, it is "extremely difficult" for a petitioner "to prove a claim of ineffective assistance of counsel without questioning counsel about the specific claim, especially when the claim is based on specific actions, or inactions, of counsel that occurred outside the record." Similarly, in *Williams v. Head*, 185 F.3d 1223, 1227-28 (11th Cir. 1999), *cert. denied*, 530 U.S. 1246 (2000), the court stated that, "where the record is incomplete or unclear about [counsel's] actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment," noting that the "district court correctly refused to 'turn that presumption on its head by giving Williams the benefit of the doubt

21

when it is unclear what [counsel] did or did not do.'" *Accord Jones v. State*, 500 S.W.3d 106, 114 (Tex. Crim. App. 2016) ("'When the record is silent on the motivations underlying counsel's tactical decisions, the appellant usually cannot overcome the strong presumption that counsel's conduct was reasonable.'") (quoting *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001)).

To be sure, there could be circumstances where the record is sufficient for the defendant to overcome the presumption that counsel acted reasonably, without questioning trial counsel. This case, however, does not present such circumstances. Syed has pointed to no evidence in the record indicating that trial counsel's decision not to interview Ms. McClain was based on anything other than reasonable trial strategy, relying instead on his blanket assertion that it is unreasonable in every case for trial counsel to fail to contact a potential alibi witness identified by the defense.[12]

Although possible reasons for counsel's decision have been discussed, we do not know if these were the reasons that counsel decided not to contact Ms. McClain. We do know, based on the record, that trial counsel presented a vigorous defense of Syed in the face of strong evidence of guilt. What we do not know is why trial counsel did not contact Ms. McClain, whether she decided not to for the reasons proffered by the State, or if there

---

[12] Syed does attempt to poke holes in the State's asserted reasons why trial counsel reasonably could have decided not to pursue Ms. McClain's purported alibi. For example, Syed argues that no witness testified in support of the State's argument that trial counsel may have believed the McClain alibi was fabricated. The State, however, does not have the burden to show why trial counsel failed to interview Ms. McClain. It is Syed's burden to overcome the presumption that she did so based on reasonable trial strategy.

were other reasons that led counsel to conclude that it was not necessary to further investigate Ms. McClain's public library alibi.[13]

Under these circumstances, Syed has failed to satisfy *Strickland*'s "high bar," *Harrington*, 526 U.S. at 105. He has failed to meet his burden to overcome the presumption that counsel's failure to contact Ms. McClain was based on reasonable trial strategy, and therefore, he has failed to meet the requirements of the performance prong of the *Strickland* test. I would reverse the judgment of the circuit court granting Syed a new trial.

---

[13] The State filed a Conditional Application for Limited Remand requesting that, if this Court granted Syed's application for leave to appeal regarding the McClain-alibi claim, it be permitted to incorporate into the record affidavits of two former classmates of Ms. McClain. The State asserted that these witnesses emailed the State after the post-conviction court granted Syed a new trial, stating that Ms. McClain's "story" about seeing Syed in the library "is a lie," and they recalled a prior conversation in class where Ms. McClain said that she believed in Syed's innocence and "would make up a lie to prove he couldn't have done it." These assertions, although not evidence in this appeal, illustrate the danger in a court finding that strategy decisions made by trial counsel were unreasonable, without any evidence regarding why those decisions were made. *See Harrington*, 562 U.S. at 105 (deferential review of trial counsel's performance is required because "[u]nlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client.").